1  Richard L. Bolton (SBN: 1012552)
2  Boardman, Suhr, Curry & Field LLP
3  P.O. Box 927
4  Madison, Wisconsin  53701-0927
5  *Pro Hac Vice*
6  Michael A. Newdow (SBN: 220444)
7  NEWDOWLAW
8  P.O. Box 233345
9  Sacramento, California  95623
10  *Attorneys for Plaintiffs*
11
12                 IN THE UNITED STATES DISTRICT COURT
13
14             FOR THE EASTERN DISTRICT OF CALIFORNIA
15
16                           CIVIL DIVISION
17
18  FREEDOM FROM RELIGION            )
19  FOUNDATION, INC.; PAUL STOREY;   )
20  BILLY FERGUSON; KAREN            )
21  BUCHANAN; JOSEPH MORROW;         )
22  ANTHONY G. ARLEN; ELISABETH      )
23  STEADMAN; CHARLES AND            )   Civil No. 2:09-CV-02894-WBS-DAD
24  COLLETTE CRANNELL; MIKE          )
25  OSBORNE; KRISTI CRAVEN;          )
26  WILLIAM M. SHOCKLEY;             )   **PLAINTIFFS' MEMORANDUM OF**
27  PAUL ELLCESSOR; JOSEPH RITTELL;  )   **POINTS AND AUTHORITIES IN**
28  WENDY CORBY; PAT KELLEY;         )   **OPPOSITION TO UNITED STATES'**
29  CAREY GOLDSTIEN; DEBORA SMITH;   )   **MOTION TO DISMISS**
30  KATHY FIELDS; RICHARD MOORE;     )
31  SUSAN ROBINSON; AND              )
32  KEN NAHIGIAN,                    )
33                                   )   Date:   May 10, 2010
34                 Plaintiffs,       )   Time:   1:00 p.m.
35                                   )   Courtroom:  5
36        v.                         )   Judge:  The Hon. William B. Shubb
37                                   )   Trial Date:  Net yet set.
38  TIMOTHY GEITHNER, in his official )   Action Filed:  October 16, 2010
39  capacity as Secretary of the United States )
40  Department of the Treasury; DOUGLAS )
41  SHULMAN, in his official capacity as )
42  Commissioner of the Internal Revenue )
43  Service; and SELVI STANISLAUS, in her )
44  official capacity as Executive Officer of )
45  the California Franchise Tax Board,  )
46                                   )
47                 Defendants.       )
48  _____  )

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES…………………………………………………… iv

I.      INTRODUCTION……………………………………………………… 1

II.     STATEMENT OF FACTS………………………………………………3

        A.      The Parties………………………………………………………3

        B.      Sections 107 And 265(a)(6) Violate The Establishment Clause…...4

        C.      California Tax Benefits To Ministers Also Violate The
                Establishment Clause……………………………………………5

        D.      Tax Breaks For Ministers Are Valuable Benefits………………..6

        E.      Section 107 Increases Government
                Entanglement With Religion……………………………………..7

        F.      Preferential Tax Breaks Favor Religion…………………………...8

        G.      Tax Preferences Favor Churches In Hiring………………………..9

III.    RELEVANT STATUTES……………………………………………10

IV.     LEGAL STANDARD…………………………………………………12

V.      THE PLAINTIFFS HAVE STANDING TO CHALLENGE
        CONGRESSIONAL TAX CODE PREFERENCES
        FAVORING RELIGION………………………………………………13

        A.      Flast v. Cohen Predicates Taxpayer Standing On
                Challenges To Congressional Action Taken Pursuant To
                Congress' Taxing And Spending Authority Which
                Allegedly Violates A Specific Constitutional Limitation…………13

        B.      Internal Revenue Code Preferences For Ministers Of The Gospel
                Provide Valuable Benefits That Are Not Neutrally Available
                To Other Taxpayers, Including The Plaintiffs……………………17

        C.      Preferential Tax Exemptions Subsidize Religion At The
                Expense Of Other Taxpayers, Including The Plaintiffs…………..24

        D.      FFRF Also Has Standing To Challenge Tax Preferences
                That Give Churches A Competitive Advantage…………………29

1

**TABLE OF CONTENTS**

2

Page

3   VI.   INTERNAL REVENUE CODE SECTION 107 VIOLATES
4       THE ESTABLISHMENT CLAUSE BECAUSE IT IS NOT
5       NEUTRAL AND PROVIDES SIGNIFICANT TAX BENEFITS
6       EXCLUSIVELY TO MINISTERS OF THE GOSPEL………..……..........33

7

8       A.    Tax Benefits That Are Not Neutrally Available
9           To A Broad Range Of Groups Or Persons Without
10         Regard To Religion Violate The Establishment Clause…………..33

11

12      B.    A Majority Of The Supreme Court Agreed On The
13         Establishment Clause Principles In Texas Monthly…....…………37

14

15      C.    Section 107(2) Provides Greater Benefits To Ministers
16         Than Section 119 Provides To Non-Clergy Taxpayers………....43

17

18      D.    Section 107(1) Also Is More Advantageous Than Section 119…...49

19

20      E.    Section 107 Is Not An Accommodation Of A Substantial
21         Government-Imposed Burden On Free Exercise Rights……........55

22

23      F.    Section 107 Increases Government
24         Entanglement With Religion………………………………………59

25

26  VII.   INTERNAL REVENUE CODE SECTION 265(a)(6) ALSO
27       PROVIDES PREFERENTIAL TAX BENEFITS TO MINISTERS
28       OF THE GOSPEL THAT ARE NOT GENERALLY AVAILABLE
29       TO OTHER TAXPAYERS……………………………………………....67

30

31  VIII.  SECTIONS 107 AND 265(a)(6) VIOLATE THE
32       ESTABLISHMENT CLAUSE UNDER THE <u>LEMON</u> TEST…………..71

33

34  CONCLUSION………………………………………………………………...77

35

36  CERTIFICATE OF SERVICE…………………………………………………78

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

Alcazar v. Corporation of the Catholic Archbishop of Seattle,
  210 U.S. App. LEXIS 5356 (9th Cir., March 16, 2010) .......................... 75
American Civil Liberties Union v. Crawford,
  2000 U.S. Dist. LEXIS 17270 (E. D. LA 2000) ...................................... 27
Arkansas Writers Project, Inc. v. Ragland,
  481 U.S. 221, 107 S. Ct. 1722, 95 L. Ed. 2d 209 (1987)............. 18, 20, 21
Arver v. United States,
  245 U.S. 366 (1918) ................................................................................ 65
Ashcroft v. Iqbal,
  129 S. Ct. 1937 (2009) ............................................................................ 12
Becker v. Federal Election Comission,
  230 F.3d 381 (1st Cir. 2000) ................................................................... 30
Bishop of Church of Jesus Christ of Latter-Day Saints
  v. Amos,
  483 U.S. 327 (1987) ..................................................................... 33, 37, 57
Byrne v. Public Funds for Public Schools of New Jersey,
  442 U.S. 907 (1979) ................................................................................ 22
Cavinass v. Horizon Community Learning Center, Inc.,
  590 F.3d 806 (9th Cir. 2010) .................................................................. 12
Clarke v. Securities Industry Association,
  479 U.S. 388 (1987) ................................................................................ 30
Colbert v. Commissioner,
  61 T.C. 449 (1974) .................................................................................. 62
Commissioner v. Kowalski,
  434 U.S. 77 (1977) ............................................................................ 46, 53
Commissioner v. Sullivan,
  356 U.S. 27 (1958) .................................................................................. 64
Committee for Public Education and Religious Liberty
  v. Nyquist,
  413 U.S. 756, 93 S. Ct. 2955, 37 L. Ed. 2d 948 (1973)   18, 19, 21, 22, 34, 37
Corporation of the Presiding Bishop of the Church of
  Jesus Christ of Latter-Day Saints v. Amos,
  43 U.S. 327 (1987) ....................................................................... 33, 37, 57
Finlator v. Powers,
  902 F.2d 1158 (CA4 1990) ............................................................... 22, 27
Flast v. Cohen,
  392 U.S. 83 (1968) .......................................................................... passim
Flowers v. United States,
  49 A.F.T.R.2d 438 (N.D. Tex. 1981) ...................................................... 64
Franchise Tax Board of California v. United Americans for
  Public Schools,
  419 U.S. 890 (1974) ................................................................................ 22
Gillette v. United States,
  401 U.S. 437 (1971) .......................................................................... 34, 65

Page

Grit v. Wolman,
    413 U.S. 901 (1973)................................................................. 22

Page

Hein v. Freedom From Religion Foundation,
    551 U.S. 587 (2007).................................................... 16, 17, 28

Hernandez v. Commissioner,
    490 U.S. 680 (1989)................................................................. 58

Hibbs v. Winn,
    542 U.S. 88 (2004)........................................................ 19, 21, 22

Hobbie v. Unemployment Appeals Commission of Florida,
    480 U.S. 136 (1987)................................................................. 65

Hunt v. McNair,
    413 U.S. 734, 93 S. Ct. 2868, 37 L. Ed. 2d 923 (1973).................... 19, 27

Hunt v. Washington Apple Advertising Commission,
    432 U.S. 333 (1977)................................................................. 29

Induni v. Commissioner of Internal Revenue,
    990 F.3d 53 (2nd Cir. 1993)................................................... 67, 69

Jimmy Swaggart Ministries v. Board of Equalization,
    493 U.S. 378 (1990)............................................................ 58, 65

Johnson v. Economic Development Corporation,
    241 F.3d 501 (6th Cir. 2001) ..................................... 26, 27, 30

Kirk v. Commissioner,
    51 T.C. 66 (1968), affd ............................................................. 35

Kosydar v. Wolman,
    353 F. Supp. 744 (SD Ohio 1972) ......................................... 22

Lemon v. Kurtzman,
    403 U.S. 602 (1971)......................................................... passim

Marks v. United States,
    430 U.S. 188 (1997)................................................................. 38

Marshall & Ilsley Corporation v. Heimann,
    652 F.2d 685 (7th Cir. 1981) ................................................... 30

Mueller v. Allen,
    463 U.S. 388, 103 S. Ct. 3062, 77 L. Ed. 2d 721 (1983)............. 18, 19, 30

Nurre v. Whitehead,
    580 F.3d 1087 (9th Cir. 2009) ................................................. 73

Parker v. Commissioner,
    365 F.2d 792 (1966).................................................................. 64

Public Funds for Public Schools of New Jersey v. Byrne,
    590 F.2d 514 (3rd Cir. 1979) ........................................... 22, 27

Regan v. Taxation with Representation of Washington,
    461 U.S. 540 (1983)................................................................. 20

Rosenberger v. Rector and Visitors of the University of Virginia,
    515 U.S. 819 (1995)................................................................. 26

Salkov v. Commissioner,
    46 T.C. 190 (1966)................................................................... 61

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss**    **V**

Page

Silverman v. Commissioner,
   1973 U.S. App. LEXIS 8851 (8th Cir. 1973), aff'd 57 T.C.
   727 (1972)..................................................................................... 61
Tenenbaum v. Commissioner,
   58 T.C. 1 (1972)............................................................................. 62
Texas Monthly v. Bullock,
   489 U.S. 1 (1989)...................................................................... passim
In Re United States Catholic Conference v. Baker,
   885 F.2d 1020 (2nd Cir. 1989)................................................... 28,30
Vanicek v. Commissioner,
   85 T.C. 731 (1985)......................................................................... 59
Walz v. Tax Commission,
   397 U.S. 664 (1970).................................................................. passim
Warren v. Commissioner of Internal Revenue,
   302 F.3d 1012 (9th Cir. 2002) .................................................. passim
Winn v. Arizona Christian School Tuition Organization,
   562 F.3d 1002 (9th Cir. 2009) .................................................. 18, 19
Zelman v. Simmons-Harris,
   536 U.S. 639 (2002)................................................................. 19, 25

**UNITED STATES CONSTITUTION**

Article I, Section 8 ................................................................. passim
Establishment Clause of First Amendment............................... passim

**FEDERAL STATUTES**

Internal Revenue Code §107.................................................... passim
Internal Revenue Code §107(1) ............................................... passim
Internal Revenue Code §107(2) ............................................... passim
Internal Revenue Code §119.................................................... passim
Internal Revenue Code §163......................................................... 8
Internal Revenue Code §164......................................................... 8
Internal Revenue Code §265(a)(1)........................................... 11, 67
Internal Revenue Code §265(a)(6)........................................... passim
Tax Injunction Act ............................................................. 21, 22, 23

**FEDERAL REGULATONS**

Treasury Reg. §1402(c)(5).......................................................... 7, 60
Treasury Reg. §1.11402(c)-5(b)(2)............................................. 7, 61
Treasury Reg. §1.1402(c)-5(b)(2)(ii)............................................... 7
Treasury Reg. §1.1402(c)-5(b)(2)(iv)............................................... 8

Page

**CALIFORNIA CONSTITUTION**

Article 1, Section 4 .................................................................................... 4, 5
Article 16, Section 5 .................................................................................. 4, 5

**CALIFORNIA STATUTES**

Section 17131.6 California Revenue Code.................................................. 5, 9
Section 17280(d)(2) California Revenue Code........................................... 5, 9

**STATE CASES**

Opinion of the Justices of the Massachusetts Supreme
    Court to the Senate,
        514 N.E.2d 353 (Mass. 1987).................................................. 26
In re Springmoor,
        498 S.E.2d 177 (N.C. 1998)..................................................... 44

**MISCELLANEOUS**

Adler, The Internal Revenue Code, The Constitution,
    and The Courts: The Use of Tax Expenditure
    Analysis in Judicial Decision-Making, 28 Wake
    Forest L. Rev. 855, 862, n. 30 (1993) ............................................ 26, 40
Chemerinsky, Erwin, The Parsonage Exemption Violates
    the Establishment Clause and Should be Declared
    Unconstitutional, 24 Whittier Law Review (2003).......................... passim
Foster, Matthew, Note: The Parsonage Allowance Exclusion:
    Past, Present and Future, 44 Vand. L. Rev. 149, 175-176
    (1991).............................................................................................. 42
O'Neill, A Constitutional Challenge to §107 of the Internal
    Revenue Code, 57 Notre Dame Law 853 (1982).................................... 45
Rakowski, The Parsonage Exclusion: New Developments,
    Tax Notes, July 15, 2002 ........................................................... 39
Sedler, Understanding the Establishment Clause: The Perspective
    of Constitutional Litigation, 43 Wayne L. Rev. 1317,
    1391-1392 (1997)................................................................... 44
Wolfman, Tax Expenditures: From Idea to Ideology, 99
    Harv. L. Rev. 491-492 (1985)................................................. 26

# I.       INTRODUCTION.

Sections 107 and 265(a)(6) of the Internal Revenue Code are Taxing and Spending measures enacted pursuant to Article I, Section 8 of the United States Constitution.  These Internal Revenue Code provisions violate the Establishment Clause because they provide preferential tax breaks to ministers of the gospel.  Church ministers can pay virtually all of their housing costs with tax-free dollars, but other taxpayers, like the plaintiffs, do not have this benefit.

Taxpayers in federal court can challenge unfair Internal Revenue Code provisions that favor religion.  The Supreme Court has consistently recognized since Flast v. Cohen, 392 U.S. 83 (1968), that taxpayers have the right to proceed in federal court to challenge Congressional Taxing and Spending measures that favor religion.  The Internal Revenue Code was enacted pursuant to Congress' Taxing and Spending authority and the preferential tax breaks of §107 and §265(a)(6) undisputedly provide a much valued benefit to churches and ministers.

Preferential tax benefits provided to religion violate the Establishment Clause. Neutrality is a *sine qua non* of the Establishment Clause, which means that tax benefits cannot be preferentially provided to religion.  The Supreme Court has refused to allow government to preferentially favor religion with tax breaks that are not generally available to other taxpayers, as recognized in Texas Monthly v. Bullock, 489 U.S. 1 (1989).

Tax-free housing for ministers is not justifiable as an accommodation of religion, nor is there any historical evidence that Congress enacted such tax breaks to abate perceived entanglement.  The Government only now offers this *post hoc* argument, which is unsupported by any evidence.

1    Sections 107 and 265(a)(6) affirmatively provide lucrative tax benefits to

2  ministers of the gospel.  These benefits are not neutrally available to other taxpayers --

3  and they do not simply accrue by default as the result of eliminating claimed burdens on

4  the free exercise of religion.  Sections 107 and 265(a)(6) provide tax breaks to ministers

5  that are not available to other taxpayers.  These tax breaks do not abate any substantial

6  burden on free exercise rights.

7    Sections 107 and 265(a)(6) create greater government entanglement with religion

8  than the "convenience of the employer" test, which is applicable to non-clergy taxpayers

9  under Internal Revenue Code §119.  In order to ensure that preferential tax benefits are

10  limited to religion, §107 and §265(a)(6) require complex determinations relating to the

11  tenets, principles and practices of those churches that provide their clergy with housing or

12  cash housing allowances.  Because the tax benefits are only available to ministers of the

13  gospel, the Internal Revenue Service must ensure that these ministers are really

14  dispensing religion -- and not something that could be done by a layman.  The Internal

15  Revenue Service, therefore, must engage in fact-intensive and instrusive inquiries to

16  ensure that the individual is in fact a "duly ordained, licensed, or commissioned" minister

17  of the gospel and that the minister is really providing religious services "in the exercise of

18  his ministery."  Sections 107 and 265(a)(6), as a result, increase government

19  entanglement with religion in order to restrict preferential tax benefits to the truly

20  religious.

21    Challenges to tax-free housing for ministers are controversial because these

22  lucrative benefits that are not available to other taxpayers.  From the perspective of

23  financial self-interest, ministers and churches are understandably concerned, but so are

24  non-clergy who are denied similar benefits.  From the perspective of the Establishment

1   Clause, preferential tax breaks for ministers violate the fundamental principle of

2   neutrality.  Tax breaks, including exemptions and deductions, must be neutral and

3   available on the basis of non-religious criteria.  That is not the case with §107 and

4   §265(a)(6).

5   **II.      STATEMENT OF FACTS.**

6           **A.      The Parties.**

7           The plaintiffs challenge provisions of the Internal Revenue Code that were

8   enacted pursuant to the power granted to Congress by Article I, Section 8 of the United

9   States Constitution.  (Complaint, ¶3.)

10          The individual plaintiffs are federal taxpayers who object to the allowance of

11  preferential tax benefits under the Internal Revenue Code, as enacted pursuant to Article

12  I, Section 8 of the United States Constitution.  (Complaint, ¶4.)  They are all members of

13  Freedom From Religion Foundation, Inc.  (Complaint, ¶¶9-28.)

14          The plaintiff, Freedom From Religion Foundation, Inc. ("FFRF"), is a non-profit

15  membership organization that advocates for the separation of church and state and

16  educates on matters of non-theism.  FFRF has more than 13,900 members, in every state

17  of the United States, including more than 2,200 members in the State of California.

18  (Complaint, ¶6.)  (FFRF's current membership is 14,486, including 2,353 members in

19  California.)

20          FFRF represents and advocates on behalf of its members throughout the United

21  States.  (Complaint, ¶7.)

22          FFRF's membership includes individuals who are federal and California taxpayers

23  residing in the Eastern District of California, and they are all opposed to government

24  endorsement of religion.  (Complaint, ¶8.)

1    The defendant Timothy Geithner is the Secretary of the United States Department

2    of the Treasury.  (Complaint, ¶29.)

3    The defendant Douglas Shulman is the Commissioner of the Internal Revenue

4    Service.  (Complaint, ¶30.)

5    The defendant Selvi Stanislaus is the Executive Officer of the California

6    Franchise Tax Board.  (Complaint, ¶31.)  The plaintiffs seek an injunction against Ms.

7    Stanislaus to prevent continuing violations of the Establishment Clause.

8    **B.    Sections 107 And 265(a)(6) Violate The Establishment Clause.**

9    The Establishment Clause of the First Amendment to the United States

10   Constitution provides that "Congress shall make no law respecting an establishment of

11   religion."  Article 1, Sec. 4 of the California Constitution contains a similarly worded

12   Establishment Clause, and Article 16, Sec. 5 of the California Constitution prohibits aid

13   in support of "any religious sect, church, creed or sectarian purpose."  (Complaint, ¶32.)

14   Sections 107 and 265(a)(6) of the Internal Revenue Code, both on their face and

15   as administered by the defendants Geithner and Shulman, violate the Establishment

16   Clause of the First Amendment because they provide tax benefits only to "ministers of

17   the gospel," rather than to a broad class of taxpayers.  (Complaint, ¶33.)

18   Sections 107 and 265(a)(6) subsidize, promote, endorse, favor, and advance

19   churches, religious organizations, and "ministers of the gospel," and they discriminate

20   against secular organizations, including nonprofit organizations such as FFRF that

21   promote atheism, humanism, secularism, and other non-religious worldviews, as well as

22   their employees and members.  (Complaint, ¶34.)

23   In order to administer and apply §§107 and 265(a)(6), the IRS and the Treasury

24   must make sensitive, fact-intensive, intrusive, and subjective determinations dependent

1   on religious criteria and inquiries, such as whether certain activities constitute "religious

2   worship" or "sacerdotal functions;" whether a member of the clergy is "duly ordained,

3   commissioned, or licensed," or whether a Christian college or other organization is

4   "under the authority of" a church or denomination.  (Complaint, ¶35.)  (See also Bolton

5   Aff., Exhibits 12-15.)

6         Sections 107 and 265(a)(6) are not permissible "accommodations" of religion

7   under the Establishment Clause because the income taxation of ministers of the gospel

8   under the general rules that apply to other individuals would not interfere with the

9   religious mission of churches or other organizations or the ministers themselves.

10   (Complaint, ¶36.)

11       **C.**    **California Tax Benefits To Ministers**
12             **Also Violate The Establishment Clause.**
13

14         Sections 17131.6 and 17280(d)(2) of the California Revenue and Taxation Code,

15   both on their face and as administered by the California Franchise Tax Board, under the

16   direction of the defendant Selvi Stanislaus, also violate the Establishment Clause of the

17   First Amendment to the United States Constitution and the Establishment Clause of

18   Article 1, Sec. 4, of the California Constitution, as well as Article 16, Sec. 5 of the

19   California Constitution.  (Complaint, ¶37.)

20         Sections 17131.6 and 17280(d)(2) of the California Revenue and Taxation Code

21   correspond to §§107 and 265(a)(6) of the Internal Revenue Code, and they have the same

22   constitutional defects and infirmities under the Establishment Clauses of the California

23   and United States Constitutions.  (Complaint, ¶38.)

24         The defendant Stanislaus, in her official capacity as the Executive Officer of the

25   California Franchise Tax Board, is responsible for administering and implementing

26   Sections 17131.6 and 17280(d)(2).  (Complaint, ¶39.)

1    The exclusion of housing allowances for clergy cost the State of California an

2  estimated $16 million in tax year 2005.  (Bolton Aff., Exhibit 4.)

3    The California Franchise Tax Board has acknowledged that the exclusion of

4  housing allowances from taxable income encourages more people to work for religious

5  organizations:

> This program [exemption for clergy housing allowances] provides tax
> relief to taxpayers who work for religious organizations.  Presumably,
> religious organizations provide socially beneficial services.  Subsidizing
> these employees may encourage more people to work for these
> organizations, thereby increasing the level of services that they can
> provide.  However, this program may lead to some economic distortions.
> This exclusion may cause changes to compensation packages offered to
> [or demanded by] clergy that would lead to an increase in the portion of
> their consumption devoted to housing.  (Bolton Aff., Exhibit 4.)

16    The cost of the clergy housing allowance to the Federal Government will be about

17  $700 million in 2010, and the cost of the exclusion will rise to $800 million by 2013.

18  (Bolton Aff., Exhibit 5.)

19    **D.    Tax Breaks For Ministers Are Valuable Benefits.**

20    The housing allowance is the most valuable tax break available to clergy.  (Bolton

21  Aff., Exhibit 7.)

22    Ministers and churches fear losing the housing allowance tax break because of

23  their financial self-interest, but not because of any expressed concern about government

24  entanglement.  (Bolton Aff., Exhibits 7-11.)

25    Ministers, in fact, justify the exemption for housing allowances because of their

26  "good works."  (Bolton Aff., Exhibits 7-8.)

27    The church practice of providing in-kind housing to ministers originated when

28  many congregations attracted priests, rabbis and other "ministers of the gospel" to their

29  communities by providing free housing.  (Bolton Aff., Exhibit 6.)

**Plaintiffs' Memorandum of Points and Authorities
in Opposition to United States' Motion to Dismiss        6**

1
2
3

      **E.**     **Section 107 Increases Government**
                 **Entanglement With Religion.**

4        Although §107 of the Internal Revenue Code does not limit the tax benefits of

5      §107 to ministers who are "duly ordained, commissioned, or licensed," the IRS requires

6      that a minister of the gospel be "duly ordained, commissioned, or licensed" in order for

7      the minister to be entitled to tax benefits.  (Complaint, ¶43.)

8        Treasury Department regulations do not clarify the meaning of "duly ordained,

9      commissioned, or licensed," and difficult determinations often must be made as to

10     whether this requirement is satisfied.  (Complaint, ¶44.)

11        The §107 exclusion is available, according to the IRS, only when a minister is

12     given use of a home or receives a housing allowance as compensation for service

13     performed "in the exercise of" his or her ministry, a requirement borrowed from 26

14     U.S.C. §1402(c)(4).  (Complaint, ¶45.)

15        The Treasury regulations under §1402(c)(4) contain detailed rules for determining

16     the circumstances under which services performed by a minister are "in the exercise of"

17     his or her ministry.  (Complaint, ¶46.)

18        Section 1.1402(c)-5(b)(2) of the Treasury Regulations provides that service

19     performed by a minister in the exercise of his ministry includes: 1) the ministration of

20     sacerdotal functions; 2) the conduct of religious worship; and 3) the control, conduct and

21     maintenance of religious organizations (including the religious boards, societies, and

22     other integral agencies of such organizations) under the authority of a religious body

23     constituting a church or church denomination.  (Complaint, ¶47.)

24        Section 1.1402(c)-5(b)(2)(ii) of the Treasury regulations further provides that

25     service performed by a minister in the control, conduct and maintenance of a religious

26     organization relates to directing, managing, or promoting the activities of such

1    organization. This section also provides that any religious organization is deemed to be

2    under the authority of a religious body constituting a church or church denomination if it

3    is organized and dedicated to carrying out the tenets and principles of a faith in

4    accordance with either the requirements or sanctions governing the creation of

5    institutions of the faith.  The term "religious organization" has the same meaning and

6    application as is given to the term for income tax purposes.  (Complaint, ¶48.)

7         Section 1.1402(c)-5(b)(2)(iv) of the Treasury regulations also provides that if a

8    minister is performing service for an organization which is operated as an integral agency

9    of a religious organization under the authority of a religious body constituting a church or

10   church denomination, all service performed by the minister in the control, conduct, and

11   maintenance of such organization is in the exercise of his ministry, including purely

12   secular duties.  (Complaint, ¶49.)

13        Section 265(a)(6) of the Internal Revenue Code further allows a minister of the

14   gospel to claim deductions under §§163 and 164 of the Internal Revenue Code for

15   residential mortgage interest and property taxes, even though the money used to pay such

16   amounts was received from a church or other employer in the form of a tax-exempt §107

17   allowance.  Such "double-dipping" is disallowed for non-clergy taxpayers.  (Complaint,

18   ¶50.)

19        **F.    Preferential Tax Breaks Favor Religion.**

20        Sections 107 and 265(a)(6) of the Internal Revenue Code provide economic

21   benefits for "ministers of the gospel" that are not provided to other taxpayers, including

22   federal taxpayers who are plaintiff members of FFRF in the Eastern District of California.

23   (Complaint, ¶51.)

1   Sections 107 and 265(a)(6), both on their face and as administered by the

2   defendants Geithner and Shulman, violate the Establishment Clause of the First

3   Amendment, and the defendants should be enjoined from any further allowance of such

4   tax benefits to ministers of the gospel.  (Complaint, ¶52.)

5   The defendant Stanislaus similarly should be enjoined from allowing or granting

6   tax benefits under §§17131.6 and 17280(d)(2) of the California Revenue and Taxation

7   Code that are available only to ministers of the gospel.  (Complaint, ¶53.)

8   The actions of all the defendants have the effect each year of excluding hundreds

9   of millions of dollars from taxation, and this exclusion is available only to ministers of

10  the gospel.  (Complaint, ¶54.)

11  **G.      Tax Preferences Favor Churches In Hiring.**

12  The tax preferences granted to ministers of the gospel under the Internal Revenue

13  Code and the California Revenue and Taxation Code also enable churches and other

14  religious organizations to reduce their salaries and compensation costs.  (Complaint, ¶55.)

15  The tax exemption for housing allowances paid to ministers allows churches to

16  reduce their wage costs, while increasing the net income available to ministers.  (Bolton

17  Aff., Exhibits 6, 9-10.)  Without the exemption for housing allowances, churches would

18  have to increase pay directed toward clergy compensation.  (Bolton Aff., Exhibits 6 and

19  10.)

20  The employees of secular organizations such as FFRF are not allowed these tax

21  preferences, and FFRF and other secular organizations incur comparatively greater

22  compensation costs than they would if their employees could be considered "ministers of

23  the gospel."  (Complaint, ¶56.)

1    The tax preferences afforded ministers of the gospel constitute a subsidy that

2    results in tangible and direct economic injury to FFRF, and to its members and

3    employees, who cannot claim these benefits.  (Complaint, ¶57.)

4    FFRF, a non-profit organization, competes with churches and religious

5    organizations, but the competition is unfair.  The tax subsidies available to churches,

6    religious organizations, and ministers of the gospel are not available to FFRF and its

7    employees.  FFRF is thereby placed at a competitive disadvantage relative to churches

8    and other organizations whose employees receive tax subsidies.  (Complaint, ¶58.)

9    **III.     RELEVANT STATUTES.**

10   Sexction 107 of the Internal Revenue Code provides ministers of the gospel with

11   an exclusion for amounts attributable to in-kind housing, as well as for cash housing

12   allowances, provided as part of a minister's compensation.  Section 107 provides:

13       Section 107.  Rental Value of Parsonages.
14          In the case of a minister of the gospel, gross income dose not
15       include -
16          (1)     The rental value of a home furnished to him as part of his
17       compensation; or
18          (2)     The rental allowance paid to him as part of his
19       compensation, to the extent used by him to rent or provide a home and to
20       the extent such allowance does not exceed the fair rental value of the
21       home, including furnishings and appurtenances such as a garage, plus the
22       cost of utilities.
23
24   The plaintiffs challenge both subsections of §107.  Subsection (1) provides an

25   exclusion for the value of in-kind housing given to ministers as part of the compensation

26   provided to acquire their services.  The plaintiffs contend that subsection (1) provides a

27   preferential exemption to ministers without requiring that in-kind housing be provided for

28   the "convenience of the employer," as required by §119 of the Internal Revenue Code,

29   which is applicable to non-clergy taxpayers.

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss     10**

1          The plaintiffs also challenge subsection (2) of §107, which allows a tax

2   exemption for cash housing allowances paid by churches to ministers of the gospel.  The

3   exemption for cash housing allowances is not available under any circumstances to non-

4   clergy taxpayers.  The exemption for cash housing allowances is provided only to

5   ministers.

6          The plaintiffs further challenge §265(a)(6) of the Internal Revenue Code, which

7   allows ministers to deduct mortgage interest and real estate taxes from their taxable

8   income when the interest is paid with a housing allowance that is already tax exempt.

9   Other taxpayers cannot deduct mortgage interest that is paid with tax-exempt income,

10   except military personnel.  Section 265(a)(6) provides:

11          Section 265.  Expenses and Interest Relating to Tax-Exempt Income.
12                 (a)       General Rule.  No deduction shall be allowed for -
13                        (1)       Expenses.  Any amount otherwise allowable as a
14              deduction which is allocable to one or more classes of income
15              other than interest (whether or not any amount of income of that
16              class or classes is received or accrued) wholly exempt from the
17              taxes imposed by this subtitle, or any amount otherwise allowable
18              under Section 212 (relating to expenses for production of income)
19              which is allocable to interest (whether or not any amount of such
20              interest is received or accrued) wholly exempt from the taxes
21              imposed by this subtitle.
22                        (6)       Section Not to Apply With Respect to Parsonage
23              and Military Housing Allowances.  No deduction shall be denied
24              under this section for interest on a mortgage on, or real property
25              taxes on, the home of the taxpayer by reason of the receipt of an
26              amount as -
27                               (A)       A military housing allowance, or
28                               (B)       A parsonage allowance excludable from
29                     gross income under Section 107.
30
31          Section 265(a)(1) allows ministers of the gospel to "double-dip," first by

32   exempting cash housing allowances provided, and second by allowing ministers to deduct

33   the amount of mortgage interest and real estate taxes paid with the exempt income.  This

34   benefit is not generally available to other taxpayers.

1    **IV.    LEGAL STANDARD.**
2
3          A Complaint must include sufficient factual matter, accepted as true, to state a

4    claim for relief that is plausible on its face.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949

5    (2009).  A claim has facial plausibility when the plaintiff pleads factual content that

6    allows the court to draw a reasonable inference that the defendants are violating the law.

7    Id.  See also Cavinass v. Horizon Community Learning Center, Inc., 590 F.3d 806, 812

8    (9th Cir. 2010).  Although the court is not bound to accept as true a legal conclusion

9    couched as a factual allegation, the court must take all of the factual allegations in the

10   complaint as true.  Id.

11         The Complaint in the present case satisfies the federal pleading requirements.

12   The detailed factual allegations, and the reasonable inferences therefrom, go well beyond

13   establishing a plausible claim.  The Complaint details the financial benefits preferentially

14   provided to ministers of the gospel under Sections 107 and 265 of the Internal Revenue

15   Code.  The Complaint further identifies specific "entangling" determinations that must be

16   made as a predicate to exempting a minister's designated housing allowance.

17         The Complaint also details the critical fact that the plaintiffs are challenging

18   provisions of the Internal Revenue Code itself, which discriminates in favor of ministers.

19   The Complaint alleges and describes the fact that FFRF competes with churches in the

20   "marketplace" of ideas relating to religion and non-theism.  The Internal Revenue Code

21   subsidizes churches, however, solely because they employ ministers of the gospel to

22   preach and promote religion.  The Internal Revenue Code does not provide a similar

23   subsidy to organizations like FFRF to support their efforts to promote non-theism.

1    The Complaint in this case includes more than a short recitation of the legal

2  elements of a claim.  The Complaint includes substantial factual detail making fully

3  "plausible" plaintiffs' claims, as indicated by relevant supporting materials.

4  **V.    THE PLAINTIFFS HAVE STANDING TO CHALLENGE**
5  **CONGRESSIONAL TAX CODE PREFERENCES**
6  **FAVORING RELIGION.**
7
8    **A.    Flast v. Cohen Predicates Taxpayer Standing On**
9    **Challenges To Congressional Action Taken Pursuant To**
10   **Congress' Taxing And Spending Authority Which**
11   **Allegedly Violates A Specific Constitutional Limitation.**
12
13   The individual plaintiffs are federal and state taxpayers who oppose government

14  action that gives preferences to religion over non-religion.  They contend that provisions

15  in the Internal Revenue Code, enacted by Congress, confer benefits that favor religion,

16  including tax exemptions to "ministers of the gospel."  The individual plaintiffs further

17  contend that Internal Revenue Code preferences violate the Establishment Clause, which

18  is a specific limitation on Congress' Taxing and Spending authority.  The standing of the

19  individual plaintiffs, therefore, is based upon their status as taxpayers, who are not

20  allowed the same Internal Revenue Code benefits that Congress has provided to ministers

21  of the gospel.

22   The defendants Geithner and Shulman (hereinafter referred to as the

23  "Government") incorrectly argue that taxpayer standing is limited to challenging just

24  Congress' "spending" authority.  The Government contends that Congress' "taxing"

25  authority cannot be challenged by itself in federal court by taxpayers.  Discriminatory

26  preferences in the Tax Code supposedly are too attenuated from taxpayer status to be of

27  judicial concern, unlike preferential spending.  The Government makes a false

28  distinction, however, which the Supreme Court and other courts have not recognized.

29   Taxpayer standing includes challenges to religious preferences embedded in the

1   Internal Revenue Code itself, which is enacted pursuant to Congress' Taxing and

2   Spending authority.  Preferential exemptions and deductions otherwise could never be

3   held up to the measure of the Constitution.  In fact, the Supreme Court has always

4   decided cases on the merits involving the constitutionality of tax exemptions, deductions

5   and other benefits, including in Walz v. Tax Commission, 397 U.S. 664 (1970)

6   (involving state property tax exemption for religious non-profit organizations).  The

7   Government identifies no case in which the Supreme Court has denied standing to

8   taxpayers challenging preferential Internal Revenue Code provisions.  Even in Walz,

9   relied upon by the Government, the Supreme Court had no reservations about the

10  plaintiffs' taxpayer standing.

11         Taxpayer standing is warranted when a complaint is sufficiently tied to

12  Congressional action, and more particularly, linked to Congress' Taxing and Spending

13  authority.  Taxpayers, therefore, can object in federal court to matters relating to

14  Congress' exercise of its taxing authority, as well as its spending authority.  The Supreme

15  Court has emphasized that Congress itself must be implicated in a taxpayer complaint,

16  via its Taxing and Spending powers, but in this case that nexus exits as to discriminatory

17  Internal Revenue Code provisions.

18         The necessary relationship between Congress' Taxing and Spending authority and

19  taxpayer status is missing when the responsibility for causing an unconstitutional use of

20  tax revenue lies solely with the Executive Branch of the Government.  When Congress

21  directly enacts a discriminatory Internal Revenue Code provision, which collects revenue

22  unfairly from taxpayers, the nexus between Congress and taxpayer is legally and

23  logically satisfied.

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss**      14

1        In Flast v. Cohen, 392 U.S. 83, 102-103 (1968), the Supreme Court first set out

2   the two-part test for determining whether a federal taxpayer has standing to challenge an

3   unconstitutional preference for religion:

4           First, the taxpayer must establish a logical link between that status
5           [taxpayer] and the type of legislative enactment attacked.  Thus, a
6           taxpayer will be a proper party to allege the unconstitutionality only if
7           exercises of congressional power under the taxing and spending clause of
8           Art. I, §8, of the Constitution.  It will not be sufficient to allege an
9           incidental expenditure of tax funds in the administration of an essentially
10          regulatory statute . . . .  Secondly, the taxpayer must establish a nexus
11          between that status and the precise nature of the constitutional
12          infringement alleged.  Under this requirement, the taxpayer must show
13          that the challenged enactment exceeds specific constitutional limitations
14          imposed upon the exercise of the congressional taxing and spending power
15          and not simply that the enactment is generally beyond the powers
16          delegated to Congress by Art. I, §8.

17
18       The Supreme Court concluded on the facts presented in Flast that the nexus

19   demanded for taxpayer standing was satisfied.  The plaintiffs challenged an exercise by

20   Congress of its power under Art. I, §8, to spend for the general welfare.  In addition, the

21   plaintiffs alleged that the exercise by Congress of its power under Art. I, §8, violated the

22   Establishment Clause of the First Amendment, which constrains and limits Congress'

23   Taxing and Spending authority.  "Our history vividly illustrates that one of the specific

24   evils feared by those who drafted the Establishment Clause and fought for its adoption

25   was that the Taxing and Spending power would be used to favor one religion over

26   another or to support religion in general."  Id at 103.  "The Establishment Clause,

27   therefore, was designed as a "specific bulwark against such potential abuses of

28   governmental power, and that clause of the First Amendment operates as a specific

29   Constitutional limitation upon the exercise by Congress of the Taxing and Spending

30   power conferred by Art. I, §8."  Id at 104.

1       The Supreme Court recently reiterated that federal taxpayer standing requires that

2  Congress bear direct responsibility for a claimed Establishment Clause violation.  In <u>Hein</u>

3  <u>v. Freedom From Religion Foundation</u>, 551 U.S. 587 (2007), the Court concluded that

4  there must be a link between Congressional action and an alleged Constitutional violation

5  -- the Executive Branch's unilateral decision to spend Congressional appropriations in

6  violation of the Establishment Clause, therefore, did not sufficiently implicate Congress'

7  Taxing and Spending authority in <u>Hein</u>.  "Respondents [in <u>Hein</u>] do not challenge any

8  specific Congressional action or appropriation; nor do they ask the Court to invalidate

9  any Congressional enactment or legislatively created program."  <u>Id</u> at 605.  The Supreme

10  Court has "refused to extend <u>Flast</u> to permit taxpayer standing for Establishment Clause

11  challenges that do not implicate Congress' Taxing and Spending power."  <u>Id</u> at 610.

12  Without such Congressional responsibility, i.e., when the challenged action bears no

13  relationship to Congressional action, a chasm exists between the taxpayers' status and the

14  type of legislative enactment attacked.

15       The Supreme Court in both <u>Flast</u> and <u>Hein</u> makes clear that federal taxpayer

16  standing is limited to complaints by taxpayers that involve Congressional responsibility

17  for the alleged Establishment Clause violation -- and the challenged Congressional action

18  must implicate Congress' Taxing and Spending authority under Art. I, §8.  A federal

19  taxpayer is limited to bringing complaints arising from Congressional action taken

20  pursuant to the Taxing and Spending Clause of the Constitution, as is the case in the

21  present matter.  The Internal Revenue Code is a product of Congress' taxing authority.

22       Because <u>Flast</u> and <u>Hein</u> involved only claims relating to the use of Congressional

23  appropriations, rather than the collection of revenue, the Government argues that

24  improper spending is a necessary element in every taxpayer case -- never mind

1   discriminatory Internal Revenue Code provisions themselves.  Because the taxpayers in

2   Flast and Hein did not challenge the imposition of a tax per se, but rather the spending of

3   a tax, the Government claims that taxpayers are precluded from complaining about

4   religious preferences embedded in the Tax Code itself.  In short, the Government reads

5   Flast to allow taxpayer standing only to challenge Congressional spending, but not

6   Congressional taxing.

7       The Supreme Court has never construed Flast to preclude taxpayer challenges to

8   religious preferences embedded in the Internal Revenue Code itself.  The Supreme Court

9   and other courts have consistently recognized taxpayer standing to raise challenges to tax

10  exemptions, deductions and credits that allegedly give preference to religion.  Nothing is

11  more central to Congress' Taxing and Spending authority than enactment of the Internal

12  Revenue Code itself.  The Government turns Flast on its head by arguing that there is no

13  nexus between the Internal Revenue Code and the objections of taxpayers who are

14  subject to that Code.  The Government's argument, if accepted, would even prevent

15  taxpayer standing to religious groups opposed to preferential exemptions given

16  exclusively to non-believers.

17  **B.    Internal Revenue Code Preferences For Ministers Of The Gospel**
18  **Provide Valuable Benefits That Are Not Neutrally**
19  **Available To Other Taxpayers, Including The Plaintiffs.**
20
21      The Government argues that Internal Revenue Code exemptions are qualitatively

22  different than direct financial grants to religion, but the Government does not deny that

23  preferential tax exemptions provide substantial financial benefits not available to other

24  taxpayers.  The Government also concedes that taxpayers would have standing to object

25  to direct financial grants, but such taxpayers supposedly do not have a sufficient interest

1   to challenge structural Internal Revenue Code preferences favoring religion.  The

2   Government's proposed distinction is not convincing.

3        Here, in the Ninth Circuit, the Court of Appeals has previously rejected the

4   distinction urged by the Government.  In Winn v. Arizona Christian School Tuition

5   Organization, 562 F.3d 1002 (9th Cir. 2009), the plaintiffs sought to challenge income

6   tax credits, which allegedly violated the Establishment Clause.  The defendants argued

7   that the plaintiff-taxpayers did not have standing under Flast because no money under the

8   Tax Credit Program passed through the State Treasury, and therefore, the Program

9   allegedly could not be characterized as involving any "expenditure" of public funds.  The

10   Ninth Circuit rejected the defendants' objection to standing, after first recognizing that tax

11   policies, such as tax exemptions, are the same in effect as direct-grant programs,

12   according to long-accepted Supreme Court precedent:

> The Supreme Court has recognized that State tax policies such as tax
> deductions, tax exemptions and tax credits are means of "channeling . . .
> [state] assistance" to private organizations, which can have "an economic
> effect comparable to that of aid given directly" to the organization.
> Mueller v. Allen, 463 U.S. 388, 399, 103 S. Ct. 3062, 77 L. Ed. 2d 721
> (1983).  The Court has therefore refused to make artificial distinctions
> between direct grants to religious organizations and tax programs that
> confer specific benefits on religious organizations, particularly tax credits
> such as the one challenged here.  As the Court noted, "for purposes of
> determining whether such aid has the effect of advancing religion," it
> makes no difference whether the qualifying individual "receives an actual
> cash payment . . . [or] is allowed to reduce . . . the sum he would otherwise
> be obliged to pay over to the State."  Committee for Public Education and
> Religious Liberty v. Nyquist, 413 U.S. 756, 790-91, 93 S. Ct. 2955, 37 L.
> Ed. 2d 948 (1973).  In either case, "the money involved represents a
> charge made upon the State for the purpose of religious education."  Id at
> 791; see also, Arkansas Writers Project, Inc. v. Ragland, 481 U.S. 221,
> 236, 107 S. Ct. 1722, 95 L. Ed. 2d 209 (1987) (Scalia, J., dissenting) ("Our
> opinions have long recognized -- in the First Amendment context as
> elsewhere -- the reality that tax exemptions, credits, and deductions are a
> form of subsidy that is administered through the tax system.").  Winn, 562
> F.3d at 1009.

1    The Court of Appeals further concluded in Winn that a sufficient nexus existed

2    between the taxpayers' standing as taxpayers and the legislative exercise of taxing and

3    spending power.  In Winn, the Arizona Legislature promulgated a tax credit under the

4    State's analogous Taxing and Spending authority, and therefore the Legislature

5    effectively created a grant program mediated through Arizona taxpayers.  In concluding

6    that the plaintiff-taxpayers had standing, the Ninth Circuit emphatically recognized that

7    the Supreme Court has repeatedly decided the merits of Establishment Clause challenges

8    brought by taxpayers challenging tax credits, deductions and exemptions:

9            The Supreme Court has repeatedly decided Establishment Clause
10           challenges brought by state taxpayers against state tax credit, tax
11           deduction and tax exemption policies, without ever suggesting that such
12           taxpayers lacked Art. III standing.  See, e.g., Mueller, 463 U.S. at 390
13           (state income tax deduction for school expenses that could be claimed for
14           expenses at religious schools); Nyquist, 413 U.S. at 789-90 (hybrid state
15           tax deduction -- Tax Credit Program for tuition paid to private schools);
16           Hunt v. McNair, 413 U.S. 734, 737-38, 93 S. Ct. 2868, 37 L. Ed. 2d 923
17           (1973) (state tax exemption for state-issued revenue bonds that went in
18           part to religious schools); Walz v. Tax Commission, 397 U.S. 664, 666, 90
19           S. Ct. 1409, 25 L. Ed. 2d 697 (1970) (state property tax exemption for
20           religious non-profit organizations).  The Supreme Court has also
21           repeatedly decided challenges brought by state taxpayers to indirect aid
22           programs -- where the ultimate decision to confer aid rested with a private
23           individual and not the government -- and again never suggested that the
24           taxpayers lack standing.  See, e.g., Zelman, 536 U.S. at 645 (state tuition
25           grants to parents for public or private schools); Nyquist, 413 U.S. at 781
26           (state tuition grants to parents for private schools).  Although we
27           acknowledge that "the Court's exercise of jurisdiction . . . is not precedent
28           for the existence of jurisdiction," . . . we also note that the [Supreme]
29           Court has rejected the suggestion that its consistent practice of exercising
30           jurisdiction amounts to "mere sub silentio holdings" that "command no
31           respect."  Hibbs, 542 U.S. at 94.  We, therefore, hold that plaintiffs have
32           standing as taxpayers to challenge Section 1089 for allegedly violating the
33           Establishment Clause.  Winn, 562 F.3d at 1010-11.
34
35           The Government tries to avoid Winn with phantom distinctions.  The Government

36    claims that the tax credit in Winn effectively constituted a program of disbursement to

37    benefited schools, while no such "program" exists with regard to the income tax

1 exemptions for ministers of the gospel.  In fact, however, the beneficiaries of the tax

2 exemptions in this case are the ministers eligible for the exemption.  They are the

3 intended class of beneficiaries.  The exemptions at issue, therefore, are similar to the tax

4 credits in <u>Winn</u> in terms of causing a distribution of benefits to a targeted group.  In each

5 instance, the tax policy operates as a "powerful legislative device for directing money" to

6 private organizations and individuals.  As in <u>Winn</u>, therefore, the tax exemptions in this

7 case undisputedly constitute a benefit that is not neutrally available, and the benefit arises

8 as a result of the Government's program of preference for ministers of the gospel.

9   The Government's attempt to distinguish between "dollar-for-dollar" tax credits

10 and income exemptions and deductions is unpersuasive.  The Government ignores the

11 economic reality that income exemptions and deductions also have the effect of diverting

12 tax payments to the targeted class of ministers based on the excludable amount of their

13 housing allowance.  Just as a home-owner exemption or deduction for expenses incurred

14 to make a home more energy efficient constitute a program of Government support, so

15 also the exemption to ministers operates as a subsidy to ministers for providing religious

16 services "in the exercise of their ministry," which is a necessary requirement of the

17 exemption.

18   Preferential treatment of an individual or organization under the Internal Revenue

19 Code always has the effect of subsidizing the preferred group.  The Supreme Court

20 recognized this in <u>Regan v. Taxation with Representation of Washington</u>, 461 U.S. 540,

21 544 (1983):

22     Both tax exemptions and tax deductions are a form of subsidy that is
23     administered through the tax system.  A tax exemption has much the same
24     effect as a cash grant to the organization of the amount of tax it would
25     have to pay on its income.  Deductible contributions are similar to cash
26     grants of the amount of a portion of the individual's contributions.
27

1         Similarly, in <u>Texas Monthly, Inc. v. Bullock</u>, 489 U.S. 1, 14 (1989), Justice

2    Brennan reasoned that "every tax exemption constitutes a subsidy that affects non-

3    qualifying taxpayers, forcing them to become 'indirect and vicarious donors.' "  To reject

4    taxpayer standing in such a situation, moreover, "would effectively insulate under-

5    inclusive statutes from Constitutional challenge."  <u>Id</u> at 8, citing <u>Arkansas Writers</u>

6    <u>Project</u>, 481 U.S. at 227.  In <u>Arkansas Writers Project</u>, the Court rejected an argument

7    against standing similar to the present case because it was "inconsistent with numerous

8    decisions of this Court in which we have considered claims that others similarly situated

9    were exempt from the operation of a state law adversely affecting the claimant."  <u>Id</u>.

10         In <u>Nyquist</u>, 413 U.S. at 790-91, the Supreme Court again recognized that "in

11    practical terms there would appear to be little difference, for purposes of determining

12    whether such aid has the effect of advancing religion," between a tax benefit and a direct

13    tuition grant.  In either instance, "special tax benefits cannot be squared with the principle

14    of neutrality established by the decisions of this [Supreme] Court."  <u>Id</u> at 793.

15         Significantly, taxpayer standing to challenge a tax exemption was also not a bar to

16    jurisdiction in the principal Supreme Court case cited by the Government, decided less

17    than two years after <u>Flast</u>.  In <u>Walz v. Tax Commission</u>, 397 U.S. 664 (1970), the

18    Supreme Court substantively addressed taxpayer challenges to the constitutionality of a

19    charitable property tax exemption that included church property.  Taxpayer standing was

20    not a bar.

21         The Supreme Court has never viewed taxpayer objections to preferential

22    exemptions as being beyond the jurisdiction of the Court.  In fact, in <u>Hibbs v. Winn</u>, 542

23    U.S. 88 (2004), the Supreme Court concluded that not even the Tax Injunction Act will

24    bar a suit by taxpayers objecting to an income-tax credit provision.  The plaintiffs in

1   Hibbs were taxpayers who did not qualify for an income tax credit and they therefore

2   brought an action in federal court challenging the Tax Credit Statute and sought to enjoin

3   its operation on Establishment Clause grounds.  The plaintiffs did not contest their own

4   tax liability, nor did they seek to impede Arizona's receipt of tax revenues.

5       The Supreme Court concluded in Hibbs that the taxpayers could proceed with

6   their lawsuit without any impediment by the Tax Injunction Act, "consistent with the

7   decades-long understanding prevailing on this issue."  Id at 112.  The Court concluded

8   that the Tax Injunction Act only restrained state taxpayers from instituting federal actions

9   to contest their liability for state taxes, but the Act does not stop third parties from

10  pursuing Constitutional challenges to preferential tax benefits in a federal forum.  The

11  Court noted a long history of cases, which implicitly belie the Government's claim that

12  such cases all involve plaintiffs without standing:

13          Further, numerous federal-court decisions--including decisions of this
14          Court reviewing lower federal-court judgments--have reached the merits
15          of third-party constitutional challenges to tax benefits without mentioning
16          the TIA.  e.g., Byrne v. Public Funds for Public Schools of New Jersey,
17          442 U. S. 907 (1979), summarily aff'g 590 F.2d 514(CA3 1979) (state tax
18          deduction for taxpayers with children attending nonpublic schools violates
19          Establishment Clause), aff'g 444 F. Supp. 1228 (NJ 1978); Franchise Tax
20          Board of California v. United Americans for Public Schools, 419 U. S.
21          890 (1974) (summarily affirming district-court judgment striking down
22          state statute that provided income-tax reductions for taxpayers sending
23          children to nonpublic schools); Committee for Public Ed. & Religious
24          Liberty v. Nyquist, 413 U. S. 756 (1973) (state tax benefits for parents of
25          children attending nonpublic schools violates Establishment Clause), rev'g
26          in relevant part 350 F. Supp. 655 (SDNY 1972) (three-judge court); Grit v.
27          Wolman, 413 U. S. 901 (1973), summarily aff'g Kosydar v. Wolman, 353
28          F. Supp. 744, 755-756 (SD Ohio 1972) (three-judge court) (state tax
29          credits for expenses relating to children's enrollment in nonpublic schools
30          violate Establishment Clause); Finlator v. Powers, 902 F.2d 1158 (CA4
31          1990) (state statute exempting Christian Bibles, but not holy books of
32          other religions or other books, from state tax violates Establishment
33          Clause); Luthens v.Bair, 788 F. Supp. 1032 (SD Iowa 1992) (state law
34          authorizing tax benefit for tuition payments and textbook purchases does
35          not violate Establishment Clause); Minnesota Civil Liberties Union v.
36          Roemer, 452 F. Supp. 1316 (Minn. 1978) (three-judge court) (state law

1
2
3
4
allowing parents of public or private school students to claim part of tuition and transportation expenses as tax deduction does not violate Establishment Clause).  Id at 108.

5   The Supreme Court also recognized in Hibbs the distinction between taxpayer

6   claims that may reduce state revenues and third-party claims that may enlarge state

7   revenues.  The Supreme Court acknowledged that "numerous federal-court decisions,

8   including the decisions of this [Supreme] Court reviewing lower federal-court judgments

9   -- have reached the merits of third-party Constitutional challenges to tax benefits without

10  mentioning the TIA [Tax Injunction Act]."  Id at 110.  In fact, "in a procession of cases

11  not rationally distinguishable from this one, no Justice or member of the bar of this Court

12  has ever raised a Section 1341 objection that, according to the petitioner in this case,

13  should have caused us to order dismissal of the action for want of jurisdiction."  Id at

14  111-112.

15  Finally, in Warren v. Commissioner of Internal Revenue, 302 F.3d 1012 (9th Cir.

16  2002), the Ninth Circuit Court of Appeals also acknowledged taxpayer standing to

17  challenge the same preferential Internal Revenue Code exemptions at issue in the present

18  case.  In Warren, Rev. Richard Warren received approximately $80,000 annually from

19  his church as a cash housing allowance, which he claimed as an exclusion under §107(2)

20  of the Internal Revenue Code.  The IRS then filed a Notice of Deficiency, claiming that

21  Rev. Warren's exclusion was excessive because it exceeded the home's fair rental value.

22  That was the issue initially raised in Warren, but after oral argument, the Court of

23  Appeals appointed Professor Erwin Chemerinsky to consider whether the §107(2)

24  exemption violated the Establishment Clause because it provides a tax benefit available

25  only to ministers of the gospel.  The parties to the Warren appeal, in the meantime,

1    settled the immediate issue of Rev. Warren's alleged deficiency.  Professor Chemerinsky

2    then filed a Motion to Intervene, while the parties filed a Stipulation of Dismissal.

3          The Ninth Circuit subsequently denied Professor Chemerinsky's Motion to

4    Intervene, but without prejudice to his right to file a separate civil action.  Neither the

5    parties' voluntary dismissal, nor the passage of subsequent Congressional legislation,

6    resolved the Constitutionality of §107(2), but "because Professor Chemerinsky may raise

7    this issue through a separate lawsuit, our [Ninth Circuit's] denial of intervention will not

8    impair his ability to protect his interest as a taxpayer." Id at 1015.  "If Professor

9    Chemerinsky chooses to file a separate taxpayer action, the new parties could plead their

10   claims and defenses more specifically and obtain whatever limited discovery and

11   evidentiary proceedings are necessary." Id.

12         The Government's argument in the present case, to the effect that preferential tax

13   exemptions cannot be challenged in court by third-party taxpayers, is wrong as a matter

14   of law.  Preferential tax exemptions undisputedly provide significant benefits to ministers

15   of the gospel, and such benefits are the result of Internal Revenue Code exemptions

16   enacted by Congress pursuant to its Taxing and Spending authority derived from Art. I,

17   §8.  An obvious nexus exists, moreover, between the plaintiffs' status and the preferential

18   tax exemptions to which they object on grounds specifically proscribed by the

19   Establishment Clause.  Taxpayer standing, in these circumstances, is fully consistent with

20   applicable Supreme Court rationale and precedent holding that exemptions that favor

21   religion are the same as direct subsidies.

22         **C.    Preferential Tax Exemptions Subsidize Religion At The**
23                **Expense Of Other Taxpayers, Including The Plaintiffs.**
24
25         Tax exemptions like those at issue in this case are recognized by the Federal

26   Government itself to be "tax expenditures."  In 1974, the Congressional Budget and

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss     24**

1  Impoundment Control Act was enacted requiring that a list of tax expenditures be

2  included in the annual Budget in order to control spending and make tax provisions more

3  transparent.  Tax expenditures are defined in the Congressional Budget Act of 1974 as

4  "revenue losses attributable to provisions of the Federal tax laws which allow a special

5  exclusion, exemption, or deduction from gross income or which provide a special credit,

6  a preferential rate of tax, or a deferral of tax liability."  These expenditures, such as those

7  resulting from special tax exemptions, effectively subsidize the beneficiary of the

8  exemption:

9           Tax expenditures are government revenue losses resulting from
10          provisions in the Tax Code that allow a taxpayer or business to reduce
11          his or her tax burden by taking certain deductions, exemptions, or credits.
12          Tax expenditures have the same effect on the Federal Budget as
13          spending.  They can have effects on recipients similar to grants or other
14          types of subsidies.  For instance, if the Government wants to encourage
15          people to buy solar panels for their homes, they can either send checks to
16          those who promise to buy the panels or offer tax breaks once the panels
17          have been purchased.
18
19          Tax expenditures can affect more than just the targeted activity.  When
20          certain people or organizations are selected to receive targeted tax breaks
21          through tax subsidies, the size of the tax base is reduced and tax rates
22          then have to be increased for everyone in order to bring in an equivalent
23          amount of revenue to the pre-tax expenditure level.  Further, if a tax
24          subsidy is not expressly intended to make a tax more efficient, then it
25          will most likely produce an economic inefficiency.  For example, when a
26          tax subsidy is given to businesses to invest in a specific commodity,
27          private investment is shifted from some other commodity into the tax-
28          preferred area of investment without regard to return on investment.  This
29          creates an economic inefficiency.  Tax subsidies can also end up
30          rewarding taxpayers for behavior they would have engaged in regardless
31          of the tax benefit.  (See Subsidy Scope-Tax Expenditures, Pew
32          Charitable Trusts.)
33
34          The tax exemptions at issue in the present case constitute classic and recognized

35  tax expenditures, costing the Federal Government $700 million this year alone.  (Bolton

36  Aff., Exhibit 5; See also Zelman v. Simmons-Harris, 536 U.S. 639, 666 (2002)

37  (O'Connor, J. Concurring) (noting that parsonage exemption for ministers lowered

1   federal revenues by around $500 million in 2002).)  Supreme Court Justice Thomas has

2   identified the very exemption at issue in this case as epitomizing a tax expenditure:

3           In the tax literature, this is called a "tax expenditure," a concept "based
4           upon recognition of the fact that a government can appropriate money to
5           a particular person or group by using a special, narrowly directed tax
6           deduction or exclusion, instead of by using ordinary direct spending
7           mechanisms.  For example, a government with a general income tax,
8           wanting to add $7,000 to the spendable income of a preacher whose top
9           tax rate is 30%, has two ways of subsidizing him.  The government can
10          send the preacher a check for $10,000 and tax him on all of his income,
11          or it can authorize him to reduce his taxable income by $23,333.33
12          [resulting in a tax saving of $7,000].  If the direct payment were itself
13          taxable and did not alter his tax bracket, the preacher would receive the
14          same benefit from the tax deduction as he would from the direct
15          payment."  Wolfman, Tax Expenditures: From Idea to Ideology, 99 Harv.
16          L. Rev. 491-492 (1985).  In fact, Congress has provided a similar "tax
17          expenditure" in §107 of the Internal Revenue Code by granting a
18          "minister of the gospel" an unlimited exclusion for the rental value of any
19          home furnished as part of his pay or for the rental allowance paid to him.
20          Rosenberger v. Rector and Visitors of the University of Virginia, 515
21          U.S. 819, 861, n. 5 (1995) (Thomas, J., Concurring).

22

23          The large body of literature about tax expenditures accepts, like Justice Thomas,

24   "the basic concept [that] special exemptions from tax function as subsidies."  Id, quoting

25   Adler, The Internal Revenue Code, The Constitution, and The Courts: The Use of Tax

26   Expenditure Analysis in Judicial Decision-Making, 28 Wake Forest L. Rev. 855, 862, n.

27   30 (1993).  See also, Opinion of the Justices of the Massachusetts Supreme Court to the

28   Senate, 514 N.E. 2d 353, 355 (Mass. 1987) (recognizing the practical equivalence of tax

29   deductions and direct government grants).

30          In Johnson v. Economic Development Corporation, 241 F.3d 501 (6th Cir. 2001),

31   the Sixth Circuit Court of Appeals also concluded that the plaintiff had taxpayer standing

32   to challenge the defendant's issuance of tax-exempt revenue bonds to a religious

33   academy.  In that case also, the defendant had argued that the requisite financial interest

34   must be a direct expenditure of government funds, rather than a loss of revenue accruing

1    from a tax exemption, but the Court concluded that a challenged exemption can provide a

2    basis for taxpayer standing, as consistently recognized by the Supreme Court:

3    Contrary to Defendant's argument, the Supreme Court in Doremus did
4    not distinguish between an expenditure and loss of revenue in
5    determining whether there was a "good-faith pocketbook injury."  Under
6    Doremus, state taxpayer standing simply requires that there is a "requisite
7    financial interest that is, or is threatened to be, injured by the
8    unconstitutional conduct."  342 U.S. at 435.  Moreover, the Supreme
9    Court has decided several cases involving Establishment Clause
10   challenges to tax exemptions as they relate to religious entities.  See e.g.,
11   Walz v. Tax Commission, 397 U.S. 664, 25 L. Ed. 2d 697, 90 S. Ct. 1409
12   (1970) (property tax exemption for church(es)); Hunt v. McNair, 413
13   U.S. 734, 737 L. Ed. 2d 923, 93 S. Ct. 2868 (1973) (tax exemption for
14   state issued revenue bonds, some of which went to religiously-affiliated
15   school(s)); Mueller v. Allen, 463 U.S. 388, 77 L. Ed. 2d 721, 103 S. Ct.
16   3062 (1983) (state income tax deduction for school expenses where some
17   of taxpayers' children attended religious schools).

18
19         The Court concluded in Johnson that the plaintiff satisfied applicable tests for

20   taxpayer standing, thereby allowing the challenge to substantively move forward.  See

21   also, American Civil Liberties Union v. Crawford, 2000 U.S. Dist. LEXIS 17270 (E. D.

22   LA 2000) (court rejected a challenge to the standing of plaintiff to challenge tax

23   exemption allowed to others); Public Funds for Public Schools of New Jersey v. Byrne,

24   590 F.2d 514, 516 n. 3 (3rd Cir. 1979) (plaintiffs challenged New Jersey income tax

25   exemptions as violative of the Establishment Clause; the Court concluded that "the

26   individual plaintiffs, as taxpayers, have standing under Flast v. Cohen", and the Supreme

27   Court summarily affirmed).

28         The Fourth Circuit Court of Appeals has also recognized that non-exempt

29   taxpayers have standing to challenge the constitutionality of preferential tax exemptions.

30   In Finlator v. Powers, 902 F.2d 1158, 1160-1161 (4th Cir. 1990), the Court too noted that

31   the Supreme Court has consistently recognized the standing of non-exempt taxpayers to

32   challenge the constitutionality of such otherwise underinclusive statutes.

**Plaintiffs' Memorandum of Points and Authorities
in Opposition to United States' Motion to Dismiss      27**

1        The Court in <u>Finlator</u>, 902 F.2d at 1161-62, also rejected the argument made by

2   the Government that non-exempt parties must administratively contest a tax prior to

3   payment, refuse to pay the tax, pay the tax under protest or reservation of rights, pay the

4   tax and seek refund, or take some other action to contest their own liability for the

5   underlying tax.  The taxpayers in <u>Finlator</u> were found to have standing to raise their

6   constitutional objection to the preferential tax exemption at issue without taking prior

7   administrative action.

8        By contrast, in <u>In Re United States Catholic Conference v. Baker</u>, 885 F.2d 1020,

9   1028-29 (2nd Cir. 1989), the Second Circuit Court of Appeals denied plaintiffs taxpayer

10   standing where they did not make a challenge to the Internal Revenue Code itself, i.e.,

11   "they do not contend that the Code favors the Church."  The taxpayers instead

12   complained that the Internal Revenue Service was lax in its enforcement of statutory

13   restrictions applicable to exempt entities.  The Court held that a challenge to an

14   exemption itself, however, was necessary in order to implicate Congress' exercise of its

15   Taxing and Spending power, as required by <u>Flast</u> and <u>Hein</u>.

16        Here, the individual plaintiffs have standing as taxpayers to object to preferential

17   tax exemptions favoring religion embedded in the Internal Revenue Code itself.  The

18   preferences at issue were enacted pursuant to Congress' Taxing and Spending authority

19   under Art. I, §8 of the Constitution.  The preferential Internal Revenue Code exemptions,

20   moreover, undisputedly confer a significant benefit to ministers of the gospel, and this

21   benefit is not neutrally available to other taxpayers, including the plaintiffs.  Finally, the

22   plaintiffs object to the preferential Internal Revenue Code preferences as violations of the

23   Establishment Clause, which is a specific and recognized limitation on Congress' Taxing

1  and Spending authority.  Each of the elements for taxpayer standing articulated in <u>Flast</u> is

2  clearly satisfied in this case.

3        In the end, the Government does not argue convincingly that taxpayers should not

4  have standing to make objections to unconstitutional preferences enacted as part of the

5  Internal Revenue Code itself.  The Government acknowledges that a taxpayer may object

6  to the unconstitutional use of tax proceeds, but argues that a taxpayer's interest in a

7  neutral taxing scheme is too attenuated from the individual's status as a taxpayer.  In fact,

8  however, the Government misreads and misapprehends the requirements for taxpayer

9  standing, all of which are satisfied by the challenge made in this case.  To deny standing

10  to challenge intrinsic infirmities in the Internal Revenue Code itself will merely invite the

11  continued subterfuge of using the Code as a means to preferentially subsidize religion in

12  violation of the Establishment Clause.

13        **D.**     **FFRF Also Has Standing To Challenge Tax**
14                **<u>Preferences That Give Churches A Competitive Advantage.</u>**

15

16        FFRF has two bases for standing.  First, FFRF claims standing as a representative

17  of its members.  Second, FFRF claims standing because Internal Revenue Code

18  preferences favoring churches cause FFRF a competitive disadvantage.

19        FFRF has representational standing in this case under the reasoning of <u>Hunt v.</u>

20  <u>Washington Apple Advertising Commission</u>, 432 U.S. 333, 343 (1977).  Representational

21  standing is appropriate if:  (1) FFRF's members would otherwise have standing to sue on

22  their own rights; (2) the interests that FFRF seeks to vindicate are germane to the

23  organization's purpose; and (3) neither the claim asserted nor the relief requested requires

24  the participation of individual members in the lawsuit.

25        Here, FFRF has standing under the criteria specified in <u>Hunt</u>, including because it

26  has individual members, who are also plaintiffs with standing to sue in their own right, as

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss**    29

1    discussed above.  The interests that FFRF seeks to vindicate, moreover, are clearly

2    germane to the organization's purpose, as described in paragraphs 6 and 7 of plaintiffs'

3    Complaint.  FFRF is a non-profit membership organization that advocates for the

4    separation of church and state and educates on matters of non-theism.  It has 14,486 total

5    members, with members in every state of the United States, including 2,353 members in

6    the State of California.  (Complaint, ¶6.)  FFRF also represents and advocates on behalf

7    of its members throughout the United States.  (Complaint, ¶7.)  Finally, FFRF's

8    membership includes individuals who are federal and California taxpayers residing in the

9    Eastern District of California, and they are opposed to government endorsement of

10   religion.  (Complaint, ¶8.)  The individual plaintiffs in this matter, in fact, are all FFRF

11   members residing in the Eastern District of California.  (Complaint, ¶¶9-28.)

12        FFRF also has standing to pursue this action because of its own direct injury

13   caused by Internal Revenue Code preferences for religion.  The Supreme Court

14   recognizes that injuries to competitors are legally cognizable for standing.  See Clarke v.

15   Securities Industry Association, 479 U.S. 388, 403 (1987).  Implicit in the Supreme

16   Court's reasoning is a requirement that in order to establish an injury as a competitor, a

17   plaintiff must show that it competes with the party to whom the government has

18   bestowed the assertedly illegal benefit.  See In Re: United States Catholic Conference v.

19   Baker, 885 F2d 1020, 1029 (2nd Cir. 1989).  See also Becker v. Federal Election

20   Comission, 230 F3d 381, 388 (1st Cir. 2000); and Marshall & Ilsley Corporation v.

21   Heimann, 652 F2d 685, 692 (7th Cir. 1981).

22        FFRF is clearly a "competitor" of the benefited churches.  FFRF advocates for the

23   separation of church and state and educates on matters of non-theism.  (Complaint, ¶6.)

24   By contrast, churches and organized religion are proselytizers, seeking to convert

1    individuals into believers of the tenets of each church's particular religious beliefs.  As a

2    result, FFRF, a non-profit organization, competes with churches and religious

3    organizations, as alleged in paragraph 58 of plaintiffs' Complaint.

4            The Complaint specifically alleges that tax preferences granted to ministers of the

5    gospel under the Internal Revenue Code enable churches and other religious

6    organizations to reduce their salaries and compensation costs.  (Complaint, ¶55.)  This,

7    again, is not just a conclusory allegation without reasonable foundation, as legal scholars

8    have also noted that tax benefits to ministers of the gospel provide "a significant financial

9    benefit to religion because churches and synagogues and mosques can pay their clergy

10   much less because of the tax-free dollars.  Without the parsonage exemption, religious

11   institutions would have to pay clergy significantly more to make up this difference."

12   Chemerinsky, Erwin, The Parsonage Exemption Violates the Establishment Clause and

13   Should be Declared Unconstitutional, 24 Whittier Law Review 707, 713 (2003).  (See

14   also Bolton Aff., Exhibits 4, 6, 9 and 10.)

15           By contrast, the employees of organizations such as FFRF are not allowed the tax

16   preferences given to religion, and so FFRF incurs comparatively greater wage costs than

17   if its employees were ministers of the gospel.  (Complaint, ¶56.)  The tax preferences

18   afforded ministers of the gospel, which reduce wage costs of churches, constitute a

19   subsidy to religion that is not available to FFRF, who cannot claim such benefits, and this

20   results in a tangible and direct economic injury to FFRF, i.e., the government has given

21   FFRF's "competitors" an economic benefit that is not also available to FFRF.

22   (Complaint, ¶57.)  The tax subsidies available to churches, religious organizations, and

23   ministers of the gospel are not available to FFRF and its employees, which puts FFRF at

1  a relative disadvantage to churches and other organizations whose employees receive tax

2  subsidies.  (Complaint, ¶58.)

3      The Government feigns ignorance of the competition between FFRF and the

4  churches benefited by housing exemptions, which is specifically alleged in the Complaint

5  -- and widely known.  The Government also seemingly pretends not to understand that

6  subsidizing churches, but not organizations of non-belief, gives an advantage to the

7  subsidized group.  The churches, themselves, have not been shy about directly

8  articulating what is at stake:  The increased money that churches would pay if they lose

9  government subsidization.  That was the premise of the proposed intervention in this

10  action by Rev. Rodgers, and that is one of the reasons for FFRF's own standing in this

11  lawsuit.  (Bolton Aff., Exhibits 4, 6, 9 and 10.)

12      The Government might better understand FFRF's basis for standing if the

13  situation confronting FFRF was reversed.  If Congress adopted tax preferences that

14  reduced the operating costs only for organizations like FFRF, then the complaints of

15  many churches would certainly be heard by the courts.  The fact that an organization

16  promoting non-theism complains about preferences given to churches, however, is just as

17  appropriate for judicial determination under the Establishment Clause.  The promotion of

18  religion in preference to non-belief is every bit as offensive to the Establishment Clause

19  as the preference of any single religion.  For that reason, FFRF does have standing in its

20  own right to pursue this action, as well as in its representative capacity.

**VI.   INTERNAL REVENUE CODE SECTION 107 VIOLATES THE ESTABLISHMENT CLAUSE BECAUSE IT IS NOT NEUTRAL AND PROVIDES SIGNIFICANT TAX BENEFITS EXCLUSIVELY TO MINISTERS OF THE GOSPEL.**

    **A.   Tax Benefits That Are Not Neutrally Available To A Broad Range Of Groups Or Persons Without Regard To Religion Violate The Establishment Clause.**

Tax benefits that are not neutral and available to a broad range of groups or persons without regard to religion violate the Establishment Clause.  The Supreme Court recognized this principle in Texas Monthly v. Bullock, 489 U.S. 1 (1989), and has never waivered since in its holdings that neutrality is a necessary requirement of such government largesse.  In the present case, Internal Revenue Code §107 is not neutral, and therefore, it is unconstitutional.

The absence of neutrality is most evident in §107(2).  Section 107(2) allows ministers of the gospel to exclude from their income the full amount of any housing allowance provided by their church.  This exemption for cash payments is available only to ministers of the gospel; other taxpayers cannot deduct similar cash allowances, even if provided for the "convenience of the employer."  The §107(2) exemption, therefore, confers a substantial financial benefit to ministers, which is not neutrally available to any other taxpayers.

The core notion animating the Establishment Clause is that government may not be overtly hostile to religion -- but government also may not favor religion over non-religion.  Texas Monthly 489 U.S. at 9-10.  "When the government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens non-beneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion . . . it provides unjustifiable awards of assistance to religious organizations and cannot but convey a

1   message of endorsement to slighted members of the community." Id at 15, quoting

2   Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 348 (1987)

3   (O'Connor, J., Concurring in Judgment).

4          Tax exemptions provided exclusively to taxpayers on the basis of religion have

5   never been upheld by the Supreme Court, including in Walz v. Tax Commission of New

6   York City, 397 U.S. 664 (1970).  In Walz, the Court sustained a property tax exemption

7   that "applied to religious properties no less than to real estate owned by a wide array of

8   non-profit organizations." Texas Monthly, 489 U.S. at 11.  The broad class of non-

9   religious as well as religious beneficiaries was a critical factor in Walz, as well as in other

10  cases decided by the Supreme Court.  This factor is consistently emphasized by requiring

11  that benefits to religious organizations also flow to a large number of non-religious

12  groups.  Id.  "Indeed, were those benefits confined to religious organizations [in Walz],

13  they could not have appeared other than as state sponsorship of religion; if that were so,

14  we [Supreme Court] would not have hesitated to strike them down for lacking a secular

15  purpose and effect." Id.

16         In reaching its decision in Texas Monthly, Justice Brennan emphasized the

17  importance in Walz that the property tax exemption at issue flowed to a large number of

18  non-religious groups.  "The breadth of New York's property tax exemption was essential

19  to our [Supreme Court's] holding that it was not aimed at establishing, sponsoring, or

20  supporting religion." Texas Monthly, 489 U.S.at 12.  The Walz decision "in no way

21  intimated that the exemption would have been valid had it applied *only* to the property of

22  religious groups or had it lacked a permissible secular objective." Id at 13, n. 2.

23  (Emphasis in original.)  Justice Brennan's explanation in Texas Monthly, moreover,

24  reflected the Court's own long-accepted understanding of the holding in Walz:

1    Nor is our reading of <u>Walz</u> by any means novel.  Indeed, it has been the
2    Court's accepted understanding of the holding in <u>Walz</u> for almost 20 years.
3    In <u>Gillette v. United States</u>, 401 U.S. 437, 454 (1971), we said: "Neutrality
4    in matters of religion is not inconsistent with benevolence by way of
5    exemptions from onerous duties, <u>Walz v. Tax Commission</u>, 397 U.S. at
6    669, so long as an exemption is tailored broadly enough that it reflects
7    valid secular purposes." We read <u>Walz</u> to stand for the same proposition in
8    <u>Committee for Public Education and Religious Liberty v. Nyquist</u>, 413
9    U.S. 756, 793-794 (1973)."Without intimating whether this factor alone
10   might have controlling significance in another context in some future
11   case," we noted that the breadth of an exemption for religious groups is
12   unquestionably an "important factor" in assessing its constitutionality.  <u>Id</u>
13   at 794.  Our [Supreme Court] opinion today builds on established
14   precedents; it does not repudiate them.  <u>Texas Monthly</u>, 489 U.S.at 13, n.
15   3.
16
17        The <u>Walz</u> decision is distinguishable in other respects as well, including the fact

18   that property taxes are generally imposed without regard to the taxpayer's ability to pay,

19   whereas the federal income tax laws "take ability to pay" into account, including the

20   different rates of taxation and low-income deductions.

21        The exemption in <u>Walz</u> also reduced potential "entanglement" issues between

22   church and state, including the need to make determinations of property value.  Section

23   107, by contrast, does not avoid entanglement.  On the contrary, §107(2) requires fact-

24   sensitive inquiries into the "fair rental value" of the property, and more important, §107

25   also requires complex inquiries regarding religious concepts, such as defining "ministers

26   of the gospel," "sacerdotal function" and "integral agency" of a church or church

27   denomination.  The potential for entanglement, therefore, is increased by virtue of §107,

28   which was not the case in <u>Walz</u>.

29        Finally, <u>Walz</u> was based in part on a unique historical rationale relating to

30   property tax exemptions for church property dating back to the founding of the Country.

31   Unlike in <u>Walz</u>, however, the exemptions created by §107 lack this historical rationale.

32   The exemption in §107(2) for cash housing allowances paid to ministers was only first

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss     35**

1   enacted in 1954, and has been questioned ever since.  Cf. Kirk v. Commissioner, 51 T.C.

2   66, 72 (1968), affd. 425 F.2d 492 (D.C. Cir. 1970).  As is apparent, therefore, the Walz

3   decision is distinguishable from the present case on many bases.

4        What remains crucial in evaluating a tax subsidy afforded to ministers is whether

5   some "overarching secular purpose justifies like benefits for non-religious groups."

6   Texas Monthly at 15, n. 4.  "In any particular case the critical question is whether the

7   circumference of legislation encircles a class so broad that it can be fairly concluded that

8   religious institutions could be thought to fall within the natural perimeter."  Id at 17,

9   quoting Walz, 397 U.S. at 696.

10        The Supreme Court rejected in Texas Monthly the counter-argument that a sales

11  tax exemption removed a government-imposed burden on the free exercise of religion.

12  According to the Court, "it is virtually self-evident that the Free Exercise Clause does not

13  require an exemption from a governmental program unless, at a minimum, inclusion in

14  the program actually burdens claimant's freedom to exercise religious rights."  Id at 18.

15  In Texas Monthly, the payment of a sales tax to purchasers of religious books did not in

16  any way offend their religious beliefs or inhibit religious activity.  A significant

17  deterrence of free exercise rights, however, is necessary in order to sustain a legislative

18  exemption as an appropriate accommodation.  Id at 18, n. 8.

19        Finally, the Supreme Court concluded in Texas Monthly that the tax exemption at

20  issue there was not mandated, or even favored, by the Establishment Clause in order to

21  avoid excessive entanglement.  "Not only does the exemption seem a blatant endorsement

22  of religion, but it appears on its face, to produce a greater state entanglement with

23  religion than the denial of an exemption."  Id at 19.  The risk of entanglement existed

1   under the exemption statute, according to the Court, because of the need to determine that

2   a publication qualified as being religious.  Id.

3        The Government's attempt to limit Texas Monthly to tax exemptions for

4   publications involving religious speech is not a distinction that favors the Government.

5   Here, the §107 exclusion for ministers is available only when a minister is given use of a

6   home or receives a housing allowance as compensation for services performed "in the

7   exercise of" his or her ministry.  Services performed by a minister in the exercise of his

8   ministry include:  (1) the administration of sacerdotal functions; (2) the conduct of

9   religious worship; and (3) the control, conduct and maintenance of religious

10  organizations under the authority of a religious body constituting a church or church

11  denomination.  In effect, the §107 tax breaks for ministers constitute "preferential support

12  for the communication of religious messages," every bit as much as in Texas Monthly.  Id

13  at 28 (Blackmun, J. Concurring).

### B.    A Majority Of The Supreme Court Agreed On The Establishment Clause Principles In Texas Monthly.

17       The controlling principles recognized in Texas Monthly were joined in by a

18  majority of five members of the Court.  Justice Brennan, joined by Justices Marshall and

19  Stephens, thoroughly distinguished Walz, while concluding that preferential tax

20  exemptions for religion violate the Establishment Clause.  Justice Blackmun concurred,

21  joined by Justice O'Connor, and they concluded that the case could be decided on the

22  basis that "a tax exemption *limited to* the sale of religious literature by religious

23  organizations violates the Establishment Clause," without deciding the Free Exercise

24  issues in the case.  Id at 28.  (Blackmun, Concurring.)  In answering the decisive

25  question, Justice Blackmun agreed with the opinion of Justice Brennan:

In this case, by confining the tax exemption exclusively to the sale of
religious publications, Texas engaged in preferential support for the
communication of religious messages.  Although some forms of
accommodating religion are constitutionally permissible, see Corporation
of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v.
Amos, 483 U.S. 327 (1987), this one surely is not.  A statutory preference
for the dissemination of religious ideas offends our most basic
understanding of what the Establishment Clause is all about and hence is
constitutionally intolerable . . . .  The Establishment Clause prohibits a tax
exemption limited to the sale of religious literature.  Texas Monthly, 489
U.S. at 28.

Although Texas Monthly is described by the Government in this case as merely a

plurality decision by a splintered Court, it is really a conclusive opinion of the Court on

the Establishment Clause issue.  The Government implies that Texas Monthly is not

binding authority because the five justices who deemed Texas' sales and use tax

exemption for religious publications unconstitutional did not sign a single opinion.

Marks v. United States, 430 U.S. 188, 193 (1997), however, recognizes the authoritative

character of holdings supported by separate opinions that comprise a Court majority.

When a fragmented court decides a case in which no single rationale explaining the result

enjoys the assent of five justices, the holding of the court may be viewed as that position

taken by those Justices who concurred in the judgment on the narrowest grounds.  Id.

Using this standard, Texas Monthly is an easy case to read because the Court does not

even count as being "fragmented" on the Establishment Clause issue.

No meaningful difference exists between Justice Brennan's plurality opinion and

Justice Blackmun's concurrence in Texas Monthly applying the Establishment Cause to

tax preferences for religious activities.  Justice Blackmun, joined by Justice O'Connor,

declined to join Justice Brennan's opinion only because Justice Blackmun thought that

the Court should not decide what the Free Exercise Clause required regarding the

taxation of religious publications.  Justice Blackmun, however, did not voice any

1    disagreement with Justice Brennan's reading of <u>Walz</u>, nor did he leave any doubt that a

2    tax exemption solely for religious publications contravenes the Establishment Clause.

3          Justice Scalia, in dissent, construed the majority holding in <u>Texas Monthly</u> to

4    prohibit preferential tax benefits provided exclusively to religion.  Religious tax

5    exemptions "of the type the Court invalidates today," including the §107 housing

6    exemption, "are likewise affected" by the <u>Texas Monthly</u> holding, according to Justice

7    Scalia.  <u>Texas Monthly</u>, 489 U.S. at 24-25.  Justice Scalia specifically identified the §107

8    housing allowance as being within the scope of the Court's holding.

9          The division within the <u>Texas Monthly</u> majority on the Free Exercise issue is

10   irrelevant to the constitutionality of §107(2) because a Court majority stated

11   unequivocally that a tax exemption solely for religious entities cannot be constitutional,

12   as opposed to a tax break that is available to a broader class of entities, and that can be

13   justified by a permissible secular purpose.  <u>See</u>, Rakowski, <u>The Parsonage Exclusion:</u>

14   <u>New Developments</u>, Tax Notes, July 15, 2002, 429; <u>See also</u> Foster, Matthew, <u>Note: The</u>

15   <u>Parsonage Allowance Exclusion:  Past, Present and Future</u>, 44 Vand. L. Rev.  149, 175-

16   176 (1991):

17        In 1989 the Supreme Court struck down a statute that granted estate sales
18        tax exemption to religious periodicals in <u>Texas Monthly, Inc v. Bullock.</u>
19        A plurality composed of Justices Brennan, Marshall and Stevens relied
20        primarily on <u>Walz v. Tax Commission of New York</u> to hold that the
21        statute was too narrow to pass Establishment Clause scrutiny. ...In a
22        concurring opinion, Justices Blackmun and O'Connor held that a state
23        may not give a tax benefit to proponents of religion without also giving it
24        to others who actively might activate disbelief in religion.
25
26        The plurality and concurring opinions in <u>Texas Monthly</u> raise serious
27        doubts about the constitutionality of [Internal Revenue Code] Section
28        107.  Specifically, Section 107 grants a tax break to those who advocate
29        religion for a living, but denies the savings to taxpayers who do not meet
30        the IRS qualifications for a minister of the gospel.  Section 107 is drawn
31        and interpreted narrowly and does not embrace a broad class of
32        beneficiaries that might legitimize it under a <u>Walz</u> analysis.  As such,

1  Section 107 arguably represents a subsidiary directed exclusively to
2  religious beneficiaries, which does not remove any state-imposed
3  deterrent to the free exercise of religion and may provide unjustifiable
4  awards of assistance to religious interests.
5
6  Professor Erwin Chemerinsky also counts five justices in Texas Monthly as

7  supporting the conclusion that a tax exemption granted only to religion violates the

8  Establishment Clause.  In the Parsonage Exemption Violates the Establishment Clause

9  and Should be Declared Unconstitutional, 24 Whittier Law Review 707, 715-716 (2003),

10  Professor Chemerinsky concludes that the Supreme Court's decision in Texas Monthly

11  was supported by a 5-Justice majority on the decisive preference issue:

12  Although Justice Brennan wrote for a plurality of three justices (he was
13  joined by Justices Marshall and Stevens), Justices Blackmun and
14  O'Connor concurred in the judgment and came to the same conclusion:
15  A tax benefit given only to religion violates the Establishment Clause.
16  Justice Blackmun, joined by Justice O'Connor, declared "the
17  Establishment Clause value suggests that a state may not give a tax break
18  to those who spread the gospel that it does not also give to others who
19  actively might advocate disbelief in religion.
20
21  Justices Blackmun and O'Connor concurred in the judgment because they
22  thought it unnecessary to discuss the Free Exercise Clause, as was done
23  in the plurality opinion.  But Justice Blackmun's opinion left no doubt as
24  to his agreement that the Texas statute violated the Establishment Clause.
25  He wrote:  "A statutory preference for the dissemination of religious
26  ideas offends the most basic understanding of what the Establishment
27  Clause is all about and hence is constitutionally intolerable."
28
29  Thus, five justices in Texas Monthly held that the Establishment Clause
30  is violated by a tax exemption that gives "a tax break to those who spread
31  the gospel that it does not also give to others."  Internal Revenue Code
32  Section 107 (2) at issue in this case, provides a large tax break to
33  "ministers of the gospel" that no one else can claim.  Texas Monthly v.
34  Bullock is squarely on point, and under its controlling authority, Section
35  107 (2) is unconstitutional.
36
37  Neither courts nor commentators have seriously questioned that a majority of the

38  Supreme Court in Texas Monthly agreed and concluded that a tax preference that is not

39  neutral and generally available violates the Establishment Clause.  The requirement of

**Plaintiffs' Memorandum of Points and Authorities
in Opposition to United States' Motion to Dismiss**       40

neutrality and general applicability, particularly after <u>Texas Monthly</u>, has consistently

prevailed in courts' analysis of tax preferences.  This conclusion is well-described by

Donna Adler in <u>The Internal Revenue Code, the Constitution and the Courts:  The Use of</u>

<u>Tax Expenditure Analysis in Judicial Decision Making</u>, 28 Wake Forest L.Rev. 855 902

(1993):

> Cases decided after <u>Walz</u> have eviscerated the Court's rationale for
> finding that the property-tax exemption granted by New York State did
> not violate the Establishment Clause.  <u>Texas Monthly</u>, however, cited the
> holding in <u>Walz</u> favorably and stated explicitly that exemptions like
> those in <u>Walz</u> would be upheld.  What, then, is left in the <u>Walz</u> decision
> that merits approval from the Court and <u>Texas Monthly</u>?  Neither the no-
> subsidy logic, the historical argument, nor the entanglement argument
> survives.  None of those arguments, which could have been made in
> <u>Texas Monthly</u>, as well as in <u>Walz</u>, is sufficient to save the sales tax
> exemption.  Rather, the one factual distinction that seems to be the
> determinative issue is the breadth of the class benefited by the tax
> exemption.
>
> The Court seems to be adopting an "equal access" type of analysis in the
> tax exemption area.  As long as the benefits offered by the government
> are available to a wide variety of organizations, the fact that religious
> institutions will share in those benefits is not objectionable.  The Court
> cites three cases in which statutes were upheld even though benefits
> flowed to religious institutions -- <u>Widmar v. Vincent</u>, which addressed
> free access to public space; <u>Mueller v. Allan</u>, which examined a tuition
> deduction for parochial schools; and <u>Walz</u> which considered a property
> tax exemption.  The Court noted that "in all of these cases, we
> emphasized that the benefits derived by religious organizations flowed to
> a large number of non-religious groups as well."  Alternatively, if the
> benefits had been confined to religious organizations, "they could not
> have appeared other than as state sponsorship of religion" and would
> have been struck down.
>
> The controlling authority of <u>Texas Monthly</u>, in fact, suggests that even <u>Walz</u>

would have been decided differently if the property tax exemption at issue had been

limited only to church properties.  <u>Cf</u>.  <u>In re Springmoor</u>, 498 S.E.2d 177 (N.C. 1998)

(invalidating preferential property tax exemption for religious retirement homes).  Robert

1    Sedler makes this point in Understanding the Establishment Clause:  The Perspective of

2    Constitutional Litigation, 43 Wayne L. Rev. 1317, 1391-1392 (1997):

3            The property tax exemption for church property [in Walz] conferred a
4            very valuable financial benefit on churches, and like any other tax
5            exemption, effectively subsidized the churches' activity.  The effect of
6            Walz is to allow the state to provide a financial benefit to religion
7            through a tax exemption when it could not provide such a benefit through
8            a direct grant.  Crucial to the Court's holding in Walz is the matter of
9            inclusion.  The tax exemption was for non-profit institutions.  Therefore,
10           churches qualified for the grant, not because they were churches, but
11           because they were included within the class of non-profit institutions.  As
12           one commentator put it, "Those institutions shared a relevant non-
13           religious attribute with secular institutions."  There is no doubt that a
14           property tax exemption for churches alone would violate the
15           Establishment Clause as a preference for religion, notwithstanding that
16           such an exemption would avoid the "entanglement problems" that the
17           Court identified in Walz.  This point is demonstrated by Texas Monthly,
18           Inc.v. Bullock, where the Court held unconstitutional an exemption from
19           the state sales tax law for "periodicals that are published or distributed by
20           a religious faith and that consists wholly of writing promulgating the
21           teaching of the faith and books that consist wholly of writings sacred to
22           our religious faith."  In other words, it is the matter of the inclusion of the
23           religious with the secular that marks the distinction between the
24           constitutionally permissible equal treatment of religion and the
25           constitutionally impermissible preference for religion.
26
27           The law is clear that preferential tax exemptions for religion, which are not

28    neutral and applicable to a broad class of beneficiaries, violate the Establishment Clause.

29    The government in the present case incorrectly argues that Texas Monthly is merely an

30    interesting plurality decision by a fractured Supreme Court.  The Texas Monthly

31    decision, in fact, represents a majority opinion of the Supreme Court on the

32    Establishment Clause issue, and that decision has never been repudiated by the Court.

33    The Texas Monthly decision, and the consistent authority of later Supreme Court

34    decisions, establish that preferential tax benefits constitute a substantive benefit that can

35    not be preferentially conferred upon religion under the Establishment Clause.

## C.    Section 107(2) Provides Greater Benefits To Ministers Than Section 119 Provides To Non-Clergy Taxpayers.

The Government incorrectly insinuates that Internal Revenue Code §107 merely provides tax benefits to ministers that are otherwise available to all taxpayers under Internal Revenue Code §119.  The benefits provided by §107, in fact, are provided to ministers without regard to the requirements of §119.  That is precisely why Congress adopted §107 -- and it is precisely why the religious community so vigorously defends the §107 benefits.  The requirements of §119 are different and more limiting than the requirements of §107, and for that reason, §107 undisputedly provides preferential benefits to religion that are not neutrally and generally available to a broad range of taxpayers.  Ministers constitute a privileged class under §107(2).

Section 107 permits only ministers of the gospel performing religious services to exclude from their taxable income that portion of their compensation that is designated as a housing allowance or housing provided in-kind.  In order to claim the housing allowance, two principal conditions must be met:

1.    The allowance must be provided as compensation for services that ordinarily are the duties of a minister of the gospel.  This condition is unrelated to any requirement that the minister's residence be used to perform the services of a minister.  The Internal Revenue Service, in fact, has determined that even a retired minister of the gospel is eligible to claim the housing allowance exemption because the allowance is deemed to have been paid as part of the retired minister's compensation for past services as a minister of the gospel.  Rev. Rul. 63-156, 1963-2 C.V. 79.

2.    The amount of the housing allowance must be designated in advance by an employing church.  The designated housing allowance must then actually be used by the minister for housing purposes.

Subsection (2) of §107, in particular, provides a tax benefit that is unavailable to other taxpayers -- beyond argument.  Section 107(2) allows an employing church to designate part of a minister's cash compensation as a housing allowance, which

1    designated compensation is then tax-free to the minister.  By contrast, §119 allows no

2    exemption for cash allowances, even if the allowances are used to provide housing for the

3    convenience of the employer.  Section 107(2), moreover, has no requirement that

4    compensation designated as a housing allowance be used for any particular housing

5    selected by the church for its own convenience.  The designated compensation paid to the

6    minister is tax-free, unlike for any other taxpayers, and the housing allowance does not

7    have to be used for the convenience of the employer, also unlike the requirement for all

8    other taxpayers.

9              Ministers derive an enormous financial benefit from Internal Revenue Code

10   Section 107(2) by being paid in tax-exempt dollars.  Professor Chemerinsky describes

11   this significant tax break to religion:

12             Section 107's blatant favoritism for religion can be seen by comparing it
13             with other provisions of the Internal Revenue Code that provide a benefit
14             to ministers on the same terms as others in similar situations in secular
15             institutions.  For example, Section 119 of the Internal Revenue Code
16             allows an income exclusion for the value of meals and lodging that are
17             provided on the business premises of an employer as a convenience to
18             the employer and as a condition of employment.  Thus, a minister who is
19             required to live on the church's premises is allowed an exclusion under
20             this provision, but so is the head of a school who lives on the premises,
21             or any other employee who is required to live in housing provided at the
22             workplace.  Section 107 is unique in that it provides a benefit to religion
23             -- to "ministers of the gospel" -- that no one else receives.
24
25             Section 107(2) allows ministers to be paid without having to pay taxes on
26             some or all of their salary by having it declared a housing allowance.
27             But the benefit is even greater than that:  Clergy also can deduct their
28             mortgage payments and real estate taxes from their income tax, even
29             though they paid for these with tax-exempt dollars.  Although this type of
30             "double-dipping" generally is not allowed, a specific provision [Section
31             265(a)(6)] of the Internal Revenue Code permits "ministers of the
32             gospel" who benefit under Section 107(2) to deduct the mortgage interest
33             and property tax that they paid with their tax-exempt allowance.  This
34             results in a substantial windfall -- or government subsidy -- for clergy
35             that no one else receives.  One commentator explains with a simple
36             example:
37

1
2
3
4
5
6
7
8

       Suppose a taxpayer receives a $1,000 per month rental
allowance from the church.  Assume also that he pays
$333 in mortgage interest every month, and is in the 33%
tax bracket.  If the taxpayer is allowed to deduct interest
under Section 265, then he will get a $111 windfall every
month.  The church spends $1,000, but the clergyman
receives total benefits in the amount of $1,111.

9
10
11
12
13
14

       Moreover, the effect is a significant financial benefit to religion because
churches and synagogues and mosques can pay their clergy much less
because of the tax-free dollars.  Without the parsonage exemption,
religious institutions would have to pay clergy significantly more to
make up this difference.

15   Chemerinsky, The Parsonage Exemption Violates the Establishment Clause and Should

16   be Declared Unconstitutional, 24 Whittier Law Review, 707, 712-713 (2003).

17          Section 107(2) does not provide a benefit that is neutrally available to other

18   taxpayers.  Section 119, generally applicable to all taxpayers, does not allow for the

19   exclusion of any cash amount paid as compensation, even if used to pay housing costs for

20   the convenience of the employer.  Section 119 is applicable only to in-kind housing,

21   which must be provided for the convenience of the employer.  The substantial tax benefit

22   of §107(2), therefore, is not available to other taxpayers under §119.  Section 107(2)

23   provides a unique benefit that is only available on the basis of religion.

24          The benefit under §107(2) accrues to ministers who may use their designated

25   housing allowance to purchase an asset that has the potential to appreciate and increase in

26   value.  This benefit is not available to other taxpayers:

27
28
29
30
31
32
33
34
35

       Section 107(2) directly benefits ministers and religion.  The most direct
effect of Section 107(2) is its significant lowering of a minister's tax
burden.  Section 107(2) concurrently bestows an economic benefit on the
minister's church, in much the same manner as Section 107(1).  While
the support that Section 107(2) provides to ministers and religions is
qualitatively identical to Section 107(1), there is one difference.  The IRS
has interpreted Section 107(2) to allow ministers to purchase homes to
exclude the home's fair rental value from gross income.  Section 107(2)
thus provides minsters with personal benefits beyond any religious

1   considerations by allowing an exemption from funds expended on a
2   home which will appreciate in value.
3
4   O'Neill, Thomas, <u>A Constitutional Challenge to §107 of the Internal Revenue Code</u>, 57

5   Notre Dame Law. 853, 864 (1982).

6   　　　The preferential tax benefits of §107(2) further differ from §119 because the

7   exemption is available without regard to the "convenience of the employer."  Section 119

8   provides an exclusion for housing if:  (1) the lodging is furnished on the business

9   premises of the employer; (2) the lodging is furnished for the convenience of the

10   employer; and (3) the employee is required to accept such lodging as a condition of his

11   employment.  Under this test, an employee must pay income tax on the value of free

12   housing, except where the lodging meets the "convenience of the employer"

13   requirements.

14   　　　Section 119 applies only where the employer desires to have a continuous

15   presence of the employee at the job site and to have him within reach at all times.  As the

16   Supreme Court held in <u>Commissioner v. Kowalski</u>, 434 U.S. 77, 93 (1977), the

17   convenience of the employer requires that the employee must accept housing in order to

18   properly perform his duties.  This requirement is not imposed as a condition of the

19   §107(2) exemption, including as to tax-free payments made directly to ministers.  Section

20   107(2) provides for tax-free compensation to ministers in circumstances that are not

21   available to other taxpayers, including under §119.

22   　　　Section 107(2) creates an incentive for churches to designate a minister's

23   compensation as a housing allowance in order to increase the minister's net income, while

24   reducing the church's wage payments correspondingly.  (Bolton Aff., Exhibit 4.)  "The

25   effect is a significant financial benefit to religion because churches and synagogues and

26   mosques can pay their clergy much less because of the tax-free dollars.  Without the

1   parsonage exemption, religious institutions would have to pay clergy significantly more

2   to make up this difference."  Chemerinsky, 24 Whittier Law Review at 713.  (See also

3   Bolton Aff., Exhibits 6, 9 and 10.)  Non-church employers cannot increase the net-

4   compensation of their employees by designating an amount to cover their housing costs --

5   and therefore, they cannot correspondingly reduce their wage payments.  By the simple

6   act of designating a housing allowance for ministers, however, churches and ministers

7   can receive a financial advantage not available to other employers and employees.

8      The incentive for churches to designate cash housing allowances derives from

9   §107(2).  The tax-saving effect of §107(2), in fact, is the very reason that ministers and

10   churches fight to keep this substantial tax benefit, which is not available under §119.

11   Even the proposed intervention in the present case by Reverend Rodgers was based on

12   his claimed financial interest in a tax-free housing allowance, which he and other

13   ministers do not automatically qualify for under §119.  Similarly, the National

14   Association of Church Business Administrators sought leave to file an amicus curiae

15   brief in the Ninth Circuit case of Warren v. Commissioner of Internal Revenue, in 2002.

16   Their motion made clear that the interest being protected was economic self interest:

17      This Court's [Ninth Circuit] decision will affect how each [church]
18      compensates at least some of its clergy.  Further, clergy are compensated
19      very modestly compared to other learned professionals with comparable
20      education and experience.  If the church's clergy are required to pay more
21      federal income taxes, then the churches must divert more of their
22      resources from their charitable and religious activities toward their
23      clergy's compensation.  As a result, the Amicus Curiae are vitally
24      interested in the outcome of this proceeding.  Motion for leave to file
25      amicus curiae brief supporting the decision of United States Tax Court,
26      filed in the United States Court of Appeals for the Ninth Circuit on April
27      24, 2002, by Attorney Frank Sommerville, attorney for the Amicus
28      Curiae.
29
30      Finally, the income tax exclusions for housing allowances provided to overseas

31   government employees and military personnel do not render §107(2) neutral and broad-

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss**  **47**

based.  These exemptions are not part of a broad and comprehensive statutory scheme for

excluding housing allowances from taxable income.  As Professor Chemerinsky has

noted, the government can give its employees a tax break, but §107(2), in contrast, is a

benefit only to privately employed clergy, and it is not at all about the government

structuring the compensation for its employees:

> The government in the <u>Warren</u> case pointed to the ability of those in the
> United States military and those employed by the United States in
> foreign countries, such as in the Foreign Service, the CIA, and the Peace
> Corps, to be paid in tax-exempt dollars.  But these are all federal
> employees and if the government wants to pay its employees via a tax
> break it certainly can do so.  Section 107(2), in contrast, obviously is a
> benefit to privately-employed clergy and not at all about the government
> structuring the compensation for its employees.  Indeed, it is noticeable
> that "ministers of the gospel" in the military or in federal employ in
> foreign countries get the same tax break as civilians in these entities; but
> the parsonage exemption benefits only religion.

Chemerinsky, 24 Whittier Law Review at 728.

The Supreme Court rejected an argument similar to the Government's in <u>Texas</u>

<u>Monthly</u>, where the State sought to justify its sales tax exemption for religious

publications by citing other sales tax exemptions provided for different purposes.  The

Court was unimpressed by this argument, noting that other exemptions for different

purposes did not rescue the exemption for religious periodicals from invalidation.  "What

is crucial is that any subsidy afforded religious organizations be warranted by some

overarching secular purpose that justifies like benefits for non-religious groups."  489

U.S. at 15 n. 4.

The Supreme Court further recognized in <u>Texas Monthly</u> that in evaluating

preferences, "the Court must survey meticulously the circumstances of governmental

categories to eliminate, as it were, religious gerrymanders.  In any particular case the

critical question is whether the circumference of legislation encircles a class so broad that

1   it can be fairly concluded that religious institutions could be thought to fall within the

2   natural perimeter."  489 U.S. at 17, quoting Walz, 397 U.S. at 696.

3          Here, §107(2) expressly provides an exemption intended to benefit religion alone.

4   The housing allowance exemption for ministers is not grounded in a secular legislative

5   policy that motivates similar tax breaks for non-religious employees.  Section 107(2)

6   does not provide an exemption for cash housing allowances paid to ministers for the same

7   reason that the government exempts housing allowances paid to the military and other

8   overseas employees of the government.  "The circumference of legislation" providing

9   allowances to overseas government employees does not "encircle a class so broad that it

10   can be fairly concluded" that ministers of the gospel could be thought to fall within the

11   natural perimeter.

12          The Internal Revenue Code does not exempt cash housing allowances for any

13   private employees other than ministers of the gospel.  This is a substantial preferential tax

14   benefit that is not available to other private employees, including under §119.  The reason

15   that §107(2) is defended so vigorously by churches and ministers, therefore, is not

16   because it merely duplicates the exemption otherwise available to them under §119; their

17   concern is driven by the fact that this substantial tax benefit would not otherwise be

18   available to them if they are held to the terms applicable to all other taxpayers.

19      **D.      Section 107(1) Also Is More Advantageous Than Section 119.**

20          Subsection (1) of §107 also provides tax benefits to ministers that are not

21   generally available.  Subsection (1) provides that gross income does not include the rental

22   value of a home furnished to a minister of the gospel "as part of his compensation."  The

23   Government contends that this is just a restatement of §119, which allows an exemption

1  for lodging provided for "the convenience of the employer."  Section 107(1), however, is

2  not equivalent to §119.

3        The Government claims that Congress' intent is evident because the original

4  parsonage exemption enacted by Congress in 1921 was supposedly adopted in response

5  to the Treasury Department's refusal to allow ministers to claim the same "convenience of

6  the employer" exemption allowed to other employees.  (Government's Brief at 25.)  Even

7  the limited evidence from 1921, however, indicates that Congress intended to create an

8  exemption that is not the same as the §119 exemption for lodging provided for the

9  "convenience of the employer."

10        The Treasury Department in 1921 did not expressly refuse to recognize "the

11  convenience of the employer" doctrine as it applied to ministers.  O.D. 862 merely

12  refused to recognize a flat exemption for housing provided in addition to the salary paid

13  to a minster:

14        Where in addition to the salary paid a clergyman is permitted to use the
15        parsonage for living quarters free of charge the fair rental value of the
16        parsonage is considered a part of his compensation for services rendered
17        and as such should be reported as income.  [O.D. 862.]
18
19        The Treasury Department, in reaching its conclusion in O.D. 862, did not

20  specifically address the "convenience of the employer" doctrine as applied to ministers.

21  There was no analysis of the convenience of the employer, but rather the Department

22  focused on the value of the parsonage as part of clergy compensation, in circumstances

23  where a minister is "permitted" to use the parsonage -- but not required to use it.  The

24  Department simply did not address the convenience of the employer doctrine as if it

25  applied -- presumably because ministers could not meet the requirements of the test.

1      By contrast, the Treasury Department did expressly apply the convenience

2 doctrine when those requirements were met by employees.  For example, with respect to

3 fish cannery employees, the Treasury Department concluded:

> Where, from the location or nature of the work, it is necessary that
> employees engaged in fishing and canning be furnished with lodging and
> sustenance by the employer, the value of such lodging and sustenance
> may be considered as being furnished for the convenience of the
> employer and deemed not, therefore, to be included in computing net
> income of the employees.  [O.D. 814.]

The Department similarly applied the "convenience of the employer" standard in respect

to hospital employees:

> Where the employees of hospital are subject to immediate service on
> demand at any time during the 24-hours of the day and on that account
> are required to accept quarters and meals at the hospital, the value of
> such quarters and meals may be considered as being furnished for the
> convenience of the hospital and does not represent additional
> compensation to the employees.  On the other hand, where the employees
> are on duty a certain specified number of hours each day and could, if
> they so desired, obtain meals and lodging elsewhere than in the hospital
> and yet perform the duties required of them by such hospital, the ratable
> value of the board and lodging furnished is considered additional
> compensation.  [O.D. 915.]

The implication of O.D. 862 is that clergy did not meet the standards of the

administratively-created "convenience of the employer" doctrine.  There are reasons for

that conclusion, including because ministers can just as easily and successfully perform

their job duties if they live at another location, and nothing in their job description

requires clergy to live on or near a church property.  In fact, churches provided

parsonages not as a requirement, but as an attractive financial benefit.  (See Bolton Aff.,

Exhibit 6.)

The "convenience of the employer" rule also was always intended to be narrow,

as evidenced by rulings such as O.D. 915 and O.D. 814.  It applied, for example, to

employees living on a ship, who obviously performed work that could not be performed

1    as they were living elsewhere.  Similarly, the convenience of the employer applies to

2    some hospital employees, but only if they are on call 24 hours a day.  The narrow scope

3    of the "convenience of the employer rule," as illustrated by O.D. 915, is the reason why

4    ministers did not meet the standards of that rule -- not that the rule was inapplicable to

5    them.

6           The subsequent Revenue Act of 1921, in response, did not simply provide that the

7    "convenience of the employer" test should apply to ministers.  The Revenue Act of 1921,

8    instead, provided that any free housing provided to ministers as part of their

9    compensation would be exempt from income taxation.  The 1921 Act did not limit the

10   exemption to housing provided for the "convenience of the employer," and it thereby

11   provided greater tax benefits to ministers.  If the Revenue Act of 1921, in fact, had

12   merely been intended to direct the Treasury Department to apply the "convenience of the

13   employer" doctrine to ministers, that is what the legislation would have said -- instead, it

14   proved an exemption that is independent of the "convenience of the employer," and hence

15   it provides broader privileges.

16          When §107(1) was enacted in 1954, Congress again allowed a tax benefit to

17   ministers for in-kind housing that was not tied to the "convenience of the employer."

18   Subsection (1) carried forward the unrestricted housing allowance from the Revenue Act

19   of 1921, which provided a tax exemption for ministers that is broader than the exemption

20   in §119, which only allows exemption for housing provided at the "convenience of the

21   employer."  The fact that §107 and §119 were both enacted in 1954 makes clear that the

22   parsonage allowance was not simply another way for Congress to articulate the

23   "convenience of the employer" test.  The reality is that Congress intended §107,

1  including subsection (1), to provide a broader exemption independent of the restrictions

2  of §119.

3       The Government's own historical argument also makes clear that the free-standing

4  housing allowance for ministers under §107(1) was not enacted to avoid any substantial

5  burden on free exercise rights.  The Government traces subsection (1) back to the

6  Revenue Act of 1921, which the Government claims was a reaction to the Treasury

7  Department's refusal to apply the "convenience of the employer" doctrine to ministers.

8  According to the Government, Congress intended the Revenue Act of 1921 to reverse the

9  Treasury Department's refusal to apply the "convenience of the employer" doctrine to

10  ministers.  Even if that was the case, however, then Congress' alleged motivation was not

11  to abate any substantial burden on free exercise rights.  Moving forward in time to 1954,

12  the Government still cites no evidence that subsection (1) of §107 was enacted to avoid

13  any substantial burden.  Congress, nonetheless, enacted an exemption for in-kind housing

14  provided to ministers in subsection (1) that provides broader benefits than §119.

15       To avoid the greater breadth of subsection (1) of §107 as applied to ministers, the

16  Government claims, without evidentiary support, that parsonages really are only provided

17  to ministers for the convenience of the employer; this unsupported factual allegation is

18  contradicted by the known evidence that free housing often was offered by churches as an

19  inducement to employment, and not for the convenience of the employer.  (See Bolton

20  Aff., Exhibit 6.)  Both subsection (1) and subsection (2) of §107, moreover, make

21  compensation an essential element of the parsonage exemption, i.e., cash or in-kind

22  lodging must be provided as part of a minister's compensation, which is a different

23  requirement than the convenience of the employer test.

1   The Government's claim that §107(1) is essentially identical to §119 is simply not

2   correct.  Section 119 applies only to in-kind lodging that is not intended as compensation.

3   The Supreme Court noted this fact in its background discussion of the "convenience of

4   the employer" doctrine in <u>Commissioner of Internal Revenue v. Kowalski</u>, 434 U.S. 77,

5   87 (1977).  The exclusion from income under "the convenience of the employer" doctrine

6   rests upon the characterization of the benefit as essentially non-compensatory, and it

7   requires that the furnishing of such benefits be necessary to allow an employee to

8   perform his duties properly.  By contrast, the parsonage exemption is explicitly

9   dependent upon the parsonage being provided as part of the minister's employment

10  compensation.

11      Subsection (1) of §107, like subsection (2), therefore, confers a tax benefit on

12  ministers that is not neutrally and generally available to other employees.  The parsonage

13  exemption of subsection (1) is not dependent upon the "convenience of the employer,"

14  which is critical to the exemption provided by §119.  The parsonage allowance is

15  intended to exempt from taxation the value of housing that churches provide to induce

16  ministers to accept employment.  Whereas in-kind lodging provided for the "convenience

17  of the employer" is not intended as an inducement to accept employment, the parsonage

18  allowance under subsection (1) exempts benefits provided to ministers that are intended

19  as part of their compensation package.

20      In sum, the parsonage allowance in subsection (1) of §107 is more advantageous

21  than the exemption provided by §119.  The parsonage allowance in subsection (1) of

22  §107 is available preferentially only to ministers of the gospel.  Other employees do not

23  receive a comparable benefit under §119, contrary to the Government's unsupported

24  claim.

**E.     Section 107 Is Not An Accommodation Of A Substantial**
**Government-Imposed Burden On Free Exercise Rights.**

The Government further argues that §107 is merely an accommodation of religion that is permissible in the case of government-imposed substantial burdens on Free Exercise rights.  According to the Government, §107 modifies the §119 standard applicable to the housing exemption so as to eliminate intrusive government inquiries, while allowing ministers of the gospel a benefit that is otherwise generally available.

The Government's argument lacks merit, in the first place, because the factual predicate is missing:  The Government advances no evidence that §107 was enacted by Congress to avoid any potential entanglement between Government and religion.  The Government's own description of the historical background to both of the subsections to §107 contradicts the Government's present argument that §107 was intended to relieve Government burdens on free exercise rights.  This self-serving argument is not supported by any evidence and seems to be made from whole cloth.

The Government's accommodation argument also lacks substantive merit, particularly with respect to §107(2).  Subsection (2) allows ministers to exclude from income a cash rental or housing allowance designated by the employing church.  The exemption for cash compensation paid for housing to ministers is unique under the Internal Revenue Code for private employees.  Employees of other private employers cannot receive a designated cash housing allowance that is tax deductible -- only church-employed ministers can deduct all of their housing costs from their taxable income.

Section 107(2) cannot be characterized as an accommodation necessary for ministers to qualify for an otherwise generally available benefit.  The benefit allowed by §107(2) is not available to other taxpayers, except some overseas government employees and military personnel, and so no accommodation can be justified in order to

1    preferentially make available a benefit to ministers of the gospel.  In fact, Congress

2    enacted §119 and §107(2) as part of the same legislative package in 1954, yet

3    discriminated in favor of ministers by creating a unique tax break that is denied to non-

4    clergy under §119.

5         The Government argues alternatively that §107(2) was enacted in 1954 in order to

6    allow ministers a tax-free housing allowance even when the employing church does not

7    provide in-kind housing.  Under this reasoning, §107(2) also is not responsive to any

8    government-imposed burden on religion, but rather is based upon the intent to give all

9    ministers a tax-free housing allowance, even when they are not provided in-kind housing

10   by their employing church.

11        The Government's attempt to justify §107(2) as a church-equity accommodation

12   is unpersuasive because the Government is nonetheless providing a benefit preferentially

13   to ministers of the gospel, albeit more of them than before; the exemption for cash

14   housing allowances paid to ministers, moreover, is unrelated to any government-imposed

15   burden; and the tax exemption for cash housing allowances paid to ministers is

16   completely independent of the "convenience of the employer," which is required for other

17   taxpayers.

18        Providing ministers who are paid in cash with a tax benefit in order to "equalize"

19   their circumstances with ministers provided in-kind housing, is constitutionally

20   unacceptable, without providing a similar exemption to secular employees.  Professor

21   Chemerinsky explains the problem for the Government:

22        Section 107(2), at issue in this case, provides a huge benefit just to
23        religion:  Only ministers of the gospel can be paid a tax-exempt housing
24        allowance.  In other words, Section 107(2) creates an enormous
25        inequality:  Favoring religious employees and religious institutions over
26        all others.  Giving more to religion hardly is a "secular purpose"
27        sufficient to meet the <u>Lemon</u> case test.

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss      56**

1
2       Indeed, the equality argument made by the Government in several of the
3       Amici in the Warren case has no stopping point.  Under this reasoning,
4       the Government could directly subsidize housing for clergy if that would
5       equalize the benefits with those who live in housing provided by their
6       churches.  The obvious impermissibility of such a subsidy shows why the
7       equality argument is insufficient to justify the parsonage exemption.  One
8       Amici says that the purpose of the parsonage exemption is to "equalize
9       the impact of the federal income tax on ministers of poor and wealthy
10      congregations."  Helping poorer religions is hardly a secular purpose;
11      surely, the Government cannot subsidize poorer religions out of a desire
12      to help make them more equal with wealthier religions.
13
14  Chemerinsky, 24 Whittier Law Review at 724-25.

15          The Government's accommodation argument with respect to §107(2) is not

16  supported by any recognized legal authority.  The Supreme Court's decision in

17  Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v.

18  Amos, 43 U.S. 327 (1987), in particular, does not support the Government's argument.  In

19  Amos, the Supreme Court considered the constitutionality of an exemption from anti-

20  discrimination hiring laws as applied to religious organizations.  The Court upheld the

21  exemption as an appropriate accommodation because of the effect that such regulatory

22  laws might have on the internal operation of religious organizations.  The Court

23  recognized in Amos that "at some point, accommodation may evolve into an unlawful

24  fostering of religion." Id at 334-335.  In reaching its decision with regard to employment

25  discrimination laws, however, the Supreme Court said that "it is a permissible leglislative

26  purpose to alleviate significant governmental interference with the ability of religious

27  organizations to define and carry out their religious missions." Id at 335.  "Where, as

28  here, the government acts for the proper purpose of lifting a [government] regulation that

29  burdens the exercise of religion, "then an accommodation may be justified." Id at 338.

30          The rationale of Amos and other cases involving accommodation of religion is

31  inapplicable to §107.  Civil rights laws are regulatory in nature, such as involved in

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss      57**

1    Amos.  They regulate what conduct is prohibited, permitted or required.  The application

2    of anti-discrimination hiring rules to a church, therefore, arguably "would interfere with

3    the conduct of religious activities."  On this basis, Amos upheld an exemption from the

4    anti-discrimination laws.

5         In the present case, income tax laws are not regulatory in nature and do not

6    govern behavior.  Rather, they only impose a monetary burden, which is not a

7    constitutionally significant burden.  "To the extent that imposition of a generally

8    applicable tax merely decreases the amount of money [the taxpayer] has to spend on its

9    religious activities, any such burden is not constitutionally significant."  Jimmy Swaggart

10   Ministries v. Board of Equalization, 493 U.S. 378, 391 (1990), citing Hernandez v.

11   Commissioner, 490 U.S. 680, 699 (1989).  In Hernandez, the Supreme Court concluded

12   that the federal income tax was not a "constitutionally significant" burden on religion

13   where the taxpayer could not claim a deduction for money paid to the Church of

14   Scientology for religious services.  Similarly, §107 is not necessary to alleviate a

15   substantial burden on the exercise of religion.  Section 107 simply cannot be justified as

16   relieving a burden on the exercise of religion, contrary to the Government's argument.

17   As in Texas Monthly, therefore, §107 cannot be justified as a means of removing any

18   "imposition on religious activity."  See Texas Monthly, 489 U.S. at 15, n. 8.

19        In the absence of a government-imposed burden on the free exercise of religion,

20   the government cannot preferentially bestow benefits exclusively on religion.  In such

21   cases, even a purported religious accommodation impermissibly advances religion if it

22   provides a benefit to religion without providing a corresponding benefit to a large number

23   of non-religious groups or individuals, as described in Texas Monthly, a case in which no

24   substantial government-imposed burden was at issue.  In fact, if Congress had truly been

**Plaintiffs' Memorandum of Points and Authorities
in Opposition to United States' Motion to Dismiss      58**

1    seeking just to equalize the tax treatment of in-kind housing and cash housing

2    allowances, then tax-free allowances could have been provided to taxpayers generally.

3    Instead, Congress enacted a new benefit available only to clergy.

4            Section 107 provides tax benefits to religion, including the exemption for cash

5    housing allowances, which are not generally available to other taxpayers, including under

6    §119.  Because no exemption otherwise exists for cash housing allowances, moreover,

7    §107(2) cannot be construed to accommodate any hypothetical government-imposed

8    burden on the free exercise of religion.  Section 107(2), purely and simply, is a tax

9    benefit provided only to religion.  As such, the exemption for cash housing allowances

10   provided to ministers by §107(2) makes quite apt the Supreme Court's admonition that

11   even "accommodation may devolve into an unlawful fostering of religion."  Amos, 483

12   U.S. at 334-335.

13           **F.        Section 107 Increases Government Entanglement With Religion.**

14           Preferential tax benefits to ministers of the gospel also cannot be justified as a

15   means to avoid government entanglement with religion.  This argument by the

16   Government is advanced only hypothetically because no evidence supports the factual

17   predicate that the Government even intended to minimize entanglement via §107.  The

18   Government is merely arguing "what if?"

19           The Government, nonetheless, postulates that the factual inquiries under §107 are

20   less intrusive into religious affairs than the "convenience of the employer" considerations

21   under §119.  The Government's claim that administering §119 with respect to ministers

22   would give rise to more entanglement than the inquiries under §107, however, is wrong

23   on the merits.

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss**      59

1        The Government unpersuasively argues that the inquiries under Internal Revenue

2   Code §119 would cause undue entanglement with religion.  The relevant considerations

3   under §119 belie the Government's contention.  Section 119 grants an exclusion for

4   lodging furnished to an employee by his employer if three conditions are met:  (1) the

5   lodging is furnished for the convenience of the employer; (2) the lodging is on the

6   business premises of the employer; and (3) the employee is required to accept the lodging

7   as a condition of its employment.  Vanicek v. Commissioner, 85 T. C. 731, 737-738

8   (1985).  (The familiar "convenience of the employer" test is essentially the same as the

9   "condition of employment" test.  Id at 739.)  To exclude the value of lodgings from

10  income under §119, moreover, a taxpayer must also show that the lodgings were located

11  on the business premises of the employer, which is defined as a place where the

12  employee performs a significant portion of his duties or on the premises where the

13  employer conducts a significant portion of its business.  Id at 739.  Inquiring into the

14  subjective intention of the employer is not important to the ultimate decision because

15  Congress intended that an objective test should be used in applying §119.  United States

16  Junior Chamber of Commerce v. United States, 167 Ct. Cl. 392, 397 (1964).  Finally,

17  §119 applies only to lodging furnished in-kind.  Kowalski v. CIR, 64 T. C. 44, 54 (1975).

18  It is these requirements of §119 that the Government now claims "might" entangle the

19  government in inappropriate and continuous "surveillance" of religious organizations.

20  The Government's argument is unsupported by any known authority and it is logically

21  unconvincing.

22        The Government's claim that inquiries under §107 are not entangling is

23  inplausible.  Section 107 excludes from the gross income of a minister of the gospel:  (1)

24  the rental value of a home furnished to him as part of his compensation; or (2) the rental

1   allowance paid to him as part of his compensation, to the extent used to rent or provide a

2   home.  This exemption requires the Internal Revenue Service to first determine whether

3   an individual qualifies as a "minister of the gospel."  Administrative regulations

4   implementing §107 further require that ministers of the gospel perform duties such as

5   sacerdotal functions, the conduct of religious worship, the administration and

6   maintenance of religious organizations and their integral agencies, and the performance

7   of teaching and administrative duties at theological seminaries.  T. Reg. 1.1402(c)-5.

8   What constitutes "religious worship" and "the administration of sacerdotal functions," in

9   turn, depend on the tenets and practices of the particular religious body at issue.  T. Reg.

10   1.1402(c)-5(b)(2)(i).

11        In practice, the necessary determinations under §107 require that a significant

12   amount of evidence be brought before the IRS just to prove that an individual is in fact a

13   minister for purposes of §107.  See Lloyd H. Meyer, IRS Letter Rulings: Rendering Unto

14   Caesar, The Exempt Organization Tax Review (May, 1999 at 331-333) (discussing IRS

15   letter ruling addressing whether "ordained deacons" constitute ministers of the gospel).

16   Although the Government claims that these inquiries involve less entanglement with

17   religion than the requirements of §119, both common sense and reality contradict the

18   Government's argument.

19        The inquiries under §107 have historically required complex inquiries into the

20   tenets of religious orthodoxy.  In Silverman v. Commissioner, 1973 U.S. App. LEXIS

21   8851 (8th Cir. 1973), aff'd 57 T.C. 727 (1972), for example, the Court of Appeals

22   considered whether a full-time cantor of a Jewish congregation qualified as a minister of

23   the gospel under §107.  In reaching a decision, "the significance of ordination in the

24   Jewish religion as practiced in the United States was a central issue as to which the views

of three major branches of Judaism were solicited."  After examining the facts of that

case against an analysis of the historical background of the cantorate in the Jewish faith,

the Court of Appeals concluded that the taxpayer qualified for the §107 exemption.

Similarly, in Salkov v. Commissioner, 46 T. C. 190, 198-199 (1966), the Court

also considered whether a full-time cantor in the Jewish faith was a minister of the gospel

entitled to exclude a rental allowance from his gross income under §107:

> Regardless of the theoretical power of a Jewish layman, what in fact does
> Cantor Salkov do and what are his functions?  He is a spiritual leader.
> He teaches.  He performs pastoral duties.  He is the minister-messenger
> of the congregation, commissioned and licensed by the congregation and
> by the Cantors Assembly of America to officiate professionally and
> regularly in sacred religious service of the Jewish people.  He performs
> what is regarded as a sacerdotal function of Judaism -- the sanctification
> of the Sabbath and festival wine in a synagogue (compare the Christian
> mass and Communion); he elevates and holds the sacred Torah (compare
> the elevation of the Host); and he waves the sacred Lulav (compare the
> waving of the palms).  For long periods of both prayer and service he is
> the only person standing at the pulpit.  At all times he and the rabbi share
> the pulpit.  Historically and functionally he is a sui generis minister.
> Hence, from the thicket of our factual and legal exploration of this issue,
> we emerge with the conclusion that in these particular circumstances the
> petitioner, a full-time cantor of the Jewish faith, qualifies as a "minister
> of the gospel" within the spirit, meaning and intendment of Section 107.

The Tax Court also had to consider the tenets of the Baptist religion in Colbert v.

Commissioner, 61 T. C. 449 (1974).  The Court recognized in that case that there is no

formal statement of precepts which are binding on Baptist churches, but nevertheless, the

term "tenets and practices" as used in the IRS Regulations include "those principles

which are generally accepted as beliefs and practices within the Baptist denomination."

Id at 455.  Determining what constitutes the official "precepts and principles" of a

religion, however, necessarily involves drawing fine lines, as in Tenenbaum v.

Commissioner, 58 T. C. 1, 8 (1972), where the Court distinguished sacerdotal functions

1   and religious worship from a minister's job "to encourage and promote understanding of

2   the history, ideals, and problems of Jews by other religious groups."

3         Questions regarding church hierarchy also must be addressed when applying

4   §107, as in Mosley v. Commissioner, 68 T. C. Memo 1994-457, where the Court

5   considered whether a particular religious organization operated under the authority or

6   control of a church or church denomination.  According to the Court, this "can only be

7   determined after reviewing all the facts and circumstances surrounding the relationship

8   between the church denomination and the organization."  The Court concluded that "a

9   religious organization is deemed under the authority of a church or church denomination

10   if it is organized and dedicated to carrying out the tenets and principles of a faith in

11   accordance with either the requirements or sanctions governing the creation of

12   institutions of the faith."

13         The IRS is regularly required to make these purely religious determinations in

14   administering §107.  The difficulty of resolving these religious questions, and the

15   potential for inconsistent conclusions, give rise to far more entanglement than the purely

16   secular inquiries under §119.  For example, another difficult religious determination that

17   the IRS must make is whether a Christian college is an "integral agency of a church."

18   This is the subject of many private rulings by the IRS, prompting one commentator to

19   note that "the Service has consistently ruled that ordained ministers who teach at schools

20   that are integrally related to churches are performing services within the exercise of their

21   ministry, no matter what they teach."  Newman, On Section 107's Worst Feature: The

22   Teacher-Preacher, 93 TNT 260-20 (emphasis added).  College administrators, and even

23   basketball coaches, as well as teachers, can thus qualify for the benefits of §107 if they

24   happen to be ordained ministers.  It is often difficult, however, to determine whether the

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss**    63

1   criteria for "integral part of a church" are satisfied.  The IRS uses the criteria listed in

2   Rev. Rul. 72-606 and Rev. Rul. 70-549, in making these determinations.  Typical rulings

3   in this area emphasize the intrusiveness of the determination.  See LTR 9608027, 96 TNT

4   39-49; LTR 200002040, 2000 TNT 11-24; and LTR 200925001, 2009 TNT 117-28.

5           Another contentious religious issue that the IRS must frequently resolve under

6   §107 is whether "sacerdotal functions" are being performed.  Although no definition is

7   provided in the regulations of this term, performing baptisms, communion or the Lord's

8   supper, and Christian weddings, clearly qualify as "sacerdotal functions."  In other cases,

9   however, the question is far more nuanced.  In one ruling, an ordained minister worked

10   for an independent §501(c)(3) organization that was not a church.  He spent 75% of his

11   time providing spiritual counseling to drug addicts and alcoholics, and 20% of his time in

12   administrative work, continuing education, networking and general management.  Only

13   5% of his time was spent performing weddings, funerals, prayer services, adult education

14   services and community outreach services.  The IRS concluded that the minister did not

15   qualify for favorable tax treatment under §107 because only 5% of his time was spent

16   performing duties such as the conduct of religious worship or the performance of

17   sacerdotal functions.  LTR 9231053, 92 TNT 157-53.  The ruling raises the basic

18   question of what is the work of a minister -- a question to which it is virtually impossible

19   to provide an objective answer.  Purely religious questions of this type illustrate the

20   pervasive entanglement that §107 creates.

21           The decision in Flowers v. United States, 49 A.F.T.R.2d 438 (N.D. Tex. 1981),

22   cited by the Government, also supports the conclusion that §107 requires active

23   entanglement because "if Congress is going to authorize an exclusion such as Section

24   107, there has to be some way for the government to monitor those who take the

1   exclusion."  Id.  The issue in Flowers involved the application of §107 to "non-hierarchal

2   churches," as to which Rev. Ruling 70-549 purported to "give non-hierarchal churches

3   advice in meeting the requirements of Section 107."  Id.  Compared to the inquiries under

4   §119, Flowers does not support the Government's claim that §107 is less entangling.  The

5   Flowers decision also does not impeach the Supreme Court's later decision in Texas

6   Monthly explaining Walz.

7          Contrary to the Government's argument, therefore, the determinations required by

8   §107 involve much greater entanglement than the determinations under §119.  The

9   inquiries under §107 involve questions that are inherently religious, subjective, intrusive

10  and beyond the general competence of government officials.  These determinations create

11  the potential for excessive entanglement, unlike the "convenience of the employer"

12  determinations under §119.  Unlike in Walz, therefore, elimination of §107's exemption

13  would reduce entanglement between government and religion.

14         By contrast, the inquiries under §119 do not impermissibly burden free exercise

15  rights, as the Government insinuates.  In the first place, the right to be free from tax or to

16  be permitted to exclude certain items from taxable income is a matter of legislative grace

17  rather than constitutional right.  Commissioner v. Sullivan, 356 U.S. 27 (1958); Parker v.

18  Commissioner, 365 F.2d 792, 795 (1966) ("as long as exemptions are denied by the

19  Commissioner on a non-discriminatory basis using specific and reasonable guidelines and

20  without inquiry into the merits of the particular religious doctrines, the withholding of

21  religious exemptions is permissible under the Constitution.").  Likewise, the imposition

22  of neutral and generally applicable provisions of the Internal Revenue Code do not

23  impose a burden on religion that is constitutionally unacceptable, which the Government

24  acknowledges, while implying otherwise.  (See Government's brief at 28, n. 9, citing

1    Jimmy Swaggart Ministries v. California Board of Equalization, 493 U.S. 378, 390-92

2    (1990) (rejecting argument that non-discriminatory sales and use taxes are an

3    unconstitutional burden on free exercise rights).)

4           Preferential tax benefits, in short, cannot be justified in this case as an

5    accommodation to religion.  Neutral and generally applicable rules of taxation as applied

6    to ministers of the gospel do not substantially burden free exercise rights or entangle

7    government with religion, unlike in Amos, involving regulations affecting hiring.  Nor is

8    Gillette v. United States, 401 U.S. 437 (1971) (upholding religious exemptions from

9    military draft), comparable to the neutral application of income tax laws.  Hobbie v.

10   Unemployment Appeals Commission of Florida, 480 U.S. 136 (1987) (allowing

11   unemployment compensation to discharged employee for refusal to work on Sabbath),

12   also is not analogous in terms of any potential burden on free exercise rights.  Application

13   of neutral income tax laws to ministers also does not raise issues of religious orthodoxy

14   like those involved in Arver v. United States, 245 U.S. 366 (1918) (upholding draft

15   exemptions for ministers and theological students).  All of the examples cited by the

16   Government to support a claim of accommodation are inapposite because they involved

17   potential regulatory burdens on the free exercise of sincerely held religious views.  No

18   similar claim is made in this case, nor could it be in light of established Supreme Court

19   precedent.

20          The Government's entanglement claim does not stand up to even casual scrutiny.

21   On the one hand, the Government defends the entanglement posed by §107, while

22   condemning the secular determinations underlying §119.  The Government then asks this

23   Court to conclude that inquiries into the tenets of religion are preferable to asking

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss      66**

1  whether a church parsonage was provided for the convenience of the employer, as a

2  means to avoid entanglement.  The Government's postulate is not plausible.

3       No factual basis exists to conclude that Congress even considered that preferential

4  tax benefits for ministers were intended as a means to avoid entanglement with religion.

5  The Government certainly does not claim that the in-kind parsonage allowance first

6  enacted in 1921 and later codified in 1954 by §107(1) was motivated by Establishment

7  Clause concerns about the "convenience of the employer" test, which all other taxpayers

8  must satisfy.  The Government also does not claim that the exemption for cash housing

9  allowances enacted in 1954 was intended to minimize burdens imposed by neutral and

10  generally applicable Internal Revenue Code provisions.  On the contrary, subsection (2)

11  of §107 exempts cash housing allowances paid to ministers, but this exemption is not

12  even provided to other taxpayers under any test.  Instead, the Government only provides

13  an exemption for cash housing allowances that are made to ministers of the gospel.

14  Government ultimately is left to pull at straws in arguing that preferential tax benefits are

15  anything other than a subsidy to religion.  This case is really about money to ministers,

16  pure and simple.

17  **VII.   INTERNAL REVENUE CODE SECTION 265(a)(6) ALSO**
18            **PROVIDES PREFERENTIAL TAX BENEFITS TO MINISTERS**
19            **OF THE GOSPEL THAT ARE NOT GENERALLY AVAILABLE**
20            **TO OTHER TAXPAYERS.**
21
22       Internal Revenue Code §265(a)(6) also provides a tax benefit to ministers of the

23  gospel that is not generally available to other taxpayers.  Section 265(a)(6) allows

24  ministers to deduct mortgage interest and real estate taxes from their taxable income,

25  even when paid from tax-free parsonage allowances.  Section 265(a)(1) otherwise

26  generally prohibits deductions for items paid for with income exempt from taxes.

27  Ministers of the gospel, however, can exclude their cash housing allowances from income

1  -- and they can also deduct mortgage interest paid with the housing allowance.  This type

2  of "double-dipping" results in a substantial windfall for clergy that other taxpayers do not

3  receive, except members of the military.  See Chemerinsky, 24 Whittier Law Review at

4  712-713.

5          The benefit of §265(a)(6) is not generally available to other taxpayers who receive

6  tax-exempt housing allowances.  In Induni v. Commissioner of Internal Revenue, 990

7  F.3d 53, 56-57 (2nd Cir. 1993), the Court of Appeals explicitly recognized that

8  §265(a)(6) created an exemption for only two taxpayer groups:  recipients of a parsonage

9  allowance and recipients of military housing allowances:

10          By specifying that "no deduction shall be denied under this section" for
11          mortgage interest and real estate expenses incurred by some -- but not all
12          -- groups of taxpayers who enjoy tax-exempt housing allowances, the
13          amendment implies that all other tax-exempt housing allowances are
14          within the ambit of Section 265.
15
16          The "double-dipping" for ministers allowed by §265(a)(6) provides a significant

17  financial benefit to ministers of the gospel.  It actually allows taxation to be avoided on

18  an amount that exceeds the actual housing allowance received.  Two examples to

19  illustrate this effect:

20          Example No. 1:

21          1.      A minister receives compensation from his church of
22          $75,000.  The church designates $25,000 as a §107(2) housing
23          allowance.  The $25,000 does not exceed the fair rental value of the
24          house.
25
26          2.      The minister spends $15,000 of the $25,000 housing
27          allowance for mortgage interest and real property taxes, which are
28          deductible under §§163 and 164 of the Internal Revenue Code.  The
29          minister spends the other $10,000 for payment of mortgage principal,
30          utilities, and other non-deductible housing expenses.
31
32          3.      The $25,000 housing allowance is excluded under §107(2)
33          because it was all spent for housing.  The $25,000 is not included in
34          gross income and is not reported as compensation on the tax return, Form

1040.  The $15,000 spent for mortgage interest and real property taxes, moreover, is deductible because of §265(a)(6).  These deductions are claimed on Schedule A of Form 1040.  If Congress had not enacted Section 265(a)(6), however, these deductions would have been barred by Section 265(a)(1).

4.      The minister receives a double benefit for the $15,000. That amount was both excluded and deducted.  Taxation, therefore, is avoided on $40,000 of income, representing the sum of the exclusion ($25,000) and the deductions ($15,000).

5.      The minister ultimately is allowed both an exclusion and a deduction for the same amount ($15,000).  This represents a double benefit unavailable to other taxpayers.  Other Americans are given only the benefit of a deduction for mortgage interest and property taxes.  The minister, moreover, only spent $25,000 on housing, but taxation was avoided on $40,000 of income.  The avoidance of tax on the additional $15,000 provides clergy with a unique financial benefit.

Example No. 2:

1.      A minister receives compensation from its church of $75,000, all of which is designated as a §107(2) housing allowance.  The $75,000 does not exceed the fair rental value of the house.

2.      The minister is married and the spouse earns $35,000 in income.  They file a joint income tax return.

3.      The minister spends $35,000 of the $75,000 housing allowance for mortgage interest and real property taxes, which are deductible under §§163 and 164 of the Internal Revenue Code.  These deductions are available because of §265(a)(6).  The minister spends the other $40,000 for payment of principal, utilities, and other non-deductible housing expenses.

4.      None of the minister's $75,000 compensation is reportable as taxable income.  This amount is not included in gross income and is not reported on the tax return because it was excluded under §107(2). The $35,000 in deductions, moreover, are used to offset the spouse's $35,000 of income.  On their joint return, zero taxable income is reported.

5.      In this example, $75,000 was spent on housing, but taxation is avoided on $110,000 (i.e., $75,000 plus $35,000).  Other taxpayers do not get such a double benefit for the amounts spent on mortgage interest and property taxes.

1        The Government incorrectly argues that the additional mortgage interest

2   deduction allowed to ministers of the gospel is necessary to give ministers the same

3   deduction as other taxpayers.  Other taxpayers can only deduct mortgage interest because

4   the interest was paid with taxable dollars, since they cannot also exempt housing

5   allowances under §107(a).  Under Induni, the only taxpayers who can deduct mortgage

6   interest paid with tax-exempt dollars are ministers and military personnel.  By enacting a

7   preferential tax benefit under §265(a)(6), therefore, ministers of the gospel receive a

8   substantial tax benefit that exceeds the benefit available to other taxpayers.  As the above

9   examples show, §265(a)(6) puts ministers of the gospel in a better financial position than

10  other taxpayers.

11       The tax preferences allowed to ministers of the gospel by §265(a)(6) violate the

12  Establishment Clause, as recognized by Texas Monthly.  The benefit of §265(a)(6) is not

13  neutral and it is not generally available to other taxpayers.  Nor are the preferential

14  benefits of §265(a)(6) necessary to alleviate any substantial burden on free exercise

15  rights, and no concern about entanglement is advanced by the Government as

16  justification.  Instead, §265(a)(6) stands simply as a benefit available only to ministers

17  and military.

18       The inclusion of military personnel within the scope of §265(a)(6) does not

19  prevent the preference given to ministers from being unconstitutional.  "The

20  circumference of legislation [must] encircle a class so broad that it can be fairly

21  concluded that religious institutions could be thought to fall within the natural perimeter."

22  489 U.S. at 17.  "What is crucial is that any subsidy afforded religious organizations be

23  warranted by some overarching secular purpose that justifies like benefits for non-

24  religious groups."  489 U.S. at 15 n. 4.  Here, ministers of the gospel are not within the

1   natural perimeter of a larger preferred class with a common defining characteristic.  The

2   Government can provide the military with whatever benefits it determines to be

3   appropriate as employer; with regard to ministers, however, §265(a)(6) defines no

4   broader class with an overarching secular purpose.

5          The Government's purported secular justification for §265(a)(6) also does not

6   support preferential tax benefits to ministers.  The Government claims that the §265(a)(6)

7   deduction to ministers is intended to encourage home ownership, but that justification

8   would apply to any taxpayer that paid mortgage interest with tax-exempt income.

9   Section 265(a)(6), however, distinguishes ministers from other non-military taxpayers,

10  apparently because Congress intended to create a "hyper-incentive" for ministers to

11  become homeowners.  If home ownership is desirable for ministers, however, then it is

12  just as desirable for other taxpayers who do not work for churches.

13         Section 265(a)(6), in reality, is clearly intended to grant tax benefits to ministers

14  that are not available to other taxpayers.  This lack of neutrality clearly violates the

15  Establishment Clause prohibitions announced in Texas Monthly.  A tax benefit like that

16  in §265(a)(6), called out especially for ministers of the gospel, and which is not generally

17  available to other taxpayers, violates the Establishment Clause.  Thus, while the

18  Government may create incentives for home ownership, the Government cannot provide

19  disproportionate benefits to encourage home ownership just by ministers.  Section

20  265(a)(6) is unconstitutional.

21  **VIII.    SECTIONS 107 AND 265(a)(6) VIOLATE THE**
22  **ESTABLISHMENT CLAUSE UNDER THE LEMON TEST.**
23
24         Section 107 and §265(a)(6) of the Internal Revenue Code violate the

25  Establishment Clause test announced in Lemon v. Kurtzman, 403 U.S. 602, 612-13

26  (1971).  Under the Lemon test, in order to be constitutional, the challenged statutes:  (1)

1   must have a secular purpose; (2) their principal or primary effect must be one that neither

2   advances nor inhibits religion; and (3) they must not foster an excessive government

3   entanglement with religion.  The Internal Revenue Code provisions at issue fail this test.

4   Section 107 and §265(a)(6) violate the Establishment Clause under the <u>Lemon</u>

5   test.  In the first place, tax breaks for ministers that are not neutral and available generally

6   to other taxpayers do not have a secular purpose.  Here, the exemption for cash housing

7   allowances paid to ministers is provided only to the clergy and it was never intended to

8   abate any substantial government-imposed burden on religion.  On the contrary, the

9   government claims that subsection (2) of §107 was enacted to provide additional tax

10  benefits exclusively to ministers, who did not receive in-kind housing from their

11  churches.  The intent of subsection (2), therefore, by all accounts was intended to benefit

12  religion.

13  Congress also intended subsection (1) of §107 to benefit religion.  This tax break

14  for in-kind housing provided to ministers originated in the Revenue Act of 1921, whereby

15  Congress allowed a tax exemption for parsonages provided to ministers -- without regard

16  to "the convenience of the employer."  The "convenience of the employer" requirement

17  applied to all other private employees, such as nurses and doctors.  The circumstances of

18  ministers, however, typically do not satisfy the "convenience of the employer" test, so

19  Congress allowed all ministers to exempt the value of housing provided irrespective of

20  whether they met the "convenience of the employer" test applicable to other private

21  employees.  This preferential benefit for ministers was then codified as §107(1) in 1954,

22  at the same time that Congress codified the "convenience of employer" test in §119,

23  applicable to all other employees.

1   Congress intended to provide a benefit to religion with the parsonage exemption

2   for in-kind housing, even though a comparable exemption was not available to other

3   employees.  This intent to provide a preferential benefit to religion is not a secular

4   purpose under the <u>Lemon</u> test.  The Government, moreover, identifies no evidence that

5   Congress acted in 1921 with the purpose to abate any Government entanglement with

6   religion, a constitutional concern that had not even been recognized by the courts in 1921.

7   There is simply no evidence that Congress enacted the preferential exemption for in-kind

8   housing provided to ministers for any reason other than to provide a substantial benefit to

9   religion.

10   Section 265(a)(6), likewise, has no recognizable secular purpose.  The tax

11   deduction allowed by §265(a)(6), for mortgage interest and real estate taxes paid with

12   otherwise tax-exempt dollars, is unique to the clergy.  The deduction allowed by

13   §265(a)(6), moreover, allows ministers to avoid taxation on an amount that actually

14   exceeds their cash housing allowance, by making the housing allowance tax-exempt and

15   also allowing a deduction for the use of the exempt funds to pay mortgage interest and

16   real estate taxes.  Other employees cannot similarly benefit by "double-dipping" because

17   Congress has refused to allow tax-exempt housing allowances for non-clergy.

18   Even the Government's claimed intent to promote home ownership with the

19   §265(a)(6) deduction does not satisfy the secular purpose test where home ownership is

20   preferentially intended for the clergy.  Encouraging home ownership by ministers is not a

21   legitimate secular purpose when other non-clergy are not similarly benefited.

22   The second prong of the <u>Lemon</u> test is violated by Government action that has a

23   principal or primary effect that advances or inhibits religion.  Government action has the

24   primary effect of advancing religion if it is sufficiently likely to be perceived as an

**Plaintiffs' Memorandum of Points and Authorities**
**in Opposition to United States' Motion to Dismiss**      73

1   endorsement of religion.  This is an objective test, asking whether a reasonable observer

2   who is informed and familiar with the history of the Government practice at issue would

3   perceive the practice as having a predominantly non-secular effect.  See <u>Nurre v.</u>

4   <u>Whitehead</u>, 580 F.3d 1087, 1096 (9th Cir. 2009).

5           Tax breaks provided preferentially to ministers cannot help but be perceived as an

6   endorsement of religion.  This, in fact, was the conclusion of the Supreme Court in <u>Texas</u>

7   <u>Monthly</u>.  Contrary to the Government's argument in this case, therefore, prohibited

8   religious endorsement is not limited to marble monuments.  The Government claims that

9   giving lucrative financial benefits to religion is inherently incapable of giving the

10  appearance of religious endorsement, but the Government's reasoning is not convincing;

11  nor does it reflect the views of the Supreme Court, requiring that tax benefits for religion

12  be neutrally and generally available on the basis of secular criteria, as articulated in <u>Texas</u>

13  <u>Monthly</u>.

14          An objective observer would perceive §107 and §265(a)(6) as an endorsement of

15  religion, including because Congress has repeatedly acted to promote the financial

16  interests of clergy by giving them special tax privileges not enjoyed by other taxpayers.

17  Contrary to what the Government argues in this case, §107 was not enacted to further

18  lofty principles of constitutional law, such as the avoidance of entanglement between

19  Government and religion.  Section 265(a)(6), similarly, was enacted to confer a financial

20  benefit on clergy, rather than to further principles of constitutional law.

21          By enacting the predecessor of §107(1) in 1921, Congress first provided clergy

22  with an exemption for the fair rental value of a parsonage provided as additional

23  compensation, rather than "for the convenience of the employer."  Other taxpayers who

1   did not qualify for the narrow "convenience of the employer" exemption did not benefit

2   from the 1921 legislation.

3        Congress subsequently enacted §107(2) in 1954, so as to make cash housing

4   allowances non-taxable for ministers, while other taxpayers were given no avenue to

5   exempt cash allowances, even under the restrictive "convenience of the employer"

6   requirement of §119, which was also enacted in 1954.  Only ministers can qualify for the

7   exemption of cash housing allowances.

8        In 1986, Congress overruled the IRS' position in Rev. Rul. 83-3 that mortgage

9   interest and property taxes could not be deducted by clergy who received §107

10   allowances.  Section 265(a)(6) is a narrow exception to the general rule of §265(a)(1) that

11   disallows deductions allocable to tax-exempt income.  This benefit, again, applies only to

12   clergy and the military.

13        Finally, Congress enacted the Clergy Housing Clarification Act of 2002, thereby

14   resolving the statutory issue on appeal to the Ninth Circuit in the <u>Warren</u> case.  Congress

15   acted for the benefit of all clergy by making the <u>Warren</u> case moot, thereby avoiding the

16   likely adverse Ninth Circuit ruling on the constitutionality of §107.

17        Congress, in short, has acted at every turn to preferentially make tax breaks

18   available for ministers.  The resulting Internal Revenue Code includes provisions that are

19   not neutral and generally applicable to other taxpayers on a secular basis.  Section 107

20   and §265(a)(6), in particular, violate the second prong of the <u>Lemon</u> test.

21        Section 107 has the effect of fostering governmental entanglement with religion.

22   In order to limit the tax break provided by §107 to ministers of the gospel, the IRS must

23   make complex, intrusive and subjective inquiries into religious matters when applying

1 §107.  Unlike the situation in Walz, therefore, the exemption provided by §107 actually

2 increases the Government's entanglement with religion.

3       By contrast, the secular inquiries of the "convenience of the employer" doctrine

4 under §119 would involve the Government in less entanglement with religion.  The

5 procedural component of entanglement analysis under the Establishment Clause is

6 intended to minimize legislative and judicial intrusion into the internal affairs of a

7 religious organization.  See Alcazar v. Corporation of the Catholic Archbishop of Seattle,

8 210 U.S. App. LEXIS 5356 (9th Cir., March 16, 2010).  Here, the inquiries required by

9 §107 implicate the procedural component of entanglement to an extent that far exceeds

10 any potential inquiries under §119.

11       The Supreme Court's holding in Texas Monthly ultimately represents the

12 controlling application of the Lemon test to the present case:  Preferential tax benefits to

13 religion, that are not neutral and generally available to other taxpayers on the basis of

14 secular criteria, violate the Establishment Clause.  While all taxpayers would like to have

15 exemptions and deductions to cover their housing costs, the reality is that only ministers

16 of the clergy get this break.  Sections 107 and 265(a)(6), therefore, violate the

17 Establishment Clause.

1

## CONCLUSION

2    For all the above reasons, the Government's Motion to Dismiss should be denied.

3    Dated this 20th day of April, 2010.

4                                              */s Richard L. Bolton*
5                                             Richard L. Bolton (SBN: 1012552)
6                                             Boardman, Suhr, Curry & Field LLP
7                                             One South Pinckney Street, 4th Floor
8                                             P.O. Box 927
9                                             Madison, Wisconsin  53701-0927
10                                            *Pro Hac Vice*
11                                            Michael A. Newdow (SBN: 220444)
12                                            NEWDOWLAW
13                                            P.O. Box 233345
14                                            Sacramento, California  95623
15                                            *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiffs'
Memorandum of Points and Authorities in Opposition to United States' Motion to
Dismiss has been made this 20th day of April, 2010 via the Court's CM/ECF system to:

Jeremy N. Hendon                              Jeremy.Hendon@usdoj.gov
*Attorney for the United States of America*

Kevin Snider
kevinsnider@pacificjustice.org
Matthew McReynolds
mattmcreynolds@pacificjustice.org
*Counsel for Amicus Curiae*

Jill Bowers                                   jill.bowers@doj.ca.gov
*Counsel for Selvi Stanislaus*

                              */s Richard L. Bolton*
                              Richard L. Bolton
                              *Counsel for Plaintiffs*

F:\DOCS\wd\26318\25\A0990209.DOC