# EXHIBIT A

STATUTES OF 1987                                    3879

Ch. 1138]

CHAPTER 1138

An act to amend Sections 16702, 16704, 16710, 17021.5, 17024.5, 17027, 17041, 17042, 17054, 17072, 17073, 17087, 17137, 17143, 17220, 17224, 17240, 17250, 17260, 17270, 17276, 17290, 17504, 17506, 17507, 17651, 17737, 17851, 17852, 17932, 18036, 18037, 18040, 18402, 18402.2, 18405, 18410, 18586.7, 18654, 18681.1, 18681.6, 18681.9, 18682, 18684.2, 18655.07, 18688, 18693.5, 18802, 18802.1, 18802.4, 18802.5, 18802.6, 18802.8, 18805, 19269, 19414, 19420, and 20503 of, to amend and repeal Sections 17052.6, 17052.9, 17052.13, 17053.8, 17053.9, 17053.11, 17069, 17231, and 17265 of, to add Sections 17020.1, 17020.2, 17020.3, 17020.4, 17020.9, 17020.11, 17029.5, 17043, 17073.5, 17076, 17078, 17135, 17508, 17515, 17551.5, 17560, 18177, 18178, 18431.5, 18681.5, 18683.5, 18802.9, 18803.2, 18807, and 18817.3, to add Article 4 (commencing with Section 19310) to Chapter 21 of Part 10 of Division 2 of, to add and repeal Sections 17052.4, 17052.12, 17053.13, 17053.14, 17057, 17058, 18035.5, 18161, 18513, 18534, and 18688.5 of, to add and repeal Article 5 (commencing with Section 18765) of Chapter 18.5 of Part 10 of Division 2 of, to repeal and add Sections 17054.5, 17085, 17272, 17740, 18684, 18803 of, to repeal, add, and repeal Sections 17061.5, 18182, 18504, and 18525 of, to repeal Sections 17042.5, 17052.2, 17053, 17053.1, 17054.6, 17061.3, 17082, 17084, 17088, 17090, 17091, 17134, 17138, 17139, 17140, 17142, 17144, 17149, 17205, 17211, 17225, 17225.5, 17241, 17243, 17244, 17245, 17250.5, 17252, 17252.5, 17254, 17255, 17261, 17262, 17276.5, 17288, 17323, 17503, 17505, 17510, 17513, 17672, 18033, 18035, 18153, 18154, 18155, 18162.5, 18169, 18173, 18175, 18176, 18681.7, and 18685 of, to repeal and add Chapter 2.1 (commencing with Section 17062) and Chapter 8 (commencing with Section 17681) of Part 10 of Division 2 of, and to repeal Chapter 15 (commencing with Section 18241) of, Part 10 of Division 2 of, the Revenue and Taxation Code, and to amend Sections 13009 and 13050 of the Unemployment Insurance Code, relating to taxation, to take effect immediately, tax levy.

[Approved by Governor September 24, 1987. Filed with Secretary of State September 25, 1987.]

*The people of the State of California do enact as follows:*

SECTION 1. This act shall be known and may be cited as the "California Personal Income Tax Fairness, Simplification, and Conformity Act of 1987."

SEC. 2. Section 16702 of the Revenue and Taxation Code is amended to read:

16702. "Generation-skipping transfer" includes every transfer subject to the tax imposed under Chapter 13 of Subtitle B of the Internal Revenue Code of 1986, as amended, where the original transferor is a resident of the State of California at the date of original transfer, or the property transferred is real or personal property in

Code, to read:

17272. For purposes of computing the deduction allowed under Section 219 of the Internal Revenue Code, relating to retirement savings, the term "adjusted gross income" shall refer to "adjusted gross income as shown on the federal tax return for the same taxable year.

SEC. 92. Section 17276 of the Revenue and Taxation Code is amended to read:

17276. The deduction provided by Section 172 of the Internal Revenue Code, relating to a net operating loss deduction, shall be modified as follows:

(a) (1) Net operating losses attributable to taxable years beginning before January 1, 1985, and on or after January 1, 1992, shall not be allowed, except for losses allowed by this section (as amended by Chapter 938 of the Statutes of 1984) and former Section 17276.5 (as amended by Chapter 158 of the Statutes of 1986).

(2) A net operating loss shall not be carried forward to any taxable year beginning before January 1, 1987.

(c) Net operating loss carrybacks shall not be allowed.

(d) Notwithstanding the provisions of Section 172(b)(1) of the Internal Revenue Code, a net operating loss attributable to a taxable year beginning on or after January 1, 1985, and before January 1, 1987, shall be a net operating loss carryover for any taxable year beginning on or after January 1, 1987, and before January 1, 1988, and for each of the two succeeding taxable years.

(e) For purposes of computing the net operating loss deduction under Section 172(a) of the Internal Revenue Code, as modified by this section, the amount of a net operating loss sustained in any taxable year during any part of which the taxpayer was not a resident of this state shall be limited to the sum of the following:

(1) The portion of the net operating loss attributable to the part of the year in which the taxpayer is a resident.

(2) The portion of the net operating loss which, during the part of the year the taxpayer is not a resident, is attributable to California source income and deductions.

SEC. 93. Section 17276.5 of the Revenue and Taxation Code is repealed.

SEC. 94. Section 17280 of the Revenue and Taxation Code is amended to read:

17280. (a) No deduction shall be denied as provided by Section 265 of the Internal Revenue Code, relating to expenses and interest relating to tax-exempt income.

(b) No deduction shall be allowed for any of the following:

(1) Any amount otherwise allowable as a deduction which is

allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this part, or any amount otherwise allowable under Section 212 of the Internal Revenue Code (relating to expenses for production of income), which is allocable to interest (whether or not any amount of such interest is received or accrued) wholly exempt from the taxes imposed by this part.

(2) Interest on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from the taxes imposed by this part. The proper apportionment and allocation of the deduction with respect to taxable and nontaxable income shall be determined under rules and regulations prescribed by the Franchise Tax Board.

(3) Interest on indebtedness incurred or continued to purchase or carry shares of stock of a diversified management company which during the taxable year of the holder thereof distributes exempt-interest dividends.

(1) For purposes of paragraph (2) of subdivision (b):

(1) "Interest" includes any amount paid or incurred—

(A) By any person making a short sale in connection with personal property used in that short sale, or

(B) By any other person for the use of any collateral with respect to that short sale.

(2) If—

(A) The taxpayer provides cash as collateral for any short sale, and

(B) The taxpayer receives no material earnings on that cash during the period of the sale, subparagraph (A) of paragraph (1) shall not apply to that short sale.

(d) No deduction shall be denied under this section for interest on a mortgage on, or real property taxes on, the home of the taxpayer by reason of the receipt of an amount as either of the following:

(1) A military housing allowance.

(2) A parsonage allowance excludable from gross income under Section 107 of the Internal Revenue Code.

SEC. 95. Section 17288 of the Revenue and Taxation Code is repealed.

SEC. 96. Section 17323 of the Revenue and Taxation Code is repealed.

SEC. 97. Section 17503 of the Revenue and Taxation Code is repealed.

SEC. 98. Section 17504 of the Revenue and Taxation Code is amended to read:

17504. (a) The provisions of Section 402(a) of the Internal Revenue Code, relating to taxability of beneficiaries of employees' trusts, shall be modified as follows:

(1) The amendments made to Section 402(a) of the Internal Revenue Code by Public Law 98-369 shall apply to distributions made after July 18, 1984, in taxable years ending after that date.

# EXHIBIT B

## Assembly Bill No. 115

### CHAPTER 691

An act to amend Sections 17024.5, 17052.6, 17072, 17077, 17085, 17131, 17132.5, 17140, 17140.3, 17144, 17152, 17220, 17250, 17250.5, 17255, 17256, 17279.4, 17501, 17551, 17731, 17733, 18571, 18572, 18628, 18633, 18648, 19008, 19041.5, 19116, 19164, 19166, 19173, 19177, 19179, 19182, 19184, 23051.5, 23701s, 23701w, 23703.5, 23705, 23711, 23712, 24306, 24349, 24356, 24369.4, 24407, 24601, 24654, 24661.5, 24872, 24949.1, and 24949.3 of, to amend and repeal Sections 17204, 19772, 19774, and 19777 of, to add Sections 17131.4, 17131.5, 17131.6, 17139.6, 17201.4, 17201.5, 17201.6, 17204.7, 17215.1, 17215.4, 17681.6, 17734.6, 17760, 18035.6, 18036.6, 18181, 19136.12, 19164.5, 24355.3, 24355.4, 24406.6, 24661.6, 24694, and 24831.6 to, to add and repeal Sections 17053.62, 17255.5, 23662, and 24356.4 of, to repeal Sections 17131.8, 17136.5, 17137, 17144.5, 17160.5, 17202.5, 17205, 19773, and 24356.5 of, and to repeal and amend Section 19559 of, the Revenue and Taxation Code, relating to taxation, to take effect immediately, tax levy.

[Approved by Governor October 7, 2005. Filed with
Secretary of State October 7, 2005.]

LEGISLATIVE COUNSEL'S DIGEST

AB 115, Klehs. Taxation: federal conformity.

Under the Personal Income Tax Law and the Corporation Tax Law, various provisions of the federal Internal Revenue Code, as enacted as of a specified date, are referenced in various sections of the Revenue and Taxation Code. Those laws provide that for taxable years beginning on or after January 1, 2002, the specified date of those referenced Internal Revenue Code sections is January 1, 2001, unless otherwise specifically provided.

Existing law requires, for any introduced bill that proposes changes in any of those dates, that the Franchise Tax Board prepare a complete analysis of the bill that describes all changes to state law that will automatically occur by reference to federal law as of the changed date. It further requires the Franchise Tax Board to immediately update and supplement that analysis upon any amendment to the bill, and requires that analysis to be made available to the public and to be submitted to the Legislature for publication in the daily journal of each house of the Legislature.

This bill would change the specified date of those referenced Internal Revenue Code sections to January 1, 2005, for taxable years beginning on or after January 1, 2005, and thereby would make numerous substantive changes to both the Personal Income Tax Law and the Corporation Tax

91

Law with respect to those areas of preexisting conformity that are subject to changes under federal laws enacted after January 1, 2002, and that have not been, or are not being, excepted or modified.

This bill would make certain other changes in federal income tax laws applicable, with specified exceptions and modifications, and make specified supplemental, technical, or clarifying changes for purposes of the Personal Income Tax Law or the Corporation Tax Law, or both, with respect to, among other things, the exclusion from income of qualified foster care payments, health savings accounts, certain definitions, expensing for small businesses, low-income community tax credits, shareholder treatment, eligible shareholders, transfers of suspended losses incident to divorce, repayment of loans for qualifying employer securities, phaseouts of certain motor fuel excise taxes, suspension of occupational taxes relating to certain alcoholic beverages, information reporting for certain individuals, capital gain treatment applying to outright sales for landowners, expenses of rural letter carriers, expensing of certain reforestation expenditures, depreciation of certain Alaskan pipeline property, interest expense allocation rules, translation of foreign taxes, certain passive foreign investment companies, deductions for certain expenses incurred by corporate taxpayers, Alaska Native Settlement trusts, civil rights tax relief, tax shelter provisions, underpayment penalty, and specified federal acts. This bill would specify various dates on which specified provisions apply, make findings and declarations that certain provisions are declaratory of existing law, specify the intent and operation in the application of provisions conforming to various federal acts, and repeal obsolete provisions.

The Personal Income Tax Law and the Corporation Tax Law authorize various deductions and credits in computing the taxes imposed by those laws.

This bill would, under both laws, for taxable years beginning on or after July 1, 2005, and before January 1, 2018, allow an environmental tax credit in an amount equal to 5¢ for each gallon of ultra low sulfur diesel fuel produced by a small refiner, as defined, at any facility located in this state.

This bill would also, under both laws, for a period beginning on January 1, 2005, and ending on January 1, 2009, authorize a small refiner to elect to treat 75% of qualified capital costs, as defined, as expenses not chargeable to a capital account and expenses that may be deducted, as provided.

This bill would take effect immediately as a tax levy.

*The people of the State of California do enact as follows:*

SECTION 1.   Section 17024.5 of the Revenue and Taxation Code is amended to read:

72(m), (q), (t), and (v) of the Internal Revenue Code using a rate of 2 ½ percent, in lieu of the rate provided in those sections.

(2) In the case where Section 72(t)(6) of the Internal Revenue Code, relating to special rules for simple retirement accounts, applies, the rate in paragraph (1) shall be 6 percent in lieu of the 2 ½ percent rate specified therein.

(d) Section 72(f)(2) of the Internal Revenue Code, relating to special rules for computing employees' contributions, shall be applicable without applying the exceptions which immediately follow that paragraph.

SEC. 7. Section 17131 of the Revenue and Taxation Code is amended to read:

17131. Part III of Subchapter B of Chapter 1 of Subtitle A of the Internal Revenue Code, relating to items that are specifically excluded from gross income, shall apply, except as otherwise provided.

SEC. 7.5. Section 17131.4 is added to the Revenue and Taxation Code, to read:

17131.4. Section 106(d) of the Internal Revenue Code, relating to contributions to health savings accounts, shall not apply.

SEC. 7.6. Section 17131.5 is added to the Revenue and Taxation Code, to read:

17131.5. Section 125(d)(2)(D) of the Internal Revenue Code, relating to the exception for health savings accounts, shall not apply.

SEC. 8. Section 17131.6 is added to the Revenue and Taxation Code, to read:

17131.6. Section 107 of the Internal Revenue Code is modified by substituting in paragraph (2) the phrase "the rental allowance paid to him or her as part of his or her compensation, to the extent used by him or her to rent or provide a home" in lieu of the phrase "the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home and to the extent such allowance does not exceed the fair rental value of the home, including furnishings and appurtenances such as a garage, plus the cost of utilities" contained therein.

SEC. 9. Section 17131.8 of the Revenue and Taxation Code is repealed.

SEC. 10. Section 17132.5 of the Revenue and Taxation Code is amended to read:

17132.5. Section 101 of the Internal Revenue Code, relating to certain death benefits, is modified as follows:

(a) Section 101(h) of the Internal Revenue Code, relating to survivor benefits attributable to service by a public safety officer who is killed in the line of duty, is modified to apply to amounts received in taxable years beginning after December 31, 1996, with respect to individuals dying after December 31, 1996.

(b) (1) Section 101 of the Internal Revenue Code, as modified by subdivision (a) is modified to additionally provide that Section 101(h) of the Internal Revenue Code shall not apply to survivor benefits attributable to service by a public safety officer who is killed in the line of duty with

# EXHIBIT C

arr

For Opinion See <u>302 F.3d 1012</u> , <u>284 F.3d 1322</u> , <u>282 F.3d 1119</u>

<u>Briefs and Other Related Documents</u>

United States Court of Appeals,

Ninth Circuit.

Richard D. and Elizabeth K. WARREN, Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 00-71217

May 3, 2002.

On Appeal from the Decision of the United States Tax Court

Supplemental Brief for the Appellant Pursuant to the Court's March 5, 2002 Order

<u>Eileen J. O'Connor</u>, Assistant Attorney General, <u>Gilbert S. Rothenberg</u> (202) 514-2914, <u>Andrea R. Tebbets</u>, (202) 353-9703, Judith A. Hagley (202) 514-8126, Attorneys, Department of Justice, Tax Division, P.O. Box 502, Washington, DC 20044

TABLE OF CONTENTS

Introduction ... 1

Argument:

I. The Court should resolve the dispute in this case without considering the constitutionality of IRC § 107(2) ... 4

A. If the Court agrees with the Commissioner's interpretation of IRC § 107(2), the constitutionality of the statute cannot be addressed in this case ... 4

B. Even if the Court agrees with the Tax Court's interpretation of IRC § 107(2), the Court should not consider sua sponte the constitutionality of IRC § 107(2) ... 8

II. IRC § 107(2) does not violate the Establishment Clause of the First Amendment ... 13

A. Government accommodation of religion is permissible under the Establishment Clause so long as it has a secular purpose, it does not have the primary effect of advancing or inhibiting religion, and it does not foster excessive entanglement between religion and government ... 13

B. The income tax exemption provided in IRC § 107(2) reflects Congress' decision to refrain from imposing differential tax burdens with respect to ministers' housing ... 16

1. A religion-specific provision that removes a burden on religious practice serves a valid secular purpose under the Establishment Clause ... 16

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

NOTE: Pages ii to iii missing in original document.

Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327 (1987) ... 13, 19-20, 28, 30-31, 37

Dickerson v. United States, 530 U.S. 428 (2000) ... 10

Droz v. Commissioner, 48 F.3d 1120 (9th Cir. 1995) ... 11-12, 32

Edelman v. Lynchburg Coll., 122 S. Ct. 1145 (2002) ... 2, 25

Employment Division v. Smith, 494 U.S. 872 (1990) ... 37

Flast v. Cohen, 392 U.S. 83 (1968) ... 11

Fowler v. Rhode Island, 345 U.S. 67 (1953) ... 28

Gillette v. United States, 401 U.S. 437 (1971) ... 13, 18, 20, 29

Haimowitz v. Commissioner, 73 T.C.M. (CCH) 1812 ... 11

Hernandez v. Commissioner, 490 U.S. 680 (1989) ... 27

Robbie v. Unemployment Appeals Comm'n, 480 U.S. 136 (1987) ... 13, 29

Immanuel Baptist Church v. Glass, 497 P.2d 757 (Okla. 1972) ... 22

Induni v. Commissioner, 98 T.C. 618 (1992), aff'd, 990 F.2d 53 (2d Cir. 1993) ... 33

Jean v. Nelson, 472 U.S. 846 (1985) ... 5

Jimmy Swaggart Ministries v. Cal. Ed. of Equalization, 493 U.S. 378 (1990) ... 27

Kirk v. Commissioner, 425 F.2d 492 (D.C. Cir. 1970) ... 11

Lambert v. Ackerley, 180 F.3d 997 (9th Cir. 1999), cert. denied, 528 U.S. 1116 (2000) ... 9

Larson v. Valente, 456 U.S. 228 (1982) ... 28

Lemon v. Kurtzman, 403 U.S. 602 (1971) ... 14-15, 19, 28, 31-32

Lyng v. Northwest Indian Cemetery Protective Ass'n., 485 U.S. 439 (1988) ... 3, 5, 10

MacColl v. United States, 91 F. Supp. 721 (N.D. III. 1950) ... 25-26

Miller v. French, 530 U.S. 327 (2000) ... 9

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2002 WL 32102765 (C.A.9)

Mitchell v. Helms, 530 U.S. 793 (2000) ... 15

NLRB v. Catholic Bishops, 440 U.S. 490 (1979) ... 30

N. Star Steel Co. v. Thomas, 515 U.S. 29 (1995) ... 25

Parrino v. FHP, Inc., 146 F.3d 699 (9th Cir. 1998) ... 9

Printz v. United States, 521 U.S. 898 (1997) ... 16

Regan v. Taxation with Representation, 461 U.S. 540 (1983) ... 38

Rosenberger v. Rectors and Visitors of the Univ. of Virginia, 515 U.S. 819 (1995) ... 39-40

Salkov v. Commissioner, 46 T.C. 190 (1966) ... 2

Saridakis v. United Airlines, 166 F.3d 1272 (9th Cir. 1999) ... 10

St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772 (1981) ... 30

State v. Erickson, 182 N.W. 315 (S.D. 1921) ... 22

Templeton v. Commissioner, 719 F.2d 1408 (7th Cir. 1983) ... 32

Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989) ... 3-4, 19, 35-40

TranSouth Fin. Corp. v. Bell, 149 F.3d 1292 (11th Cir. 1998) ... 36

United States National Bank of Oregon v. Indep. Ins. Agents, Inc., 508 U.S. 439 (1993) ... 10

United States v. Harris, 185 F.3d 999 (9th Cir.), cert. denied, 528 U.S. 1055 (1999) ... 9

United States v. Mead Corp., 533 U.S. 218 (2001) ... 2

United States v. Sandoval-Lopez, 122 F.3d 797 (9th Cir. 1997) ... 5

Walz v. Tax Commission, 397 U.S. 664 (1970) ... passim

Warnke v. United States, 641 F. Supp. 1083 (E.D. Ky. 1986) ... 41

Whittington v. Commissioner, 80 T.C.M. (CCH) 396 (2000) ... 41

Widmar v. Vincent, 454 U.S. 263 (1981) ... 30

Williamson v. Commissioner, 224 F.2d 377 (8th Cir. 1955), rev'g 22 T.C. 566 (1954) ... 26

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110 (9th Cir. 2000), cert. denied, 532 U.S. 958 (2001) ... 26

Zorach v. Clauson, 343 U.S. 306 (1952) ... 13, 17, 19, 28-29, 37

Statutes:

18 U.S.C. § 3626(b) ... 9

Internal Revenue Code of 1986 (26 U.S.C.):

§ 107 ... passim

§ 119 ... 30

§ 134 ... 33

§ 912 ... 33

§ 1402 ... 11-12, 31-32

§ 3121 ... 32

§ 6212 ... 6

§ 6214 ... 6

37 U.S.C. § 403 ... 33

Revenue Act of 1921, § 213(b)(11) ... 23-24

Miscellaneous:

Alan Savidge, The Parsonage in England (1964) ... 22

Boris I. Bittker, Churches, Taxes and the Constitution, 78 Yale L. J. 1285 (1969) ... 19, 30

Dean M. Kelley, Why Churches Should Not Pay Taxes (1977) ... 19

Douglas Laycock, Towards a General Theory of the Religion Clauses, 81 Colum. L. Rev. 1373 (1981) ... 21

Edward A. Zelinsky, Are Tax 'Benefits' Constitutionally Equivalent to Direct Expenditures?, 112 Harv. L. Rev. 379 (1998) ... 19

Edward A. Zelinsky, Dr. Warren, the Parsonage Exclusion, and the first Amendment, 95 Tax Notes 115 (Apr. 1, 2002) ... 9

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Erwin Chemerinsky, The Court Should Have Remained Silent: Wliy the Court Erred in Deciding Dickerson v. United States. 149 U. Pa. L. Rev. 287 (2000) ... 8-9

Fed. R. App. P. 25(d)(2) ... 48

## INTRODUCTION

This case arises under Section 107(2) of the Internal Revenue Code, 26 U.S.C. (the Code or IRC), which excludes from gross income a minister's "rental allowance."[FN1] The sole issue contested by the parties is the *amount* of compensation that the taxpayer, Richard D. Warren, is entitled to exclude under Section 107(2). The taxpayer contends that he may exclude his entire allowance so long as it does not exceed his actual housing expenditures. Under the Commissioner's interpretation - first enunciated over 30 years ago in Rev. Rul. 71-280, 1971-2 C.B. 92 - the exclusion in Section 107(2) is limited to the fair market rental value of a minister's home. The Commissioner accordingly determined that taxpayer was liable for income tax deficiencies resulting from the difference between the allowance received and the fair market rental value of his home. Giving no deference to the Revenue Ruling, the Tax Court agreed with taxpayer that Section 107(2) does not contain a rental value cap and, therefore, that there was no deficiency. This statutory issue has been fully briefed and argued, as has the question of the proper degree of deference to be given to revenue rulings in light of *United States v. Mead Corp.*, 533 U.S. 218 (2001).[FN2]

> FN1. As used in this brief, words like "ministers" and "churches" carry no exclusionary religious connotation. Although Section 107 "is phrased in Christian terms" to apply "in the case of a minister of the gospel," the Tax Court long ago decided that "Congress did not intend to exclude those persons who are the equivalent of 'ministers' in other religions." *Salkov v. Commissioner*, 46 T.C. 190, 194 (1966). The Commissioner has consistently applied that principle to all religions.

> FN2. In *Barnhart v. Walton*, 122 S. Ct. 1265, 1267 (2002) the Supreme Court recently emphasized that a "long-standing" agency interpretation may be entitled to *Chevron* deference even though it is reached through "means less formal than 'notice and comment' rulemaking." See also *Edelman v. Lynchburg Coll.*, 122 S. Ct. 1145, 1150 & n.7 (2002).

In an order entered on March 5, 2002, the Court has asked the parties to provide supplemental briefing on the following questions: (i) whether the Court has the authority to raise *sua sponte* the question of the constitutionality of Section 107(2); (ii) if so, whether the Court should exercise that authority as a prudential matter; and (iii) whether Section 107(2) is constitutional under the Establishment Clause, with specific reference to the opinion of the Supreme Court in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989) (plurality opinion). We submit that the constitutional issue described in the Court's order should not be reached because it has not been raised by either party and is not necessary to the resolution of this case. As we demonstrate below, the statutory dispute regarding the rental value limitation in Section 107(2) must be resolved first. If the Court agrees with the Commissioner's interpretation of the statute, then the case would properly be disposed of on that ground alone.

If this Court were instead to accept the taxpayer's assertion that no rental value limitation applies under the statute, it would not be without power to pursue its constitutional inquiry. See *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-448 (1988). Nevertheless, the Court should refrain from taking up the constitutionality of Section 107(2) here, for neither party has raised the matter and its resolution may wait until it is presented as a genuine controversy in a more appropriate proceeding.

If the Court were nonetheless to reach the constitutional question, it should hold that the exemption afforded by Section 107(2) is constitutional under *Walz v. Tax Commission*, 397 U.S. 664 (1970). As we demonstrate below, Section 107(2) meets the three controlling requirements of *Walz*: it has a secular purpose, it neither advances nor inhibits religion, and it does not foster excessive government entanglement with religion. As we further explain, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

three-judge plurality opinion in *Texas Monthly* does not control this case.

ARGUMENT

I

## THE COURT SHOULD RESOLVE THE DISPUTE IN THIS CASE WITHOUT CONSIDERING THE CONSTITUTIONALITY OF IRC § 107(2)

### A. If the Court agrees with the Commissioner's interpretation of IRC § 107(2), the constitutionality of the statute cannot be addressed in this case

The only case or controversy that was before the Tax Court in this case - and, therefore, that is before this Court on appeal, *see Commissioner v. McCoy*, 484 U.S. 3, 6-7 (1987) - is whether the taxpayer is entitled to exclude a greater amount from his gross income for the tax years in question than was allowed by

NOTE: Pages 5 to 6 missing in original document.

As we noted above, under *McCoy*, this Court cannot impose a deficiency greater than was addressed in the Tax Court. This Court can thus reach the result sought by the Commissioner - reversal of the Tax Court's decision followed by entry of a decision in the Commissioner's favor in the amount of $46,073 - by holding that the exclusion in Section 107(2) is subject to a fair market rental value cap, as Rev. Rul. 71-280 provides.

3. Since the resolution of the one issue over which this Court has jurisdiction turns squarely on the presence or absence of a rental value cap, it follows that the disposition of the appeal does not require inquiry into the constitutionality of Section 107(2). To the contrary, the settled precedents of the Supreme Court and this Circuit require consideration of the statutory arguments advanced by the parties before consideration of any alternate constitutional question. If the Court agrees with the Commissioner that Section 107(2) contains a rental value cap, then the taxpayer is liable for the tax deficiencies determined against him, and this case is at an end. No "case or controversy" would then exist as to the constitutionality of Section 107(2).

### B. Even if the Court agrees with the Tax Court's interpretation of IRC § 107(2), the Court should not consider *sua sponte* the constitutionality of IRC § 107(2)

As we have demonstrated, the constitutional question posed by the Court could properly be reached only if the Court were to conclude that the Section 107(2) exclusion is not limited to the fair market rental value of the taxpayer's home. Even in that situation, however, "premature adjudication" of the constitutional question would not be appropriate. *See Arizonans for Official English*, 520 U.S. at 77, 79. In our tripartite system of government, the courts do not act as "constitutional checks" on Congressional enactments unless and until they have been called upon, in a bona fide dispute between litigants, to pass on the validity of a statute essential to one of the parties' claims. *See, e.g., Communist Party of United States*, 367 U.S. at 72.

1. As a matter of prudence and restraint, courts generally abstain from addressing issues not raised by the parties. *See, e.g., Lambert v. Ackerley*, 180 F.3d 997, 1011 (9th Cir. 1999), *cert. Denied*, 528 U.S. 1116 (2000). "The nature of the adversary system is such that courts are to rule on the arguments made by the parties to the litigation *only*. Except for issues of subject matter jurisdiction, it is not for the courts to raise arguments themselves." Erwin Chemerinsky, *The Court Should Have Remained Silent: Why the Court Erred in Deciding* Dickerson v. United States, 149 U. Pa. L. Rev. 287, 302 (2000) (emphasis added).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. Courts are particularly wary of deciding constitutional questions that have not been raised by the parties. *Parrino v. FHP, Inc.*, 146 F.3d 699, 707 (9th Cir. 1998); *see also* Edward A. Zelinsky, *Dr. Warren, the Parsonage Exclusion, and the First Amendment*, 95 Tax Notes 115, 116 n.4 (Apr. 1, 2002) (doubting that the Court "should *sua sponte* address a constitutional question raised by neither party"); Chemerinsky, *supra*, 149 U. Pa. L. Rev. at 292. As this Court has recognized, "the presumption is that a statute is constitutional," *United States v. Harris*, 185 F.3d 999, 1003 (9th Cir.), *cert. Denied*, 528 U.S. 1055 (1999), and not that it offends. It is therefore entirely proper for a court to assume that a statute is constitutional in resolving the parties' statutory disputes. *See Miller v. French*, 530 U.S. 327, 347 (2000) ("We note that the constitutionality of [18 U.S.C.] § 3626(b) is not challenged here; we assume, without deciding, that the new standards it pronounces are effective."); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000) ("We will continue to assume, without deciding, that RFRA is constitutional as applied to federal law."), *cert. denied*, 532 U.S. 958 (2001). Indeed, courts generally refuse to consider constitutional questions (in the same way as other matters) when raised by a party for the first time on appeal. *See, e.g., Saridakis v. United Airlines*, 166 F.3d 1272, 1275 n.3 (9th Cir. 1999).

The same presumption of constitutionality should attach to Section 107(2), particularly since the subject of the parties' dispute is the extent - not the existence - of the exclusion the statute confers. The Court should therefore decline to address the constitutional issue raised in its March 5 order.

3. *United States National Bank of Oregon v. Independent Insurance Agents, Inc.*, 508 U.S. 439 (1993), cited by the Court in its March 5 order, is distinguishable from the present case, because there the antecedent question addressed by the lower court was the very existence of a statute, not its constitutionality. Two other cases cited in the March 5 order also are distinguishable: *Lyng v. Northwest Indian Cemetery Protective Ass'n*, on the ground that the constitutional issue there was specifically addressed by the parties in the lower courts, *see* 485 U.S. at 443-446; and *Dickerson v. United States*, 530 U.S. 428 (2000), on the ground that both parties attacked the constitutionality of the statute in issue. Thus, none of the authorities referenced by the Court suggests that the presumption of constitutionality is lost in a case like this one, where the parties do not challenge the constitutionality of the statute underlying their dispute.

4. The forbearance we are urging here will not impede constitutional scrutiny of Section 107(2) on an appropriate occasion. In *Bowen v. Kendrick*, 487 U.S. 589 (1988), and *Flast v. Cohen*, 392 U.S. 83 (1968), the Supreme Court held that taxpayers may bring a challenge under the Establishment Clause to the use of the federal taxing and spending power. Consistent with this stance, the District of Columbia Circuit has concluded that an Establishment Clause challenge to Section 107(2) can be mounted by a taxpayer under these precedents. *See Kirk v. Commissioner*, 425 F.2d 492, 495 (D.C. Cir. 1970); *see also Haimowitz v. Commissioner*, 73 T.C.M. (CCH) 1812 (following *Kirk*).[FN3]

    FN3. We note that the court of appeals in *Kirk* nonetheless declined to address the taxpayer's Establishment Clause challenge to Section 107(2), on the ground that "it would not affect the tax liability in th[e] case." 425 U.S. at 495.

In addition, this Court's opinion in *Droz v. Commissioner*, 48 F.3d 1120 (9th Cir. 1995), suggests that a taxpayer seeking to come within the terms of a statute providing for religious exemptions from tax has standing to make an Establishment Clause challenge to the statute. *Droz* involved the exemption from self-employment taxes made available under IRC § 1402(g) to members of religious sects whose tenets are opposed to participation in the Social Security system and who provide for the care of their dependent members. The taxpayer in *Droz* had refused to pay Social Security taxes, even though he did not belong to any sect or other religious organization and therefore did not meet the express requirements of Section 1402(g). 48 F.3d at 1121-1122. The taxpayer contended that the statute violated the Establishment Clause by denying him a similar exemption based on his personal religious objections to the Social Security system, and this Court held that he had standing to raise that claim. *Id.* at 1122 & n.1. This Court went on to hold that Section 1402(g) did not violate the Establishment Clause.

*Droz* has two important implications for the case at bar. First, it suggests that a taxpayer who receives a cash hous-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing allowance but who fails to satisfy the clergy eligibility requirements of Section 107(2) may mount a justiciable challenge to the statute under the Establishment Clause. Because the constitutionality of Section 107(2) could be raised in a proper case, there is no reason for the Court to enter into the constitutional thicket in a case, such as this one, in which it has not been raised. Second, if the Court were to address the constitutional issue here, it should hold that Section 107(2), like the religion-specific exemption upheld in *Droz*, does not violate the Establishment Clause. *See* 48 F.3d at 1124-1125.

II

### IRC § 107(2) DOES NOT VIOLATE THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT

**A. Government accommodation of religion is permissible under the Establishment Clause so long as it has a secular purpose, it does not have the primary effect of advancing or inhibiting religion, and it does not foster excessive entanglement between religion and government**

The Supreme Court has "long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144-145 (1987) (internal footnote omitted) (reversing denial of unemployment compensation to claimant discharged for refusal to work on her Sabbath); *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987) (upholding exemption to Title VII prohibition on religious discrimination in employment for all employees of religious nonprofit organizations); *accord, Gillette v. United States*, 401 U.S. 437, 450 (1971) (upholding religion-specific exemption from military draft for those who oppose all wars); *Zorach v. Clauson*, 343 U.S. 306, 314 (1952) (upholding religion-specific exemption from compulsory education laws for students receiving voluntary off-campus religious instruction). When the Court last reviewed the constitutionality of a tax exemption generally applicable to religious organizations - rather than one confined to dissemination of religious writings, as in *Texas Monthly* (which we distinguish *infra*, at pages 35-42) - it observed that "[t]he basic purpose" of the Establishment Clause "is to insure that no religion be sponsored or favored, none commanded, and none inhibited." *Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970). "[T]he First Amendment," the Court continued, "will not tolerate either governmentally established religion or governmental interference with religion." *Id*, The Court concluded in *Walz* that "each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are *intended* to establish or interfere with religious beliefs and practices or have the *effect* of doing so." *Id*. (emphasis added).

The *Walz* analysis underpins the three-part test of constitutionality enunciated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and further developed in *Agostini v. Felton*, 521 U.S. 203, 232 (1997). In *Lemon*, the Court drew the line between a statute touching upon religion and a prohibited "'law respecting an establishment of religion,'" *id*. at 612, "with reference to the three main evils against which the Establishment Clause was intended to afford protection," namely, "'sponsorship, financial support, and active involvement of the sovereign in religious activity,'" 403 U.S. at 612 (quoting *Walz*, 397 U.S. at 668). In order to comport with the Establishment Clause, the Court said that: (1) the statute "must have a secular legislative purpose"; (2) "its principal or primary effect must be one that neither advances nor inhibits religion" [citation omitted]; and (3) it "must not foster 'an excessive government entanglement with religion,' *Walz, supra*, at 674 [parallel citation omitted]." *Lemon*, 403 U.S. at 612-613.[FN4] Furthermore, as the Court has consistently emphasized, "[t]he limits of *permissible* state accommodation to religion are by no means coextensive with the noninterference *mandated* by the Free Exercise Clause." *Walz*, 397 U.S. at 673 (emphasis added); *see Amos*, 483 U.S. at 334, 339 n.7; *see also, e.g., Brown v. Gilmore*, 258 F.3d 265, 275 (4th Cir.) (upholding "minute of silence" in public schools), *cert. denied*, 122 S. Ct. 465 (2001); *Children's Healthcare Is a Legal Duty, Inc., v. Min de Parle*, 212 F.3d 1084, 1094 (8th Cir. 2000), *cert. denied*, 532 U.S. 957 (2001). Evaluated under these principles, the income tax exemption provided by Section 107(2) represents a constitutionally permissible accommodation of religious practice.

    FN4. While the Court has occasionally discussed whether "excessive entanglement" is "a factor separate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and apart from 'effect'" (*Agostini v. Felton*, 521 U.S. at 232) or "an aspect of the inquiry into a statute's effect" (*Mitchell v. Helms*, 530 U.S. 793, 806 (2000)), it is clear that purpose, effect, and entanglement remain integral to Establishment Clause jurisprudence.

**B. The income tax exemption provided in IRC § 107(2) reflects Congress' decision to refrain from imposing differential tax burdens with respect to ministers' housing**

**1. A religion-specific provision that removes a burden on religious practice serves a valid secular purpose under the Establishment Clause**

The fact that Section 107(2) involves a tax exemption, rather than the granting of a direct subsidy, is crucial to an understanding of its constitutional soundness. A line of cases going back at least 80 years instructs that government may, consistent with the Constitution, refrain from imposing a burden on religion through a regulatory or tax exemption, even though the scope of the exemption is religion-specific.[FN5]

> FN5. In addition to this 80-year sequence of judicial precedent, congressional tax exemptions for religious property date back to the earliest days of the Republic. *See, e.g.*, 2 Stat. 194 (1802) (applying the taxing statute of Virginia, which provided an exemption for churches); 6 Stat. 116(1813) (refunding duties paid by religious organization upon the importation of plates for the printing of Bibles); 6 Stat. 346 (1816) (refunding duties paid by a church upon the importation of vestments); *see generally Walz*, 397 U.S. at 677 ("Congress, from its earliest days, has viewed the Religion Clauses of the Constitution as authorizing statutory real estate tax exemption to religious bodies"); *id.* at 681-686 (Brennan, J., concurring). As the Supreme Court has often noted, "early congressional enactments 'provid[e] "contemporaneous and weighty evidence" of the Constitution's meaning.'" *Printz v. United States*, 521 U.S. 898, 905 (1997) (internal citations omitted).

In the first of these authorities, *Arver v. United States*, 245 U.S. 366, 389-390 (1918), the Supreme Court said that "the unsoundness" of an Establishment Clause challenge to draft exemptions for ministers and theological students was "too apparent" to require further comment. Fifty years ago, in *Zorach v. Clauson*, the Court examined a "released-time program" exempting public school students from state compulsory education laws so that they could receive religious instruction away from school. 343 U.S. at 308. The Court held that the religion-specific exemption did not offend the First Amendment, because the Establishment Clause did not require "that the government show callous indifference to religious groups." *Id.* at 314. To do so "would be preferring those who believe in no religion over those who believe." *Id.*

In 1971, the Supreme Court examined a New York City property tax exemption that was available to religious organizations for properties used solely in religious worship and also to other nonprofit organizations. *Walz*, 397 U.S. at 666. The Court observed that "for the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." *Id.* at 668. But "[t]he legislative purpose of a property tax exemption is neither the advancement nor the inhibition of religion," the Court said, and thus "is neither sponsorship nor hostility." *Id.* at 672. The New York statute did not attempt to establish religion, but "simply spar[ed] the exercise of religion from the burden of property taxation levied on private profit institutions." *Id.* at 673. The fact that the exemption in *Walz* also applied to nonreligious organizations was not dispositive for the majority, which found it "unnecessary to justify" the exemption for religious organizations "on the social welfare services or 'good works'" they might provide. *Id.* at 674. Indeed, to have rested the exemption on a "good works" rationale would have invited excessive entanglement with religion. *Id.*[FN6]

> FN6. In *Gillette v. United States*, 401 U.S. 437, 454 (1971), the Court relied on *Walz*, 397 U.S. at 669, in stating that "'[n]eutrality' in matters of religion is not inconsistent with 'benevolence' by way of exemptions from onerous duties ... so long as an exemption is tailored broadly enough that it reflects valid secular purposes." On that basis, the Court rejected an Establishment Clause challenge to an exemption to the mili-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

tary draft that was then available to anyone "who, by reason of religious training or belief, is conscientiously opposed to participation in war in any form," 401 U.S. at 450, while excluding from its reach those professing "conscientious objection to a particular war," *id.* at 441.

In a concurring opinion joined by Justices Marshall and Stevens, Justice Brennan focused on the distinction between tax exemptions and "governmental subsidy of churches," which "would of course, constitute impermissible state involvement with religion." *Id.* at 690. He explained that a "subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole," whereas an exemption "assists the exempted enterprise only passively, by relieving a privately funded venture of the burden of paying taxes." *Id.*[FN7]

> FN7. Although Justice Brennan retreated from that position in *Texas Monthly*, a majority of the Court has never done so, as is discussed below (at pages 38-39), and the argument that "tax expenditure" analysis has no place in Establishment Clause jurisprudence remains compelling. *See generally* Boris I. Bittker, *Churches, Taxes and the Constitution*, 78 Yale L. J. 1285 (1969) (cited by Justice Brennan in *Walz*, 397 U.S. at 691 nn. 10 & 11); Edward A. Zelinsky, *Are Tax 'Benefits' Constitutionally Equivalent to Direct Expenditures?*, 112 Harv. L. Rev. 379 (1998); Dean M. Kelley, *Why Churches Should Not Pay Taxes* 11-13, 47-57 (1977).

In *Amos*, decided in 1987, the Supreme Court drew upon *Zorach* and *Walz* in holding that a provision in Title VII of the Civil Rights Act of 1964 exempting religious organizations from the prohibition against religious discrimination in employment did not violate the Establishment Clause. From *Walz*, the Court concluded that an exemption statute could be a "permissible accommodation" of religion. 483 U.S. at 334-335. Through *Zorach*, the Court clarified that the requirement of a secular legislative purpose "does not mean that the law's purpose must be unrelated to religion," and it emphasized that "the Establishment Clause has never been so interpreted." *Id.* at 335; *accord, Texas Monthly,* 489 U.S. at 10 (Court has never required "that legislative categories make no explicit reference to religion") (Brennan, Marshall, & Stevens, JJ.). "Rather, *Lemon's* 'purpose' requirement aims at preventing the relevant governmental decisionmaker - here,

NOTE: Pages 20 to 21 missing in original document.

is to achieve parity among clergy and denominations irrespective of a minister's housing arrangements, and between ministers and similarly situated laypeople.

These statutory purposes comport fully with the restraints of the Establishment Clause. By accommodating church-related housing needs and resources, Section 107 avoids creating tax-based discrimination for, against, or among the practices of different religions.

a. Church-provided housing is a tradition that dates back at least to the 13th century. Alan Savidge, *The Parsonage in England* 7-9 (1964). Furthermore, a minister's residence is traditionally more than mere housing. A minister's home is typically used for religious purposes "such as a meeting place for various church groups and as a place for providing religious services such as marriage ceremonies and individual counseling." *Immanuel Baptist Church v. Glass*, 497 P.2d 757, 760 (Okla. 1972); *State v. Erickson*, 182 N.W. 315, 319-320 (S.D. 1921); *see generally* Maurice T. Brunner, *Taxation: Exemption of Parsonage or Residence of Minister, Priest, Rabbi, or Other Church Personnel*, 55 A.L.R.3d 356, 404 (1974) ("Most ministerial residences can be expected to be incidentally used to some considerable extent as an office, a study, a place of counseling, a place of small meetings, such as boards or committees, and a place in which to entertain and lodge church visitors and guests."). Recognizing that a minister's residence may

NOTE: Page 23 missing in original document.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

light on the section's purpose. Immediately before the enactment of Section 213(b)(11), the Treasury Department had allowed some employees - but not clergy - to exclude the value of employer-provided housing from income. *See generally* *Commissioner v. Kowalski*, 434 U.S. 77, 84-90 (1977) (describing history of tax exemptions for employer-provided housing). They included seamen living aboard ship (O.D. 265, 1 C.B. 71 (1919)); persons living in "camps" (T.D. 2992, 2 C.B. 76 (1920)); cannery workers (O.D. 814, 4 C.B. 84, 84-85 (1921)); and hospital employees (O.D. 915, 4 C.B. 85, 85-86 (1921)). In 1921, Treasury announced that clergy would be taxed on the fair rental value of parsonages provided as living quarters, O.D. 862, 4 C.B. 85 (Apr. 1921), even though ministers traditionally resided in church-provided housing for the convenience of their organizations. Therefore, when Congress changed that treatment by enacting Section 213(b)(11), it merely placed ministers on an equal footing with other employees who were already permitted to exclude from income housing provided for their employers' convenience.

When churches that did not own parsonages (among them entire denominations) provided their ministers with cash housing allowances in lieu of housing in kind, Treasury continued to take the position that such allowances must be included in income. *See* I.T. 1694, C.B. II-1, at 79 (1923) ("the statute applies only to cases where a parsonage is furnished to a minister and not to cases where an allowance is made to cover the cost of a parsonage"). Several courts, however, rejected Treasury's position and held such allowances to be excludable. *See* *Conning v. Busey*, 127 F. Supp. 958, 959 (S.D. Ohio 1954); *MacColl v. United States*, 91 F. Supp. 721, 722 (N.D. Ill. 1950); *Williamson v. Commissioner*, 224 F.2d 377, 381 (8th Cir. 1955), *rev'g* 22 T.C. 566 (1954). As the Eighth Circuit stated in *Williamson*, "it was not the intent nor purpose of Congress that a house allowance in lieu of the rental value of a dwelling house and appurtenances thereof furnished to a minister of the gospel should be included in his gross income." *Id.*

c. In 1954, Congress resolved the dispute by codifying the prevailing judicial view in IRC § 107(2). Very recently, the Supreme Court reaffirmed that "'it is not only appropriate but realistic to *presume* that Congress was thoroughly familiar'" with pertinent judicial precedents "'and that it expect[s] its enactment[s] to be interpreted in conformity with them.'" *Edelman v. Lynchburg Coll.*, 122 S. Ct. at 1152 n. 13 (quoting *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) (emphasis added)). There is no basis for any contrary presumption in connection with Section 107(2). Indeed, Congress was urged to include the housing allowance provision in the 1954 Code precisely because the Commissioner "had

NOTE: Page 26 missing in original document.

exist against ministers, and between churches that historically provide parsonages and those that do not.[FN10]

> FN10. It is not our position that the mere existence of a tax on ministers, without more, would impose a burden on religion that is itself constitutionally intolerable. *See* *Jimmy Swaggart Ministries v. Cal. Ed. of Equalization*, 493 U.S. 378, 390-92 (1990) (rejecting argument that duty of religious ministry to collect nondiscriminatory sales and use taxes from retail purchasers and remit to the state "interfered with religious activities"); *Hernandez v. Commissioner*, 490 U.S. 680, 699-700(1989).

Section 107 allows each church to decide whether and how best to provide for the housing needs of its ministers.[FN11] The decision whether to furnish clergy with housing in kind, an allowance in cash, or no housing at all depends on many factors, such as church tradition, the size, composition, and wealth of the congregation, the location of the church, and the recipient's status within the ministry. A historic parish, for example, might be more likely to own a parsonage than a newly formed church or a new religious movement. Even if a parsonage were available for the principal minister, the assisting clergy might be given cash instead for the provision of housing.

> FN11. *Cf.* *Boyer v. Commissioner*, 69 T.C. 521 (1977) (noting that the purpose of Section 107 was to accommodate church needs and practices, rather than to allow a minister to "bootstrap" his chosen secular pursuits into a tax exemption).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Because Section 107 has the permissible secular purpose of avoiding government discrimination among religions, it furthers one of the core purposes of the Establishment Clause. *Cf. Larson v. Valente,* 456 U.S. 228 (1982); *Fowler v. Rhode Island,* 345 U.S. 67 (1953). The statute works a permissive accommodation of diverse religious practices, and it therefore passes the first test of constitutionality under *Wah* and *Lemon.*

**3. IRC § 107(2) does not have the primary effect of advancing or inhibiting religion, nor does it promote excessive entanglement between religion and government**

**a. Primary effect**

A law does not have the primary effect of advancing religion merely because "religious groups [are] better able to advance their purposes on account of [the law]." *Amos,* 483 U.S. at 336 (citations omitted); *accord, Bd. of Educ. of Kiryas Joel Vill Sch. Dist. v. Grumet,* 512 U.S. 687, 706 (1994); *Bowen,* 487 U.S. at 607;*Zorach,* 343 U.S. at 313. Rather, the test is whether "the *government itself* has advanced religion through its own activities and influence." *Amos,* 483 U.S. at 337 (emphasis in original). In contrast, Section 107(2) simply leaves religion alone.

Given the specialized professional qualifications and duties on which eligibility for the exemption depends, *see*Treas. Reg. §§ 1.107-1(a), - 1(b), 1.1402(c), it is inconceivable that Section 107(2) creates new incentives to religious activity. Regulatory exemptions have been upheld that implicate far more plausible incentives for religious activities than the housing exemption involved here. *See Kiryas Joel,* 512 U.S. at 725 (Kennedy, J., concurring) (discussing draft exemption upheld in *Gillette*); *Amos,* 483 U.S. at 338 (exemption from civil rights staffing constraints); *Hobbie,* 480 U.S. at 144-145 (unemployment benefits); *Zorach,* 343 U.S. at 312, 315 (time off from public school for children receiving religious education).

In particular, Section 107(2) does not provide government funding for any religious activity. *Walz* makes clear that the "grant of a tax exemption is not sponsorship" prohibited by the Establishment Clause, despite the "indirect economic benefit" accruing therefrom, because "the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." 397 U.S. at 675. As was noted in *Walz,* "the Court seems always to have viewed attacks upon the constitutionality of the exemptions" for churches and other charitable institutions "as wholly frivolous." 397 U.S. at 686 n.6. Indeed, "[n]othing in two centuries of uninterrupted freedom from taxation has given the remotest sign of leading to an established church or religion and on the contrary it has operated affirmatively to help guarantee the free exercise of all forms of religion." *Id.* at 678.

NOTE: Page 30 missing in original document.

By making such scrutiny unnecessary, the exemption provided in Section 107(2) avoids entanglement and promotes the secular purpose of the statute. *See Amos,* 483 U.S. at 335;*Walz,* 397 U.S. at 674-675.Section 107(2) accordingly meets all three elements of the *Lemon* test - a secular purpose, a primary effect that neither advances nor inhibits religion, and no excessive entanglement between church and state.

**C. IRC § 107(2) is analogous to other provisions whose constitutionality is not in doubt**

The Internal Revenue Code contains several religion-specific provisions whose constitutionality is now settled. It also contains a variety of unquestionably valid exemptions tailored to persons with particular housing requirements. Section 107(2) fits within the mold of these analogous provisions.

1. Section 1402 of the Code contains several exceptions applicable only to ministers and other persons with specified religious affiliations. Under IRC §§ 1402(a)(8) and (c)(4), a minister or a member of a religious order is treated as self-employed, for purposes of the self-employment tax (SEC A), with respect to "the performance of service in the exercise of his ministry" or "duties required by such order." IRC § 1402(e) permits a minister, a member of a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

religious order, or a Christian Science practitioner to obtain an exemption from SECA if he demonstrates religious or conscientious objections to payment of such tax. Under IRC § 1402(g), "any individual," whether lay or clergy, may obtain an exemption from SECA tax "if he is a member of a recognized religious sect," is "an adherent of established tenets or teachings of such sect … by reason of which he is conscientiously opposed" to the acceptance of social security, waives all right to social security benefits, *and* demonstrates that the sect makes equivalent provision for its members.

This Court, applying the *Lemon* test, upheld the constitutionality of § 1402(g) against an Establishment Clause challenge in *Droz*, 48 F.3d at 1124-1125. In *Battinger v. Commissioner*, 728 F.2d 1287, 1292 (10th Cir. 1984), the Tenth Circuit reached the same conclusion regarding §§ 1402(e) and (g). *Accord*, *Templeton v. Commissioner*, 719 F.2d 1408, 1412 n.5 (7th Cir. 1983) (rejecting a constitutional challenge to § 1402(g) for lack of standing, but also noting that courts reaching the merits of that question had "uniformJy held that this section is not unconstitutional"); *Bethel Baptist Church v. United States*, 822 F.2d 1334, 1340-1341 (3d Cir. 1987) (holding that IRC § 3121(w), providing limited exemption for churches and qualified church-controlled organizations from mandatory participation in social security scheme, did not violate Establishment Clause). These decisions reflect the consistent conclusion that tax exemptions that accommodate religious practice are not unconstitutional.

2. In addition to ministers, some other categories of taxpayers receive housing-related tax exemptions that, like Section 107(2), are tailored to their special housing needs. For example, Section 134 of the Code excludes from gross income "any qualified military benefit," meaning "any allowance or in-kind benefit (other than personal use of a vehicle)," which is received by reason of the taxpayer's status as a member of the uniformed services and was excludable under another provision of law in effect on September 9, 1986. As is relevant here, one excludable allowance is the "basic housing allowance" authorized in 37 U.S.C. § 403, which varies according to pay grade, dependency status, and geographic location.

Section 912 of the Code excludes from gross income, *inter alia*, certain "foreign area allowances" paid to civilian officers and employees of the Foreign Service, the CIA, and other agencies, as well as Peace Corps allowances. The Overseas Differential and Allowances Act (ODAA), codified in IRC § 912(1)(C), is the main vehicle for tax-exempt housing allowances for government workers overseas. *See, e.g.*, *Induni v. Commissioner*, 98 T.C. 618 (1992), *aff'd*, 990 F.2d 53 (2d Cir. 1993) (INS employee); *Anderson v. United States*, 16 Cl. Ct. 530 (1989), *aff'd*, 929 F.2d 648 (Fed. Cir. 1991) (civilian teachers in overseas military schools); *Bell v. United States*, 78-1 U.S. Tax Cas. (CCH) ¶ 9123 (Foreign Service officer).

The legislative history of ODAA reflects that Congress wanted to equalize the treatment accorded to United States employees in foreign countries who were provided free housing, and those who were not, just as IRC § 107(2) was intended to remove discrimination against ministers who receive a cash allowance instead of a parsonage. *See Anderson*, 16 Cl. Ct. at 533-535. The purpose of ODAA was "to improve and strengthen government overseas activities by establishing a uniform system for compensating all government employees in overseas posts irrespective of the agency by which they are employed" and to "provide uniformity of treatment for all overseas employees to the extent justified by relative conditions of employment." S. Rep. No. 1647, 86th Cong., 2d Sess., *reprinted in* 1960 U.S.C.C.A.N. at 3338, n.7.

Section 107(2) is therefore one of several special cases - all worthy, in the view of Congress - in which the particular housing requirements of a particular group of employees call for a particular tax exemption. These exemptions all possess the valid secular purpose of lessening the burden of housing costs for persons whose occupations - whether minister, soldier, diplomat, or Peace Corps volunteer - impose particular housing requirements. Section 107(2), moreover, has the permissible secular purpose of avoiding discrimination among religious practices. Thus understood, Section 107(2) cannot be viewed as an establishment of religion.

### D. The Supreme Court's opinion in *Texas Monthly* does not control this case

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The panel has directed the parties to address the implications for this case of the decision in *Texas Monthly v. Bullock*, 489 U.S. 1 (1989) (plurality opinion). In *Texas Monthly*, Justices Marshall and Stevens joined Justice Brennan in an opinion that concluded that the Establishment Clause was violated by a state sales tax exemption for "periodicals that are published or distributed by a religious faith and that consist wholly of writings promulgating the teachings of the faith and books that consist wholly of writings sacred to a religious faith." 489 U.S. at 5. Justice White wrote separately to *say* that "the proper basis" for invalidating the Texas exemption was that it involved content-based discrimination in violation of the Free Press Clause, *id.* at 25-26, a question the plurality found unnecessary to reach, *id.* at 5. In a separate concurrence joined by Justice O'Connor, Justice Blackmun proposed "a narrow resolution of the case" on the ground that "a tax exemption limited to the sale of religious literature by religious organizations violates the Establishment Clause." *Id.* at 28.

The reasoning of these three separate opinions in *Texas Monthly* does not support a conclusion that the housing exemption for ministers is unconstitutional. Moreover, the statute at issue in *Texas Monthly* is readily distinguishable from Section 107(2) in crucial respects.

1. None of the opinions issued in *Texas Monthly* commanded a majority of the Court. None of those opinions is therefore controlling here, for plurality opinions of the Supreme Court are not binding on lower courts except on the narrow question decided. *See, e.g.*, *TranSouth Fin. Corp. v. Bell*, 149 F.3d 1292, 1296-97 (11th Cir. 1998). In *Texas Monthly*, that question was whether a state sales tax exemption "violates the Establishment Clause or the Free Press Clause of the First Amendment when the State denies a like exemption *for other publications*." 489 U.S. at 5 (emphasis added). The plurality's decision was that, "*when confined exclusively to publications advancing the tenets of a religious faith*, the exemption runs afoul of the Establishment Clause." *Id.* (emphasis added). The present case raises a very different question concerning the scope of a rental value limitation on the exclusion under IRC § 107(2), something that has nothing to do with a tax exemption for religious writings.

Moreover, in *Texas Monthly*, the plurality expressly repudiated any inference "that all benefits conferred exclusively upon religious groups or upon individuals on account of their religious beliefs are forbidden by the Establishment Clause unless they are mandated by the Free Exercise Clause." 489 U.S. at 18 n.8; *see also id.* at 38 (Scalia, J., dissenting) (emphasizing that the Court had never adopted such a sweeping proposition). In citing *Zorach* and *Amos* in this context (*id.* at 18), the *Texas Monthly* plurality acknowledged the continued vitality of this line of precedent - *i.e.*, the same line of precedent on which we rely here - as authority for permitting religion-specific exemptions like Section 107(2). And, the Court has not disavowed that line of precedent in any subsequent opinion. Indeed, just one year after *Texas Monthly* was decided, a *majority* of the Court invited the unsuccessful litigants in *Employment Division v. Smith*, 494 U.S. 872, 890 (1990), to seek religion-specific exemptions from general regulatory laws (under which they were ineligible for unemployment compensation as a result of work-related "misconduct" involving ceremonial drug use) through legislative action.[FN12] Had such exemptions been regarded as unconstitutional *per se*, the *Smith* Court would not have suggested that avenue of relief.

> FN12. The six justices forming the majority in *Smith* included Justice Stevens as well as the three dissenters in *Texas Monthly*, Justices Rehnquist, Kennedy and Scalia.

2. In his concurring opinion with respect to the March 5 order in the present case, Judge Reinhardt emphasized the following language from the opinion of Justice Brennan in *Texas Monthly*:

[W]hen government *directs a subsidy* exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens non-beneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion, ... it provides unjustifiable awards of assistance to religious organizations and cannot but convey a message of endorsement to slighted members of the community.

489 U.S. at 15 (emphasis added). Any assertion that Justice Brennan regarded a tax exemption to be indistinguisha-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ble from an actual "direct subsidy" is impossible to reconcile, however, with the scrupulous distinction that he and the majority drew between the two in *Walz,* 397 U.S. at 690-691.*See also Regan v. Taxation with Representation,* 461 U.S. 540, 544 & n.5 (1983) ("In stating that exemptions and deductions ... are like cash subsidies, ... we of course do not mean to assert that they are in all respects identical.") (citing *Walz*). In seeking to accommodate religious belief and practice by foregoing collection of income tax on that portion of ministers' compensation corresponding to their housing costs, and in seeking to treat all denominations equally by exempting cash allowances from tax in the same way as physical housing, Congress did not subsidize religious practice and did not offend the Establishment Clause.

In short, *Texas Monthly* did riot produce a majority overruling the Court's holding in *Walz* that a tax exemption does not constitute a benefit to religion for Establishment Clause purposes. That holding in *Walz* accordingly remains controlling here.[FN13]

> FN13. It is telling that all nine justices in *Rosenberger v. Rectors and Visitors of the University of Virginia,* 515 U.S. 819 (1995), understood the critical difference between true subsidies and tax exemptions. The dissenters - including Justice Stevens, who had joined the *Texas Monthly* plurality - emphasized that "tax exemptions did not involve the expenditure of government funds in support of religious activities." *Id.* at 881 n.7 (Souter, J., dissenting). The majority also relied on the fact that there were no prohibited "direct money payments" in holding that public funding of printing costs of religious publications did not violate the Establishment Clause. *See id.* at 838-844.

3. The plurality opinion in *Texas Monthly* also cannot support the inference that the result in *Walz* depended on the breadth of the New York property tax exemption. *See*489 U.S. at 10-12, 15-16. Although the exemption in *Walz* did reach "a large number of nonreligious groups that ostensibly served an expressly articulated secular objective that religious groups could reasonably be thought to advance as well," *Texas Monthly,* 489 U.S. at 15, n.5, only Justice Brennan (joined by Justices Marshall and Stevens) relied on the theory that only "[t]he very breadth" of the scheme in *Walz* "negates any suggestion that the State intended to single out religious organizations for special preference," 397 U.S. at 689. The majority in *Walz* had concluded just the opposite - that it was "unnecessary to justify the tax exemption on the social welfare services or 'good works' that some churches perform for parishioners and others," 397 U.S. at 674;*accord, Rosenberger,* 515 U.S. at 881 (Souter, J., dissenting) ("In ... *Walz,* we noted that the law at issue was applicable to a 'broad class of property owned by nonprofit [and] quasi-public corporations,' ... but did not rest on that factor alone.") (internal citation omitted; bracketed material in original). The Court warned in *Walz* that "the use of a social welfare yardstick as a significant element to qualify for tax exemption could conceivably give rise to confrontations that could escalate to constitutional dimensions." 397 U.S. at 674. The Court in *Walz* thus emphasized that it "did not approve an exemption for charities that happened to benefit religion; it approved an exemption for religion as an exemption for religion." *Texas Monthly,* 489 U.S. at 38 (Scalia, J., dissenting).

4. The concern over excessive entanglement in *Texas Monthly* related to the possibility of "inconsistent treatment and government embroilment in controversies over religious doctrine" in the enforcement of the narrow sales tax exemption in issue there. *See*489 U.S. at 20. The disputed exemption was not generally available to religious *organizations* but was limited to their *religious* publications, *i.e.,* writings "promulgating the teachings of the faith" and those "sacred to a religious faith." *Id.* at 1. As such, it could hardly avoid excessive entanglement in calling upon civil authorities to decide which writings were "sacred" and which were not. *Id.* at 5. Even within a single sect, there may be disputes as to what is sacred and what is not. Moreover, the inquiry necessarily required by the Texas statute carried a risk of bias in favor of religions with "inspired" literature. *See id.* at 20. Finally, the necessity of determining whether certain writings consisted "wholly" of the favored content, *id.* at 5, presented distinct risks of excessive entanglement.

In contrast, determining the "boundaries of exemption" under Section 107(2) does not entail any scrutiny of doctrinal "message[s] or activity" by secular authorities, much less an assessment of consistency with the faith. To be eligible for the exclusion, a claimant need only show that (1) he or she is a minister (2) to whom a rental allowance has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

been paid as part of his or her compensation. The class of qualifying ministers is unquestionably "very broad." _Warnke v. United States_, 641 F. Supp. 1083, 1088 (E.D. Ky. 1986); _see_ Treas. Reg. §§ 1.107-1(a), 1.1402(c)-5. The statute has been held to be "sufficiently broad so as not to preclude ... [even] self-employed ministers from enjoying the parson's exclusion." _Warnke_, 641 F. Supp. at 1087, 1091; _accord_, _Whittington v. Commissioner_, 80 T.C.M. (CCH) 396, 398-399 (2000). Objective evidence within the possession and control of the minister or the church is sufficient to establish the availability and the amount of the exemption under Section 107(2). In this case, for example, the taxpayer's status as a minister and the contents of his compensation agreement with his church were established by stipulation. (App't Opening Br. 5-8.).

Section 107(2) accordingly satisfies the three-part test of constitutionality enunciated in _Walz_: it has a permissible secular purpose; it does not have the primary effect of advancing religion; and it avoids excessive entanglement. It does not violate the Establishment Clause.

CONCLUSION

For the reasons stated above, there is no need for the panel to address the constitutionality of Section 107(2), but if it does; it should hold that the statute is constitutional.

Briefs and Other Related Documents (Back to top)

• 2001 WL 34091107 (Appellate Brief) Reply Brief for the Appellant (Feb. 14, 2001)
• 2001 WL 34091442 (Appellate Brief) Reply Brief for the Appellees (Jan. 8, 2001)
• 2000 WL 33980323 (Appellate Brief) Opening Brief for the Appellant (Dec. 18, 2000)
• 00-71217 (Docket) (Sep. 26, 2000)
Richard D. and Elizabeth K. WARREN, Petitioners-Appellees, v. COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.
2002 WL 32102765 (C.A.9 ) (Appellate Brief )

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.