IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---o0o---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---o0o---

FREEDOM FROM RELIGION
FOUNDATION, INC., et al.,

         Plaintiffs,

vs.                           No. Civ. S-09-2894

TIMOTHY GEITHNER, in his
official capacity as Secretary
of the United States Department
of the Treasury, et al.,

         Defendants.

_____/


---o0o---

<u>REPORTER'S TRANSCRIPT</u>

MOTION TO INTERVENE

MONDAY, NOVEMBER 23, 2009

---o0o---




Reported by:    KATHY L. SWINHART, CSR #10150

1                          APPEARANCES

2

3    For the Plaintiffs:

4            NEWDOW LAW
             Post Office Box 233345
5            Sacramento, California  95823
             BY:    MICHAEL NEWDOW
6                   (Appearing telephonically)

7

     For Defendant United States of America:
8

             U.S. DEPARTMENT OF JUSTICE
9            Post Office Box 683
             Ben Franklin Station
10           Washington, D.C.  20044-0683
             BY:    JEREMY N. HENDON
11                  Trial Attorney, Tax Division

12

     For the Intervenors/Defendants:
13

             PACIFIC JUSTICE INSTITUTE
14           Post Office Box 276600
             Sacramento, California  95827
15           BY:    MATTHEW B. MC REYNOLDS

16

17

18

19

20

21

22

23

24

25

1                   SACRAMENTO, CALIFORNIA

2              MONDAY, NOVEMBER 23, 2009, 2:44 P.M.

3                         ---o0o---

4          THE COURT:  Who's on the line now?

5          THE CLERK:  This is Mr. Newdow.

6          MR. NEWDOW:  This is Mike Newdow for the plaintiffs.

7          THE CLERK:  Calling Item 8, civil S-09-2894, Freedom

8    from Religion Foundation versus Timothy Geithner, et al.

9          Counsel, your appearances.

10         MR. MC REYNOLDS:  Thank you, Your Honor.  Matthew

11   McReynolds on behalf of the proposed defendant intervenors,

12   and I have with me my law clerk Timothy Kelly.

13         MR. HENDON:  Good afternoon, Your Honor.  Excuse me.

14   Jeremy Hendon on behalf of defendant United States of America

15   representing the federal defendants in this case.

16         THE COURT:  All right.  Please be seated.  And speak

17   into the microphone so that Mr. Newdow will be able to hear

18   you as well as the Court.

19         Mr. McReynolds, your clients want to intervene here as

20   either permissive defendants or mandatory intervention.

21         MR. MC REYNOLDS:  Yes, sir, that's correct.

22         THE COURT:  The first question is, why do you want to

23   be sued?  You can ask the Court for leave to file an amicus

24   brief, which everyone has indicated apparently they have no

25   objection to.  If you're sued, you're sued.  And I don't know

1    whether the plaintiffs are asking for costs, attorney's fees

2    or any other affirmative relief besides an injunction.  But if

3    they are, are you volunteering to be liable in the event that

4    plaintiff prevails?

5         MR. MC REYNOLDS:  Well, Your Honor, first of all, as

6    to amicus standing, I think from our standpoint amicus

7    standing is insufficient in this case because of the unique

8    nature of the interests that the ministers have.  They have

9    direct financial interests in this case.  And so what we've

10   done in order to -- to hopefully minimize any potential

11   liability in that situation, there was one named minister who

12   contacted us initially that wanted to be part of this case.

13   There have been a number of others that have asked to join in

14   the case, about twenty at this point, that we would like to

15   substitute in for the doe defendants if Your Honor is of a

16   mind to grant the motion.  I think that would significantly

17   disperse any potential costs that might arise in this case.

18        And the bottom line is, as amicus, I think the ability

19   of the ministers to participate in the case would be severely

20   limited.  They would really like to file a motion to dismiss,

21   those types of motions.  We're already mostly done with one

22   that we would like to file if we're granted intervention.

23        They would like to have the ability to appeal this

24   case and to participate in other meaningful ways which amicus

25   status simply does not accomplish.  And that was recognized by

1     one of the cases that Mr. Hendon cited, the United States

2     versus City of Los Angeles case, that amicus status, even

3     though there are inherent risks associated with it, and I

4     believe -- my understanding of the case law is a little bit

5     fuzzy on this, but I think it's an open question as to whether

6     intervenor defendants share in court costs and attorney's fees

7     with the originally named defendants.  But that is -- when we

8     come to that bridge, we're certainly willing to cross it.

9          THE COURT:  You said the defendants have a direct

10    financial interest.

11         MR. MC REYNOLDS:  Yes, Your Honor.

12         THE COURT:  What is their direct financial interest?

13         MR. MC REYNOLDS:  Your Honor, what the plaintiffs are

14    trying to accomplish in this case is to have declared

15    unconstitutional the U.S. and state tax exemptions for

16    ministerial housing allowances, otherwise known as parsonage

17    allowances or rental allowances.  If those allowances are

18    declared unconstitutional and taken away from the ministers,

19    they're going to be hit with a significant tax burden that

20    they have never encountered before.

21         THE COURT:  Well, how is that any different than any

22    other financial interest that a taxpayer would have in any

23    lawsuit which would seek to change the law in such a way that

24    that taxpayer would no longer enjoy a deduction, a credit or

25    some other tax benefit?

 1          MR. MC REYNOLDS:  That's a great question.

 2          I think in this case the statute -- the entire lawsuit

 3   focuses on ministers.  The statutes, as they're being

 4   challenged, focus on ministers.  We have a very small group of

 5   ministers that are a very small percentage of the overall

 6   population in this state who are benefited currently by the

 7   tax exemption and who will be hit by the loss of the tax

 8   exemption.  So I think that very small percentage of the

 9   ministers versus general taxpayers is a significant

10   difference.

11          THE COURT:  So it's really the small number of persons

12   affected that you think separates them from the average case

13   that I've suggested?

14          MR. MC REYNOLDS:  I think that's certainly the main

15   way, Your Honor.

16          THE COURT:  Well, you said they want to participate,

17   and the two examples you gave were filing a motion to dismiss

18   or filing an appeal.  Do you have any reason to believe that

19   the United States government would not file a motion to

20   dismiss or would not file an appeal in the event of an adverse

21   decision?

22          MR. MC REYNOLDS:  I don't know, Your Honor, and I'm

23   sure Mr. Hendon will address that.  But the problem we have,

24   and the reason that we're asking for intervention in this

25   case, is the conflict of interest that we raised in our

1    briefs, and I think that's a significant question that the

2    Ninth Circuit addresses when it looks at motions to intervene

3    under the adequacy of the representation prong.

4         And in this case, you have the federal and the state

5    governments who have every incentive for the statutes to be

6    struck down.  And that doesn't mean --

7         THE COURT:  Well, they don't have every incentive.

8    One of their incentives is to uphold the law.  That's one of

9    their constitutional obligations.

10        Now --

11        (Brief interruption in proceedings.)

12        MR. MC REYNOLDS:  Well, Your Honor, I think it is --

13   with them it's a point of honor, so to speak, to uphold this

14   statute.  However, in the event of an adverse decision, the

15   government has lost absolutely nothing and gained quite a bit,

16   whereas the ministers have taken a direct financial hit.

17        And so, as far as the conflict goes, there was one

18   thing that I wanted to bring to Your Honor's attention that

19   was -- that came to my attention after -- after the briefs had

20   been filed.  And that's a case that I believe Mr. Hendon is

21   familiar with, the Warren versus Commissioner of the Internal

22   Revenue Service case, that dealt with the same federal

23   statutes about seven years ago in the Ninth Circuit.

24        And in that case, the IRS went after a very prominent

25   minister, Rick Warren, author of the Purpose Driven Life, for

1    what they deemed to be excessive claiming of the housing

2    allowance under these statutes.  So it put the IRS and the

3    minister in direct conflict with one another.  Mr. Warren sued

4    to challenge that, he eventually won, he got the tax court to

5    agree with him.  Then there was a Congressional amendment made

6    to the law that's changed it a little bit.  But that case

7    illustrates that the IRS cannot adequately represent the

8    interests of ministers that it has at times enforced these

9    laws to the detriment of.

10          And so --

11          THE COURT:  Well, I'd have to know more about that

12   suit.  But, you know, the IRS will enforce its laws against

13   everybody at one time or another, every group of individuals

14   if they believe that they're abusing those provisions.  They

15   go after people for excessive business expenses.  They go

16   after people for abusive trusts.  That doesn't mean that they

17   could not defend the provisions of the IRS Code that relate to

18   business expenses or trust deductions.

19          MR. MC REYNOLDS:  Well, Your Honor, one of the cases

20   that has -- was discussed in both of our briefs, the

21   California Lockyer versus United States case, I think

22   illustrates that one of the key things you look at when you're

23   talking about inadequacy of representation is whether or not

24   there are going to be differing -- whether there have been

25   differing constructions of a statute utilized by the

1  government that's purporting to defend the statute and the

2  proposed intervenors.

3        THE COURT:  That would be a question that would be

4  relevant, and that's why I said I would need to know more

5  about that Warren case.  Did the IRS or the Justice Department

6  take a position in that case that would be in any way

7  different from the position that it would have to take here in

8  order to defend the constitutionality of this statute?

9        MR. MC REYNOLDS:  In that case, Your Honor, they took

10  a narrow view of the statute in order to go after Mr. Warren

11  and to limit his housing allowance, and he and all other

12  ministers that we would be representing would take a broader

13  view of the statute.

14        And so that's what -- to the Ninth Circuit in the

15  Lockyer case, that was a linchpin in determining that there

16  had been a past history where the parties had had a narrow

17  versus a broad construction of the statute and, therefore,

18  there -- you couldn't say that the government could adequately

19  represent their interests.

20        THE COURT:  Let me ask you if you've read a case that

21  just came down from the Ninth Circuit on Thursday, Kristin

22  Perry and others versus Proposition 8 Official Proponents.

23        MR. MC REYNOLDS:  I have, Your Honor.

24        THE COURT:  Well, the reason I ask is that there was a

25  similar argument made in that case that the Campaign for

1   California Families, which wanted to intervene, was going to

2   take, as I recall, a broader approach than the Proposition 8

3   Official Proponents, who were the defendants in the case.  And

4   the court said there it didn't make any difference, all they

5   look to was whether the parties' ultimate objectives were the

6   same.

7           MR. MC REYNOLDS:  Well, a couple things, Your Honor.

8   First of all, I am familiar with some of the parties in that

9   case, with the history of that case.  And I can tell you just

10  as a -- as background to that case that the Campaign for

11  California Families actually had originally been promoting a

12  different ballot measure than the one that they ultimately

13  asked the Ninth Circuit to let them defend.

14          But as to the nuts and bolts of that case, and

15  actually a number of cases that the Department of Justice has

16  brought out here, I think something that's really important to

17  note in the Perry case and in a lot of these other cases, the

18  United States versus City of Los Angeles, the Arakaki case,

19  Southern California Edison case, is that when the court denied

20  intervention in a lot of these cases, one of the very

21  practical things that they were looking at that I think was

22  unavoidable was that they had already allowed other parties to

23  intervene in those cases.  And so these other people who were

24  coming behind them, the court said, okay, there's adequacy of

25  representation here.  We've already allowed one group to

1    intervene to defend the statute, which is exactly what

2    happened in the Perry case.

3         They allowed the Proposition 8 campaign to intervene

4    to defend the statute, and then they shut the door behind

5    them.  They said, but no more, that group is now adequately

6    represented; therefore, we're going to take a dim view

7    and really --

8         THE COURT:  I don't see that in the opinion.  Maybe

9    you know more about the facts, and so that may be true.  But

10   the way I read it when I saw the case was that this group

11   called Proposition 8 Official Proponents was in the case, and

12   the Campaign for California Families was the group that sought

13   to intervene.

14        MR. MC REYNOLDS:  That's right, Your Honor.  The Prop

15   8 Proponents had already intervened in the case.

16        THE COURT:  Oh, okay.  I thought you said campaign.

17   So it's the Prop 8 Proponents.

18        MR. MC REYNOLDS:  That's correct, Your Honor.  All

19   during the campaign they were referred to as the Prop 8

20   campaign, so maybe they have a different official name now.

21        THE COURT:  That raises the additional question why

22   should we let your client intervene as opposed to the next

23   person that might come around?  Is it the first one that wants

24   to intervene gets special treatment?

25        MR. MC REYNOLDS:  Well, I think it's a little more

1    nuance than that, Your Honor.  Right now, looking at the

2    adequacy of representation prong, there's no one in the case

3    that represents the interests of ministers at all.  And our

4    position is that those interests are materially different than

5    the interests of the United States or state government.

6              THE COURT:  Well, a related question would be --

7              MR. MC REYNOLDS:  Sure.

8              THE COURT:  -- you said that you want 20 others to be

9    substituted as doe plaintiffs.  This sounds like a class

10   action.  I don't know how you would proceed if you were

11   permitted to intervene here.  The next group of ministers that

12   comes around needs to know that you represent them.  And so

13   would we be stuck with something like a class certification

14   issue and have to make all the determinations that have to be

15   made in a class action in order to make sure that you

16   adequately represent all the other ministers that might want

17   to be represented in this case?

18             MR. MC REYNOLDS:  Well, I don't think so, Your Honor.

19   I think we could avoid that.

20             First of all, our goal is to intervene in the case on

21   behalf of numbers of ministers that have been in touch with

22   our organization about this case whether they're actually

23   named defendants or not.  We would be content with the single

24   minister that we have named as a proposed defendant intervenor

25   at this point.  I think it would benefit the Court to have a

1   number of other ministers from many other denominations and

2   faith traditions who could stand in the shoes of the ministers

3   and those denominations before the Court, to have declarations

4   that involve some different types of faith traditions that all

5   take advantage of the housing allowance.  I think that would

6   benefit the Court.  If the Court thinks differently, then

7   certainly you have the prerogative to limit that and just say

8   you got one, that's it.

9           But that's where we stand on that.  I don't -- I don't

10  think the Court would need to go into any kind of class

11  certification.

12          Again, going back to the adequacy of representation

13  issue, I think what happens, the latecomers don't necessarily

14  have the door completely foreclosed to them, but they have

15  a -- a higher burden of showing why -- if there are ministers

16  already in the case, why there's no -- there's still

17  inadequate representation.

18          THE COURT:  All right.  Mr. Hendon, let me ask you.

19  Mr. McReynolds' concern seems to be that there may be a number

20  of motions that his clients would like to make that he's not

21  sure that the government would make.  Is there any reason that

22  he should be concerned about that?

23          MR. HENDON:  No, Your Honor.  Excuse me.  No, Your

24  Honor.  The United States is anticipating filing a motion to

25  dismiss in this case.  We haven't fleshed out all of the

1    issues for the motion yet, but our deadline is not until the

2    end of next month.  So with respect to whether or not a motion

3    to dismiss is going to be filed, the government will be filing

4    one.

5         Now, if they have arguments to make, we've already

6    said we're happy -- we're fine adding them as an amicus, and

7    they can make all of the arguments they want if they think for

8    some reason the government doesn't cover everything in its

9    motion to dismiss.  But with respect to that issue, I can

10   assure you that there will be a motion to dismiss.

11        With respect to the appeal issue, the Ninth Circuit

12   has actually allowed a third party to come in after a district

13   court ruling and bring up the appeal when the parties to the

14   case did not appeal.  That was in the Yniguez case.  Even

15   though it was ultimately vacated on different grounds, there

16   is some authority to say that the Ninth Circuit would be or

17   may allow a third party to come in, especially one that had

18   been involved in the process.

19        THE COURT:  When you say come in, you mean to file the

20   notice of appeal or to file an amicus brief on the appeal?

21        MR. HENDON:  To actually file the appeal should the

22   government, for whatever reason --

23        THE COURT:  I see.

24        MR. HENDON:  -- not do it.

25        And right now obviously I can't make any

1    representations about that because the Solicitor General

2    ultimately makes that decision on behalf of the government.

3         THE COURT:  Right.  And that was a good point because

4    I could see an intervenor, such as the parties here, being

5    concerned that the government may not file appeal even if the

6    government's ultimate interests were the same as theirs

7    because the Solicitor General has to make those

8    determinations.  And as we learn whenever the Solicitor

9    General speaks at any functions or when we study this, the

10   considerations that are taken into account in determining

11   whether the government will appeal are not necessarily the

12   same as when a private party considers appeal.  The government

13   has to be concerned with other cases and the priority of other

14   issues and a number of considerations that private parties

15   don't make.

16        But if you're telling me that there is authority for a

17   private party whose only appearance is by amicus to file

18   notice of appeal, that would answer that concern.

19        MR. HENDON:  Your Honor, yes.  And like I said, it

20   went up to the Supreme Court.  It's the Yniguez that turned

21   into the Arizonans for Official English case at the Supreme

22   Court level.  But the Ninth Circuit allowed the -- the

23   Arizonans for Official English group, they were not an actual

24   party in the case, they allowed them to bring the appeal

25   before the Ninth Circuit.

1      And so I'm not -- again, it's been vacated on other

2  grounds, but I believe that the Ninth Circuit would be willing

3  to entertain that should that ever occur in the future because

4  it was overruled -- if you remember, the case ultimately in

5  the Supreme Court was decided on standing grounds because the

6  plaintiff in that case, who worked for the State of Arizona,

7  had quit her job by the time it was on appeal.  So the court

8  said there was no more -- it was not ripe any more because she

9  was no longer an employee.

10      THE COURT:  Mr. Newdow can probably appreciate that.

11      MR. NEWDOW:  Yes.

12      MR. HENDON:  But, Your Honor, I do want to respond

13  specifically about this Warren versus Commissioner case in the

14  Ninth Circuit because I believe that answers the question

15  about adequacy of representation and whether or not the

16  government would defend this statute that's at issue in this

17  case.

18      In the Warren case, and this was -- I can give you the

19  cite.  It was -- the Ninth Circuit cite was 00-71217.  And

20  counsel is correct, it started in the tax court.  Mr. Warren

21  had asserted that he was entitled to more housing allowances

22  than the IRS believes.  So it was a matter like you said, like

23  the Court said, someone taking a deduction that the IRS

24  thought it was extra than what the statute allowed.  It wasn't

25  dealing with the constitutionality of the statute.

 1          On appeal to the Ninth Circuit, the Ninth Circuit sua

 2     sponte asked the parties to brief the constitutionality of

 3     Section 107, which is the -- one of the statutes at issue here

 4     today.  And so the government actually submitted a brief

 5     arguing that the statute is constitutional, and that was filed

 6     in -- the date that it was filed, I believe it was May of

 7     2002.  And so that gives clear evidence that the government is

 8     willing to go forward and to represent -- defend the

 9     constitutionality of the statute at issue in the case.

10          So I think when counsel was trying to say in that case

11     the government was taking a different view of the statute,

12     that's not really correct.  It was more what the Court said, a

13     situation where someone was trying to expand, get a higher

14     deduction than what the statute itself allowed.

15          THE COURT:  How do you answer Mr. McReynolds' argument

16     that the government will have nothing to gain financially --

17     nothing to lose -- the government will have nothing to gain

18     financially and everything to lose if the plaintiff prevails?

19          MR. HENDON:  With respect to that issue, Your Honor,

20     all I could say is that this statute has been on the books

21     since the 1954 code, and actually before that it was a

22     provision that was allowed.  That's the parsonage that we're

23     talking about, the exception here.  So if the government

24     wasn't going to not enforce it for 55 years, it doesn't make

25     sense that all of a sudden the government would say, okay,

1   we're not going to allow this exclusion anymore of these

2   deductions.

3          THE COURT:  All right.  Mr. Newdow, what is your

4   position?

5          MR. NEWDOW:  We have no objection to the intervention.

6   That's fine with us.

7          THE COURT:  What about if the Court -- well, let me

8   ask you this.  Why would it make a difference to you whether

9   it's intervention or the Court allows them to file an amicus

10  brief?

11         MR. NEWDOW:  Nope, either way is fine.  We actually

12  enjoy when the other groups participate because it usually

13  provides more fodder for us to make our point.

14         THE COURT:  Do you think it might slow the progress of

15  your case down if we allow them to intervene and there are

16  procedural objections, you know, such as the standing of the

17  20 ministers that they want to add or other procedural issues

18  arise?

19         MR. NEWDOW:  I'm not sure if standing will arise since

20  there will be defendants.  I imagine there could be some

21  procedural issues that will delay it, but I'm not thinking of

22  those -- none are coming to mind right now.  The deadlines

23  will be set and the briefing will proceed I think pretty much

24  along the same schedule.

25         THE COURT:  All right.  So you can handle it either

1    way?

2            MR. NEWDOW:  Sure.

3            THE COURT:  All right.  So was there anything else

4    that you wanted to say, Mr. McReynolds?

5            MR. MC REYNOLDS:  There were a couple things, Your

6    Honor.

7            First of all, I gotta address the Yniguez cite.  I

8    don't have citations for you.  I could come up with I think

9    half a dozen in, you know, 20 or 30 minutes.  But the great

10   weight of authority in the Ninth Circuit is that they do not

11   let people in as intervenors after the -- after this stage.

12   It's considered untimely.  In all the cases that have been

13   cited both by us and by Mr. Hendon, there are a number of

14   references to that.  And so there may have been one case

15   somewhere that was later vacated where that was allowed, but I

16   know that there are several others in which the court has said

17   the opposite.

18           And so I would be very uncomfortable assuming or

19   presuming that the Ninth Circuit would allow -- or the U.S.

20   Supreme Court, for that matter, if it goes above the Ninth

21   Circuit, which Mr. Newdow certainly has a history taking his

22   cases all the way to the U.S. Supreme Court, I would not

23   venture to guess at all that we would be allowed intervention

24   beyond this point.

25           THE COURT:  Well, where I think that might be allowed

1    would be where the United States takes a position that it had

2    not previously taken and suddenly now no longer opposes the

3    motion or some aspect of the motion.  And then a party who no

4    longer feels that their interests are represented could ask to

5    intervene.

6           MR. MC REYNOLDS:  One other thing I need to call to

7    the Court's attention is the fact that the motion today and

8    what we have been talking about is directed entirely to the

9    federal causes of action and the federal statutes.  There's

10   been no appearance by, no opposition from the state

11   defendants.  We have no idea where they're at in terms of this

12   lawsuit.  And so -- and Mr. Newdow has not opposed us, the

13   plaintiffs have not opposed us on our motion to intervene for

14   that.

15          So --

16          THE COURT:  But you're a little premature on that.  As

17   you point out, they haven't even appeared yet, so you can't

18   construe their lack of opposition to this as agreement.

19          MR. MC REYNOLDS:  Well, I think they've had, certainly

20   had a fair amount of time in which to oppose it if they cared

21   about it.

22          THE COURT:  They haven't even filed a responsive

23   pleading yet, have they?

24          MR. MC REYNOLDS:  No, Your Honor.

25          THE COURT:  All right.

1          MR. MC REYNOLDS:  So is it -- can I take it from the

2     Court, then, that we would be allowed to file a separate

3     motion to intervene once the state defendants have stated

4     their appearance and it becomes clear what their position is?

5          THE COURT:  Legally I think so.  But as a practical

6     matter, if you don't have any arguments against the state that

7     you didn't have against the government, and I deny you

8     intervention against the government, you may anticipate what

9     the Court's ruling might be.

10         However, as you know from the Prop 8 case, any

11     decision disallowing intervention is immediately appealable.

12     So you would have a right to appeal from this Court's denial

13     of your motion to intervene whether the state is a party yet

14     or not.

15         MR. MC REYNOLDS:  We would, Your Honor.  From a

16     practical standpoint, we are currently involved as intervenor

17     defendants in another high profile case that Mr. Newdow is

18     litigating on his own behalf.  We've been waiting 23 months

19     since oral arguments before the Ninth Circuit for a decision.

20     So I think by that time, things -- the train pretty much would

21     have left the station in this court.

22         THE COURT:  That's funny you point that out, because I

23     was wondering how long it takes to perfect one of these

24     interlocutory appeals.  And I looked at the Prop 8 case, and I

25     noticed that it was filed in the district court apparently

1  earlier this year.

2       MR. MC REYNOLDS:  That was an extraordinarily and is

3  an extraordinarily high profile case, Your Honor.

4       THE COURT:  Well, again, that's a shame that the speed

5  of justice depends on the profile of the case.

6       MR. MC REYNOLDS:  Well, I can't --

7       THE COURT:  That's just my little editorial comment,

8  and that's not the way I try to run this court.

9       All right.  But it is -- anyway, that is one of your

10  options.

11       Anything else?

12       MR. MC REYNOLDS:  I believe -- I think we've pretty

13  well set forth.  I think in closing, Your Honor, that this is

14  an archetypal intervention case where the interests of the

15  ministers and the interests of the U.S. government are simply

16  not the same.  And if you can't get intervention in this case,

17  then I -- I don't know where you can get it.

18       THE COURT:  Thank you.  The motion is taken under

19  submission.

20       MR. MC REYNOLDS:  Thank you, Your Honor.

21       MR. HENDON:  Thank you, Your Honor.

22       MR. NEWDOW:  Thank you, Your Honor.

23       (Proceedings were concluded at 3:15 p.m.)

24                        ---o0o---

25

1

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4

5

                              /s/ Kathy L. Swinhart
6                             KATHY L. SWINHART, CSR #10150

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25