UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

FREEDOM FROM RELIGION
FOUNDATION, INC.; PAUL STOREY;          NO. CIV. 2:09-2894 WBS DAD
BILLY FERGUSON; KAREN
BUCHANAN; JOSEPH MORROW;
ANTHONY G. ARLEN; ELISABETH             MEMORANDUM AND ORDER RE:
STEADMAN; CHARLES AND COLLETTE          MOTIONS TO DISMISS
CRANNELL; MIKE OSBORNE; KRISTI
CRAVEN; WILLIAM M. SHOCKLEY;
PAUL ELLCESSOR; JOSEPH
RITTELL; WENDY CORBY; PAT
KELLEY; CAREY GOLDSTEIN;
DEBORAH SMITH; KATHY FIELDS;
RICHARD MOORE; SUSAN ROBINSON;
AND KEN NAHIGIAN,

          Plaintiffs,

     v.

TIMOTHY GEITHNER, in his
official capacity as Secretary
of the United States
Department of the Treasury;
DOUGLAS SHULMAN, in his
official capacity as
Commissioner of the Internal
Revenue Service; and SELVI
STANISLAUS, in her official
capacity as Executive Officer
of the California Franchise
Tax Board,

          Defendants.
_____/

1

----ooOoo----

Freedom From Religion Foundation, Inc. ("FFRF"), a non-profit organization that advocates for the separation of church and state, and several of its members who live in California have filed this action against Timothy Geithner, in his official capacity as the Secretary of the United States Department of Treasury, and Douglas Shulman, in his official capacity as Commissioner of the Internal Revenue Service, and Selvi Stanislaus, in her official capacity as Executive Officer of the California Franchise Tax Board, seeking a declaration that 26 U.S.C. §§ 107 and 265(a)(6) violate the Establishment Clause of the United States Constitution and that sections 17131.6 and 17280(d)(2) of the California Revenue and Taxation Code violate the Establishment Clause of the United States and California Constitutions and seeking injunctive relief.

Defendants Geithner and Shulman ("federal defendants") and defendant Stanislaus separately move to dismiss plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

I.   <u>The Assailed Statutes and Regulations</u>

Section 107 of the Internal Revenue Code ("IRC") provides that:

> In the case of a minister of the gospel, gross income does not include-
> (1) the rental value of a home furnished to him as part of his compensation; or
> (2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home and to the extent such allowance does not

2

exceed the fair rental value of the home, including furnishing and appurtenances such as a garage, plus the cost of utilities.

26 U.S.C. § 107. Subsection 1.107-1(a) of the Treasury Regulations further provides:

In order to qualify for the exclusion, the home or rental allowance must be provided as remuneration for services which are "ordinarily the duties of a minister of the gospel." In general, the rules provided in § 1.402(c)-5 will be applicable to such determination. Examples of specific services the performance of which will be considered duties of a minister for purposes of § 107 include the performance of sacerdotal functions, the conduct of religious organizations and their integral agencies, and the performance of teaching and administrative functions at theological seminaries.

The Complaint alleges that the IRS also requires ministers of the gospel to be "duly ordained, commissioned, or licensed" in order to be entitled to the exclusion. (Compl. ¶¶ 43-44.)

The § 107 exclusion[1] is available only when a minister is given use of a home or receives a housing allowance as compensation for services performed "in the exercise" of his ministry, language that is borrowed from § 1402(c)(4). The Treasury Regulations promulgated under § 1402(c)(4) provide that services performed by a minister "in the exercise" of his ministry include: (1) the ministration of sacerdotal functions; (2) the conduct of religious worship; and (3) the control, conduct, and maintenance of religious organizations under the authority of a religious body constituting a church or church denomination. Treas. Reg. § 1.1402(c)-(5)(b)(2).

IRC § 265(a)(6) allows "ministers of the gospel" to claim deductions under §§ 163 and 164 of the IRC for residential

---

[1] The parties and relevant caselaw alternately use the term "exclusion" and "exemption."

3

mortgage interest and property tax payments, even if the money used to pay those expenses was received in the form of a tax-exempt § 107 allowance.  Plaintiffs allege that non-clergy taxpayers are not able to take advantage of this "double dipping."  (Compl. ¶ 47.)

Sections 17131.6 and 17280(d)(2) of the California Revenue and Taxation Code correspond to sections 107 and 265(a)(6) of the IRC.

II.  <u>Discussion</u>

A.  <u>Motions to Dismiss for Lack of Subject Matter Jurisdiction</u>

Defendants first argue that the court lacks subject matter jurisdiction over plaintiffs' claims because, in the case of Stanislaus only, the Eleventh Amendment bars plaintiffs' suit and, with respect to all defendants, plaintiffs lack standing.

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." <u>Rasul v. Bush</u>, 542 U.S. 466, 489 (2004) (quoting <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994).  The court is presumed to lack jurisdiction unless the contrary appears affirmatively from the record.  <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 342 n.3 (2006).  Consistent with these basic jurisdictional precepts, the Ninth Circuit has articulated the standard for surviving a motion to dismiss for lack of jurisdiction as follows:

When subject matter jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.  A plaintiff suing in a federal court must show in his pleading, affirmatively and distinctly,

4

the existence of whatever is essential to federal jurisdiction, and, if he does not do so, the court, on having the defect called to its attention or on discovering the same, must dismiss the case, unless the defect be corrected by amendment.

Tosco Corp. v. Cmtys. for a Better Env't, 236 F.3d 495, 499 (9th Cir. 2001) (citations and internal quotations omitted). Additionally, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

> 1. Eleventh Amendment Immunity

Stanislaus argues that plaintiffs' claims against her in her official capacity are barred by the Eleventh Amendment. See Hans v. Louisiana, 134 U.S. 1 (1890). The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

The Eleventh Amendment grants states sovereign immunity against suits in federal court. The State's sovereign immunity poses "a bar to federal jurisdiction over suits against non-consenting States." Alden v. Maine, 527 U.S. 706, 728-29 (1999); accord V.O. Motors v. Cal. State Bd. of Equalization, 691 F.2d 871, 873 (9th Cir. 1982). The bar extends to suits in federal court against a state by its own citizens as well as by citizens of another state. Edelman v. Jordan, 415 U.S. 651, 662-63 (1974). This jurisdictional bar applies to suits "in which the State or one of its agencies or departments is named as the defendant" and "applies regardless of the nature of the

5

relief sought," <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465
U.S. 89, 100 (1984), including suits for declaratory or
injunctive relief. <u>Cory v. White</u>, 457 U.S. 85, 91 (1982).
Furthermore, a suit for damages against a state official in his
or her official capacity is tantamount to a suit against the
state itself, and is thus subject to the Eleventh Amendment.
<u>Pennhurst</u>, 465 U.S. at 101-02.

  "The Eleventh Amendment immunity is designed to allow a
state to be free to carry out its functions without judicial
interference directed at the sovereign <u>or its agents</u>." <u>V.O.</u>
<u>Motors</u>, 691 F.2d at 872 (emphasis added). In this case,
plaintiffs sue Stanislaus only in her official capacity as
Executive Director of the California Franchise Tax Board, an
agency of the State of California. Plaintiffs' claims against
her are therefore subject to the Eleventh Amendment's guarantee
of sovereign immunity to the states. <u>Id.</u>; <u>Pennhurst</u>, 465 U.S. at
101-02.

  Claims under 42 U.S.C. § 1983 for deprivation of
federal civil rights are limited by the Eleventh Amendment.
Because suits against state officials in their official capacity
are tantamount to suits against the state itself, "state
officials sued in their official capacities are not 'persons'
within the meaning of § 1983." <u>Doe v. Lawrence Livermore Nat'l</u>
<u>Lab.</u>, 131 F.3d 836, 839 (9th Cir. 1997). An exception to the
rule that state officials are not "persons" under § 1983 is found
in <u>Ex parte Young</u>, 209 U.S. 123 (1908). When sued for
prospective injunctive relief, a state official in her official
capacity is considered a "person" for § 1983 purposes. <u>See</u> <u>Will</u>

v. Mich. Dep't of State Police, 491 U.S. 58, 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985)).

This provides a narrow exception to Eleventh Amendment immunity where the plaintiff seeks to "end a continuing violation of federal law." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 73 (1996) (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)); see Green, 474 U.S. at 68 ("[T]he availability of prospective relief of the sort awarded in Ex parte Young gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.").

Here, the "continuing violation of federal law" alleged by plaintiffs is the administration and enforcement of sections 17131.6 and 17280(d)(2) of the California Revenue and Taxation Code in violation of the Establishment Clause. In their Complaint, plaintiffs seek only prospective declaratory and injunctive relief, both of which are available to plaintiffs bringing suit against a state pursuant to § 1983. See, e.g., Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 847 (9th Cir. 2002) (collecting cases).

Although Idaho v. Coeur D'Alene Tribe of Idaho, 521 U.S. 261 (1997) limited Ex parte Young and held that the state sovereignty interest in title to its lands is "core area of state sovereignty" such that suit for quiet title is barred by the

7

Eleventh Amendment, this limitation does not apply here.  See
Aqua Caliente Band of Cahuilla Indians v. Hardin, 223 F.3d 1041
(9th Cir. 2000) (finding that sovereignty interest present in
Coeur D'Alene is not present in state taxpayer suits for
violation of federal law and that Ex parte Young applies).
Plaintiffs therefore fall under the Ex parte Young exception for
their § 1983 claim against Stanislaus for alleged violation of
their federal constitutional rights.

However, because Ex parte Young does not apply to
supplemental state law claims, see Pennhurst, 465 U.S. at 119-21,
the court will grant Stanislaus's motion to dismiss based on
Eleventh Amendment sovereign immunity with regard to plaintiffs'
claims against her under the California constitution.[2]  See 28
U.S.C. § 1367(c); see also Ulaleo v. Paty, 902 F.2d 1395, 1400
(9th Cir. 1990) (explaining that it "would offend federalism" and
not further the justification for the Ex parte Young exception
for a federal court to decide claims that a state violated its
state constitution).

2.   Standing

The judicial power of the federal courts is limited to
"Cases" and "Controversies."  U.S. Const. Art. III, § 1.  The
doctrine of standing is an "essential and unchanging part of the
case-or-controversy requirement of Article III."  Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citing Allen v.
Wright, 468 U.S. 737, 751 (1984)).  Article III standing requires

_____

[2]    At oral argument, counsel for plaintiffs conceded that
the court lacks jurisdiction over plaintiffs' claims brought
under the California constitution.

8

that a plaintiff allege "a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  Allen, 468 U.S. at 751.

### a. Federal Taxpayer Standing

The Supreme Court has long held that plaintiffs alleging an injury that arises solely out of their federal taxpayer status generally do not have standing in federal court. See Frothingham v. Mellon, 262 U.S. 447, 487 (1923) (holding that a taxpayer's "interest in the moneys of the Treasury . . . is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded" for standing); see also Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 599 (2007) ("As a general matter, the interest of a federal taxpayer in seeing that Treasury funds are spent in accordance with the Constitution does not give rise to the kind of redressable 'personal injury' required for Article III standing.").

This line of taxpayer standing cases is "equally applicable to . . . taxpayer challenges to so-called 'tax expenditures,' which reduce amounts available to the treasury by granting tax credits or exemptions." DaimlerChrysler, 547 U.S. at 343-44 (state tax credit challenged under Commerce Clause).

In Flast v. Cohen, 392 U.S. 88 (1942), however, the Supreme Court created an exception to the general prohibition on federal taxpayer standing.  In Flast, the Supreme Court held that federal taxpayers had standing to challenge a statute which funded education and instruction materials in religious schools

9

on the ground that it violated the Establishment Clause. The
*Flast* decision has since been cited for the general proposition
that taxpayer plaintiffs have standing when they allege that an
exercise of congressional power under the Taxing and Spending
Clause violates the Establishment Clause of the First Amendment.
See, e.g., DaimlerChrysler, 547 U.S. at 348; United States v.
Richardson, 418 U.S. 166, 173 (1974).

The federal defendants argue that plaintiffs' challenge
falls outside of *Flast*'s limited exception because tax exemptions
and deductions are not "expenditures" of government funds as was
the case in *Flast*. See DaimlerChrysler, 547 U.S. at 348 (stating
that the *Flast* Court discerned in the history of the
Establishment Clause "the specific evils feared by [its drafters]
that the taxing and spending power would be used to favor one
religion over another or to support religion in general" and that
the "injury" alleged in Establishment Clause challenges to
federal spending is the very "extract[ion] and spen[ding]" of
"tax money" in aid of religion alleged by a plaintiff (quoting
*Flast*, 392 U.S. at 103, 106)).

The Supreme Court, however, has "refused to make
artificial distinctions between direct grants to religious
organizations and tax programs that confer special benefits on
religious organizations." Winn v. Ariz. Christian Sch. Tuition
Org., 562 F.3d 1002, 1009 (9th Cir. 2009) (citing cases).
Rather, the Court has recognized that tax policies such as tax
credits, exemptions, and deductions can have "an economic effect
comparable to that of aid given directly" to religious
organizations. Mueller v. Allen, 463 U.S. 388, 399 (1983). Just

10

as <u>Flast</u> recognized the taxpayer injury from having tax revenues directly flow to religious organizations, the Court has also noted that "[e]very tax exemption constitutes a subsidy that affects nonqualifying taxpayers, forcing them to become 'indirect and vicarious donors.'" <u>Tex. Monthly, Inc. v. Bullock</u>, 489 U.S. 1, 14 (1989) (plurality opinion) (quoting <u>Bob Jones Univ. v. United States</u>, 461 U.S. 574, 591 (1983)) (internal quotation marks omitted); <u>see</u> <u>Regan v. Taxation With Representation of Wash.</u>, 461 U.S. 540, 544 (1983) ("Both tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income.").

The Supreme Court has decided countless cases where a tax credit, deduction, or exemption was alleged to violate the Establishment Clause and either did not address the issue of taxpayer standing or affirmatively decided that the challengers did have standing. <u>See, e.g.</u>, <u>Hibbs v. Winn</u>, 542 U.S. 88 (2004) (state taxpayer challenge to state tax credits for payments to nonprofit "school tuition organizations" that award scholarships to students in private schools is not prevented by Tax Injunction Act); <u>Tex. Monthly</u>, 489 U.S. 1 (1989) (nonreligious periodical had standing to challenge state tax exemption for religious periodicals); <u>Mueller</u>, 463 U.S. 388 (state taxpayer challenge to state tax deduction for expenses incurred in providing tuition, textbooks, and transportation to school children); <u>Comm. for Pub. Educ. & Religious Liberty v. Nyquist</u>, 413 U.S. 756 (1973) (state taxpayer challenge to New York tax credits and deductions for

expenses related to attending nonpublic schools); see also Winn, 562 F.3d at 1010-11 (citing cases).  While this court must of course satisfy itself that plaintiffs have standing to bring their suit, it is not irrelevant that many similar cases have worked their way up to the Supreme Court.

Nor is there, as the federal defendants argue, any meaningful distinction between tax deductions or exclusions and tax credits.  Tax credits--like those at issue in Winn--are dollar-for-dollar reductions in tax liability.  The Arizona tax credit challenged in Winn effectively gave state taxpayers a choice: pay taxes to the state or give money to a student tuition organization ("STO").  Taxpayer donations to STOs were "free" because they directly offset taxes due, and the Ninth Circuit determined that the Arizona credit was essentially a state-created grant program.  Winn, 562 F.3d at 1010.  The Winn panel stated that the tax credit was a "powerful legislative device for directing money to private organizations," id. at 1009, and rejected the argument that the money was "not publicly subsidized simply because it does not pass through the treasury."  Id. at 1009-10.

These conclusions hold equal weight with respect to tax deductions and exemptions.  In their effort to distinguish the instant case from Winn, the federal defendants correctly note that tax exemptions and deductions[3] do not create dollar-for-

[3]    Tax exemptions are amounts never entered into the calculation of taxable income whereas tax deductions are amounts subtracted from taxable income after it has been calculated.  Tax deductions and exemptions have the same financial effect on taxpayers of reducing the amount of income subject to taxation.

12

dollar reductions in tax liability. Rather, they reduce tax
liability by a percentage directly related to one's income tax
bracket. The deductions and exemptions plaintiffs challenge in
this case provide benefits to "ministers of the gospel" by
allowing them to exempt from taxable income the value of their
housing allowance and to deduct mortgage interest and property
tax expenses from taxable income. These benefits reduce a
minister's would-be tax burden by a percentage of the value of
his or her housing and related expenses. They also, as explained
further below, benefit churches by reducing the cost of hiring
ministers. Whether the benefit is a one-hundred-percent subsidy
of ministers' housing costs or only a partial subsidy is
irrelevant. The effect of either is comparable to what the Ninth
Circuit in <u>Winn</u> considered to be an impermissible grant program,
although admittedly of different amounts.

Finally, the federal defendants quote <u>Walz v. Tax
Commission of New York</u>, 397 U.S. 664 (1970), for the proposition
that tax exemptions cannot confer <u>Flast</u> standing on taxpayers.
Yet in <u>Walz</u> the Supreme Court did not address the challengers'
standing. Rather, the Court evaluated the merits of the
Establishment Clause challenge presented. <u>Walz</u> therefore does
not provide support for the federal defendants' position that
plaintiffs lack standing.

In sum, <u>Flast</u> has never been interpreted to be so
limited as to prohibit plaintiffs from challenging tax benefits
that by their very terms accrue only to certain religious
authorities simply because the government has chosen to provide
financial aid through exclusions or exemptions from taxable

13

income under the tax code rather than though direct grants.  The
court declines to so hold today.  Plaintiffs have therefore
established that they have standing as federal taxpayers to
challenge §§ 107 and 265(a)(6) of the Internal Revenue Code for
allegedly violating the Establishment Clause.

### b.  State Taxpayer Standing

The Supreme Court recently clarified state taxpayer
standing limits in DaimlerChrysler, stating that the general
prohibition on federal taxpayer standing "applies with
undiminished force to state taxpayers."  547 U.S. at 345.  The
Court specifically addressed and rejected the Ninth Circuit's
criteria--most prominently articulated in Hoohuli v. Ariyoshi,
741 F.2d 1169 (9th Cir. 1984)--for determining whether a state
taxpayer met the Doremus v. Board of Education of Borough of
Hawthorne, 342 U.S. 429 (1952), "good-faith pocketbook" test for
whether a taxpayer had standing to sue.  DaimlerChrysler, 547
U.S. at 346 & n.4 ("[W]e hold that state taxpayers have no
standing under Article III to challenge state tax or spending
decisions simply by virtue of their status as taxpayers.").
While prior Ninth Circuit case law interpreting Doremus may have
articulated different tests for state and federal taxpayer
standing, DaimlerChrysler applies federal taxpayer standing
restrictions to state taxpayers as well.  See Arakaki v. Lingle
("Arakaki II"), 477 F.3d 1049, 1061-63 (9th Cir. 2007) (noting
that DaimlerChrysler effectively overruled Hoohuli).
Stanislaus's reliance on Doremus, Arakaki v. Lingle, 423 F.3d 954
(9th Cir. 2005), Hoohuli, and Cammack v. Waihee, 932 F.2d 765
(9th Cir. 1991), therefore, is misplaced in light of

14

DaimlerChrysler.

While the Supreme Court has never decided the issue of whether a state tax benefit was "analogous to an exercise of congressional power under Article 1, § 8," DaimlerChrysler, 547 U.S. at 347, the Ninth Circuit in Winn specifically noted that state tax credits constituted exercises of the state's taxing and spending powers. See 562 F.3d at 1008. Furthermore, as the court has previously discussed, the Supreme Court has repeatedly heard and decided state taxpayer suits challenging state tax credits, exemptions, and deductions under the Establishment Clause and analyzed them according to the Flast test. See Hibbs, 542 U.S. 88, Tex. Monthly, 489 U.S. 1, Mueller, 463 U.S. 388.[4]

Because, as explained above, plaintiffs have successfully alleged an Establishment Clause violation that meets Flast's strict dictates, plaintiffs have likewise established that they have standing as state taxpayers to challenge sections 17131.6 and 17280(d)(2) of the California Revenue and Taxation Code for allegedly violating the Establishment Clause.

B.   Motions to Dismiss for Failure To State a Claim

On a motion to dismiss, the court must accept the allegations in the complaint as true and draw all reasonable

---

[4]     Federal courts have also decided challenges to state tax benefits under the Equal Protection Clause of the Fourteenth Amendment.  See Hibbs, 542 U.S. at 93-94 ("It is hardly ancient history that States, once bent on maintaining racial segregation in public schools, and allocating resources disproportionately to benefit white students to the detriment of black students, fastened on tuition grants and tax credits as a promising means to circumvent Brown v. Board of Education, 347 U.S. 483 (1954). The federal courts, this Court among them, adjudicated the ensuing challenges, instituted under 42 U.S.C. § 1983, and upheld the Constitution's equal protection requirement.") (internal citation omitted).

inferences in favor of the plaintiff.  <u>Scheuer v. Rhodes</u>, 416

U.S. 232, 236 (1974), <u>overruled on other grounds by</u> <u>Davis v.</u>

<u>Scherer</u>, 468 U.S. 183 (1984); <u>Cruz v. Beto</u>, 405 U.S. 319, 322

(1972).  To survive a motion to dismiss, a plaintiff needs to

plead "only enough facts to state a claim to relief that is

plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct.

1955, 1974 (2007).  This "plausibility standard," however, "asks

for more than a sheer possibility that a defendant has acted

unlawfully," and where a complaint pleads facts that are "merely

consistent with" a defendant's liability, it "stops short of the

line between possibility and plausibility." <u>Ashcroft v. Iqbal</u>,

129 S. Ct. 1937, 1949 (2009) (quoting <u>Twombly</u>, 550 U.S. at

556-57).  When ruling on a motion to dismiss, a court's inquiry

is generally limited to the facts alleged in the complaint and

"documents whose contents are alleged in the complaint and whose

authenticity no party questions, but which are not physically

attached to the plaintiff's pleading."[5] <u>Branch v. Tunnell</u>, 14

F.3d 449, 454 (9th Cir. 1994), <u>overruled on other grounds by</u>

<u>Galbraith v. County of Santa Clara</u>, 307 F.3d 1119 (9th Cir.

2002); <u>accord</u> <u>Anderson v. Angelone</u>, 86 F.3d 932, 934 (9th Cir.

1996).

     The Establishment Clause of the First Amendment

---

[5]     Stanislaus objects to Exhibits 6, 7, 8, 9, and 11
attached to the affidavit of Richard L. Bolton as violating Rules
802 and 807 of the Federal Rules of Evidence.  Those exhibits are
newspaper articles offered for the truth of the matters therein
asserted.  Because the exhibits objected to by Stanislaus are not
properly subject to judicial notice, the court will not consider
them in evaluating defendants' motions to dismiss.  <u>See</u> <u>Barron v.</u>
<u>Reich</u>, 13 F.3d 1370, 1377 (9th Cir. 1994).

16

provides that "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. Amend. I.   In Lemon v. Kurtzman, 403 U.S. 602 (1971), the Supreme Court articulated a three-pronged test with which to evaluate whether federal or state statutes violate the Establishment Clause. **First**, the statute must have a secular legislative purpose; **second**, its principal or primary effect must be one that neither advances nor inhibits religion; and **third**, the statute must not foster an excessive government entanglement with religion.   Id. at 612-13.

a.   IRC § 107

A statute is unconstitutional if it fails to satisfy any prong of the Lemon test.   Because, for the reasons discussed below, the court finds that plaintiffs have sufficiently alleged that § 107 fails to satisfy the second prong in that it has the unconstitutional effect of advancing religion, the court need not address the first or third prongs of Lemon dealing with the legislative purpose of the statute or whether it promotes excessive government entanglement with religion.

The second prong of the Lemon test investigates whether Congress's action has a "principal or primary effect . . . that . . . advances [or] inhibits religion."   403 U.S. at 612. "Governmental action has the primary effect of advancing or disapproving of religion if it is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices."   Vasquez v. Los Angeles County, 487 F.3d 1246, 1256 (9th Cir. 2007) (internal citation and

17

quotation marks omitted).  This is an objective test, asking whether a reasonable observer who is "informed . . . [and] familiar with the history of the government practice at issue," would perceive the action as having a predominately non-secular effect.  <u>Id.</u> (alteration in original) (internal citation and quotation marks omitted).

To determine whether the primary message had a disapproving effect on religion, the restriction must be viewed "as a whole."  <u>Am. Family Ass'n, Inc. v. City & County of San Francisco</u>, 277 F.3d 1114, 1122 (9th Cir. 2002); <u>see</u> <u>Lynch v. Donnelly</u>, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring). The court therefore evaluates § 107 within the context of the entire IRC.  While courts are "reluctant to attribute unconstitutional motives to government actors in the face of a plausible secular purpose," <u>Kreisner v. City of San Diego</u>, 1 F.3d 775, 782 (9th Cir. 1993) (quoting <u>Mueller</u>, 463 U.S. at 394-95), no such presumption applies in the second <u>Lemon</u> prong analysis. Even assuming that, as the federal defendants argue, Congress had the legitimate <u>purpose</u> of avoiding excessive entanglement and involvement with religion in passing § 107, the court must nevertheless determine what § 107 actually accomplishes.  <u>See</u> <u>Lynch</u>, 465 U.S. at 690 (O'Connor, J., concurring).

The federal defendants first argue that "[t]he grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." <u>Walz</u>, 397 U.S. at 675; <u>see</u> <u>id.</u> ("There is no genuine nexus between tax exemption and the establishment of religion. . . . It restricts the fiscal

relationship between church and state, and tends to complement and reinforce the desired separation insulating each from the other."). But see Tex. Monthly, 489 U.S. at 14 (invalidating sales tax exemption for wholly religious publications).

While Walz uses sweeping language, the Supreme Court has recognized that the breadth of a tax exemption is important when evaluating Establishment Clause challenges. Id. (noting that the tax exemption in Walz was broadly applied to property of charitable and otherwise socially beneficial organizations). Since Walz, the Supreme Court has also recognized that tax exemptions and deductions provide real benefits to religion comparable to direct grants that can run afoul of the Establishment Clause. See, e.g., id.; Mueller, 463 U.S. at 399; Bob Jones Univ., 461 U.S. at 591; Regan, 461 U.S. at 544; see also Winn, 562 F.3d at 1009. Walz, therefore, does not control.

Plaintiffs allege that § 107 provides an exclusive benefit to "ministers of the gospel." Specifically, although § 119 allows non-minister taxpayers who receive employer-provided housing for the "convenience of the employer" to exclude the value of that housing from taxable income, § 107 provides for tax-exempt housing and housing allowances for all ministers regardless of whether they would qualify for the "convenience of the employer" requirement from § 119. Ministers can thus claim the exemption under § 107 regardless of whether they must live in their parsonage as a condition of employment and regardless of where the parsonage is located. In essence, § 107 provides a blanket exemption from taxable income for ministers' housing that is not available to similarly situated secular employees.

19

1  Moreover, ministers can now also receive a housing
2  allowance tax-free under § 107(2)--a benefit that no taxpayer can
3  claim under § 119.[6]  No longer must ministers live in a parsonage
4  on or near church property; rather, ministers can collect the
5  allowance tax-free and provide their own housing anywhere they
6  choose.  This benefit clearly goes beyond the limited exemption
7  carved out in § 119 for employer-provided housing on business
8  premises in which employees are required to live.  While the
9  purpose of passing § 107(2) may well have been to equalize tax
10 treatment among religions and congregations, plaintiffs'
11 allegations that the cumulative effect of § 107 clearly goes
12 beyond merely putting ministers on an "equal footing" with
13 secular taxpayers cross "the line between possibility and
14 plausibility."  Iqbal, 129 S. Ct. at 1949.

15      It is not difficult to see how § 107 also provides a
16 direct and exclusive benefit to religion itself: churches can pay
17 ministers lower salaries because part of their salary is not
18 subject to tax.  A minister who receives use of a parsonage tax
19 free or who receives a tax-free housing allowance has a greater
20 net income than a similarly situated secular employee who must
21 pay taxes on the rental value of the employer-provided home or on
22 the housing allowance.  Churches, therefore, can either pay
23 ministers the same salaries as similarly situated secular workers
24 with the effect of giving ministers a greater post-tax income, or

25

26      [6]   In 1954, Congress added what is now § 107(2) to the
27 ministerial housing exemption from taxable income: ministers
   could then exclude from taxable income a "rental allowance" if
28 they received that in lieu of a parsonage.  Pub. L. No. 591, ch.
   736, § 107, 68A Stat. 3, 32.

they can pay ministers lower salaries than similarly situated secular employers with the effect of giving ministers an equivalent post-tax income. While § 107 is a tax exemption to be claimed by ministers, churches as employers clearly benefit by being able to pay their ministers more, for less. The financial effect of the exemption is the same as if the government were giving direct subsidies to ministers or churches to hire ministers. See Regan, 461 U.S. at 544.

The court recognizes that exclusive benefits to religion are not per se unconstitutional. Walz, 397 U.S. at 673. Rather, courts must determine whether an exclusive benefit crosses the line between permissible accommodation and unconstitutional fostering of religion. See Amos, 483 U.S. at 334-35. Recognizing that tension exists between the Free Exercise and Establishment Clauses of the First Amendment, the Supreme Court has repeatedly said that "there is room for play in the joints between the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." Cutter v. Wilkinson, 544 U.S. 709, 713 (2005) (quoting Locke v. Davey, 540 U.S. 712, 718 (2004)) (internal quotation marks omitted).

Cases that have upheld exclusive religious exemptions from generally applicable statutes provide a good guide as to what types of accommodation are permissible and what types are not. In Amos, Congress had previously exempted religious organizations from part of Title VII of the Civil Rights Act of 1964 that forbade employment discrimination on the basis of

religion only with respect to religious activities of those
organizations.  483 U.S. at 335-36.  Congress later expanded that
exemption to cover the secular activities of religious
organizations as well because it would significantly burden
religious organizations to predict which of its activities a
court would consider to be religious and which activities secular
for purposes of establishing Title VII liability.  Id.

  The statute at issue in Cutter likewise removed the
state-imposed deterrent to the free exercise of religion inherent
when the state incarcerates persons by increasing protection for
prisoners' right to practice their religion.  544 U.S. 709.  Even
the cases the federal defendants cite in support of their
position that § 107 is a reasonable accommodation of religion
relate to government-imposed burdens on religious practice.  See
Zorach v. Clauson, 343 U.S. 306 (1952) (city statute allowing
public school students to be released from school attendance to
attend religious classes is a constitutional accommodation);
Arver v. United States, 245 U.S. 366 (1918) (military draft
exemption for ministers and theological students is a
constitutional accommodation).  Section 107 imposes no such
burden.

  Some taxes can indeed infringe on Free Exercise rights.
See, e.g., Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105
(1943) (solicitation license tax).  The Supreme Court has
repeatedly recognized, however, that the payment of a generally
applicable tax does not implicate the Free Exercise Clause just
because religion must make payments in support of the state.
See, e.g., Jimmy Swaggart Ministries v. Bd. of Equal. of Cal.,

22

493 U.S. 378, 391 (1990) (general sales and use tax does not impose a "constitutionally significant" burden on religion to the extent that it "merely decreases the amount of money" the tax-paying entity has to spend on religious activities) (citing Hernandez v. Comm'r, 490 U.S. 680, 699 (1980)); Hernandez, 490 U.S. at 700 (rejecting the argument that "an incrementally larger tax burden interferes with [] religious activities" because "[t]his argument knows no limitation"); Follett v. Town of McCormick, S.C., 321 U.S. 573, 578 (1944), (reiterating that a preacher is not "free from all financial burdens of government, including taxes on income or property," and "like other citizens, may be subject to general taxation").  The exclusive benefit to ministers and religion provided in § 107, therefore, cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion.

The federal defendants also argue that § 107 is a natural outgrowth of the historical tradition of exempting church property from taxation.  See Walz, 397 U.S. at 677.  The federal defendants correctly note that there is a historical precedent for the state exempting church property from taxation that precedes the Republic, and such exemptions have been found not to violate the Establishment Clause.  Id. at 667 & n.1.  But see id. at 678 ("[N]o one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.").

Indeed, property tax exemptions serve the important purpose of keeping government out of the undesirable--and

23

constitutionally questionable--position of having to foreclose on church property for the nonpayment of taxes. See id. There is no evidence, however, that income tax exemptions for employees of religious organizations share a similar historical tradition or serve a similarly important government purpose. While the income exempted from taxation under § 107 is that allocated to a minister's housing expenses, there is no real connection to the property of the church. To the contrary, § 107(2) completely severs any tie that might have existed between a church's property and the ministerial housing allowance, as ministers now may receive an exemption for housing allowances received and used to pay for housing that is not owned by the church. Plaintiffs therefore plausibly allege that § 107's connection with religious property is too attenuated to fall under the constitutional protection afforded property tax exemptions.

Finally, the federal defendants argue that the effect of § 107 is to avoid a potential Establishment Clause problem of excessive entanglement with religion. It is true that actions taken to avoid potential Establishment Clause violations have a legitimate secular purpose under Lemon. Nurre v. Whitehead, 580 F.3d 1087, 1095 (9th Cir. 2009); Vasquez, 487 F.3d at 1255; see Amos, 483 U.S. at 335 ("Under the Lemon analysis, it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions."). It would follow that some--but not all--of such actions taken would also have the permissible secular effect of avoiding Establishment Clause violations.

Some efforts that have a legitimate secular purpose will, however, go too far and cross the line between accommodation and establishment.  See Amos, 483 U.S. at 334-35. Such is what plaintiffs allege in this case.  Regardless of Congress's motive in passing § 107 and regardless of whether § 107 has an effect of reducing government entanglement with religion by keeping ministers out of the § 119 exemption,[7] plaintiffs have alleged sufficient facts which, if accepted as true, "leave open the possibility" that an objective observer would determine that § 107 goes too far in aiding and subsidizing religion by providing ministers and churches with tangible financial benefits not allowed secular employers and employees. Winn, 562 F.3d at 1012.

In sum, the court believes that plaintiffs have sufficiently alleged that a reasonable and objective observer would perceive § 107 as endorsing religion and as having a predominantly non-secular effect.  At this stage in the proceedings, it is not implausible on the face of plaintiffs' Complaint that § 107 fails to satisfy the second prong of the Lemon test.  Plaintiffs have therefore stated facts sufficient to withstand a motion to dismiss on their challenge to the enforcement of § 107.

b.  IRC § 265(a)(6)

Plaintiffs allege that § 265(a)(6) impermissibly lets ministers "double dip" in that they can receive a housing

---

[7]    The court need not speculate as to how Congress might choose to provide ministers with tax-free housing should § 107 be found unconstitutional.

allowance tax free under § 107, use that allowance to purchase a home, and receive another tax deduction under § 265(a)(6) for the interest paid on the mortgage.[8]  Looking to the three prongs of the <u>Lemon</u> test, first, it is clear first from the face of § 265(a)(6) that its purpose is to encourage ministers and military members who receive tax-free housing allowances to purchase a home, which is a permissible secular purpose and effect.  This is the same incentive provided to every other American under § 163(h) and property tax deductions under § 164.  Plaintiffs also have not cited any facts that would support an inference that Congress had a predominantly religious purpose when it passed § 265(a)(6).

Further, with respect to § 265(a)(6), there is substantial legislative history to shed light on Congress's intent.  Section 265(a)(6) was passed in 1986 in the Tax Reform Act of 1986, Pub. L. No. 99-514, apparently in response to a Revenue Ruling which held that, unlike other taxpayers who generally have the ability to deduct home mortgage interest and property tax payments from taxable income, ministers and military personnel who received tax-exempt housing allowances were not allowed deductions for home mortgage interest and real property taxes under § 265(a)(1).  Rev. Rul. 83-3, 1983-1 C.B. 72; <u>see</u> <u>Induni v. Comm'r</u>, 990 F.2d 53, 56 (2d Cir. 1993).  The United States Senate Finance Committee report on the Act stated that the reason for changing § 265 to include § 265(a)(6) was because "it is appropriate

_____

[8]    If § 107 is found unconstitutional as this court has indicated, then plaintiffs' challenge to § 265(a)(6) is moot as there would be no "double dipping."  The court nevertheless addresses plaintiffs' claims.

to continue the long-standing tax treatment with respect to deductions for mortgage interest and real property taxes claimed by ministers and military personnel who receive tax-free housing allowances." S. Rep. No. 99-313, 61 (1985).

Second, plaintiffs have not alleged sufficient facts to show that an objective observer would determine that the predominant effect of § 265(a)(6) is to do anything other than give ministers and military members the same incentive as every other American to purchase a home. The fact that ministers receive their housing allowances tax-free and that therefore receive some additional benefit from deducting property taxes and mortgage interest payments is incidental to the predominant secular effect of giving ministers the same incentive as other Americans to purchase a home.

Plaintiffs do not dispute that § 265(a)(6) has an effect of encouraging home ownership; rather, they focus on the financial benefits ministers receive as a result of this government policy. While it is true that ministers receive a benefit by being able to "double dip," exclusive benefits are not per se impermissible. See Tex. Monthly, 489 U.S. at 15.

Third, plaintiffs Complaint does not appear to allege, nor does the court discern, that § 265(a)(6) fosters an excessive government entanglement with religion. For the foregoing reasons, defendants' motion to dismiss plaintiffs' claim with respect to § 265(a)(6) will be granted.

b.   California Revenue & Taxation Code Sections

Plaintiffs' allegations with regard to sections 17131.6 and 17280(d)(2) of the California Revenue and Taxation Code,

which incorporate, respectively, §§ 107 and 265(a)(6) of the IRC with insignificant changes,[9] are substantially the same as their arguments that §§ 170 and 265(a)(6) violate the Establishment Clause, and Stanislaus's motion adds nothing to distinguish the issues with respect to the state statutes from those with respect to §§ 107 and 265(a)(6).  Accordingly, for the reasons discussed above, the court will deny defendant Stanislaus's motion to dismiss with respect to section 17131.6 and grant its motion with respect to section 17280(d)(2) of the California Revenue and Taxation Code.

IT IS THEREFORE ORDERED that defendant Stanislaus's motion to dismiss be, and the same hereby is, GRANTED with respect to plaintiffs' claims under the California constitution and with respect to plaintiffs' claim challenging California Revenue and Taxation Code section 17280(d)(2), and DENIED in all other respects.

IT IS FURTHER ORDERED that the federal defendants' motion to dismiss be DENIED with respect to plaintiffs' claim challenging IRC § 107 and GRANTED with respect to plaintiffs' claim challenging IRC § 265(a)(6).

DATED:  May 21, 2010

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[9]     At oral argument, counsel for Stanislaus represented that section 17131.6, unlike its federal counterpart, contains no limitation on the amount that a minister may claim as a housing allowance.  This, if anything, would strengthen plaintiffs' claims that California is impermissibly benefitting religion.